1  KAREN P. HEWITT
   United States Attorney
2  GEORGE V. MANAHAN
   Assistant U.S. Attorney
3  California State Bar No. 239130
   United States Attorney's Office
4  Federal Office Building
   880 Front Street, Room 6293
5  San Diego, California  92101-8893
   Telephone: (619) 557-7174
6
   Attorneys for Plaintiff
7  UNITED STATES OF AMERICA

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,     )    CRIMINAL CASE NO. 3:08-CR-01761-JM (AJB)
                                  )
12                                )    DATE:      June 11, 2008
                 Plaintiff,       )    TIME:       9:00 a.m.
13                                )
                                  )    GOVERNMENT'S RESPONSE AND
14       v.                       )    OPPOSITION TO DEFENDANTS' MOTIONS:
                                  )    TO DISMISS THE INFORMATION; AND
15                                )    TO SUPPRESS STATEMENTS;
    JAVIER GARCIA-VILLEGAS,       )
16                                )    AND GOVERNMENT'S RESPONSE TO
              Defendant.          )    DEFENDANT'S MOTIONS:
17                                )    TO COMPEL DISCOVERY; AND
                                  )    FOR LEAVE TO FILE FURTHER MOTIONS;
18                                )
                                  )    TOGETHER WITH A STATEMENT OF THE
19                                )    FACTS AND THE MEMORANDUM OF
                                  )    POINTS AND AUTHORITIES, AND
20  _____)    GOVERNMENT'S MOTIONS FOR:

21                                     RECIPROCAL DISCOVERY

22

23          COMES NOW, the plaintiff, UNITED STATES OF AMERICA, by and through its counsel,

24  Karen P. Hewitt, United States Attorney, and George V. Manahan, Assistant United States Attorney, and

25  hereby files its Response and Opposition to Defendant's Motion to Dismiss and to Suppress Statements,

26  its response to Defendant's motions for Discovery and for leave to file further motions, and its Motion

27  for Reciprocal Discovery.  This response and motion is based upon the files and records of the case

28  together with the attached statement of facts and memorandum of points and authorities and exhibits.

I

## STATEMENT OF THE CASE

On May 22, 2008, the Government filed a complaint charging Javier Garcia-Villegas ("Defendant") with illegal entry into the United States (misdemeanor) in violation of 8 U.S.C. § 1325. On May 23, 2008, Defendant made his initial appearance. On May 29, 2008, the Government filed a one-count information charging Defendant with attempted illegal entry into the United States (misdemeanor) in violation of 8 U.S.C. § 1325. Also on May 29, 2008, Defendant was arraigned on the information and entered a plea of not guilty. On June 9, 2008, contemporaneous with the filing of this motion, the Untied States filed a superceding information.

II

## STATEMENT OF FACTS

On May 21, 2008, Border Patrol Agent Andrew Kim was performing line watch duties in Imperial Beach, California, in an area know as "Druckers," approximately 5 miles east of the San Ysidro Port of Entry and 30 yards north of the International Border. At approximately 5:39 p.m., a Remote Video Surveillance System operator advised Agent Kim of two individuals heading north from the International Boundary Fence. Following his arrival in the described area, Agent Kim observed an individual returning back to Mexico. Subsequently, the RVSS operator advised Agent Kim that the other individual had gotten past the concertina wire and entered the truck lanes just north of the secondary fence. Agent Kim soon thereafter discovered an individual attempting to conceal himself in a nearby bush along the truck lane. Agent Kim identified himself as a United States Border Patrol Agent and asked the individual, later identified as Defendant, to come out. After handcuffing Defendant and performing a patdown, Agent Kim asked Defendant his country of citizenship. Defendant responded by admitting he was born in Mexican and that he did not have any immigration documents permitting him to enter or remain in the United States legally. Agent Kim arrested Defendant and had him transported to the Imperial Beach Border Patrol Station for processing.

Subsequent to his arrival at the Imperial Beach Border Patrol Station, Defendant was advised of his administrative rights with regards to removal proceedings by Border Patrol Agent Ramon Villarreal. Approximately 40 minutes later, at approximately 8:10 p.m., Agent Villarreal told Defendant that the

08-CR-1761

nature of the proceedings against him had changed, in that he was now accused of committing a federal crime, and therefore Defendant had different rights. At approximately 8:12 p.m., Defendant received <u>Miranda</u> warnings from Agent Villarreal and agreed to answer questions. Specifically, the following conversation occurred between Agent Villarreal and Defendant:

Agent Villarreal:    [Y]ou were previously informed of your rights, in which you asked to to [sic] return to your country as soon as possible. You should understand that those rights only apply in Immigration proceedings for removing you from the United States. Now you should understand that there has been a change in which you will not be returned to your country at this time. Eh, instead now you will be tried for a federal crime. Do you understand what I have just explained?

Defendant:    Yes. . . .

Agent Villarreal:    Sir, before we ask you any question, you should understand your rights. You have the right to remain silent. Anything that you say can be used against you in court or in any Immigration or administrative proceeding. You have the right to speak with an attorney so that he may counsel you before we ask you questions, and he can be present during the questioning. If you do not have the means to hire an attorney, one will be designated before any questioning if you so desire. If you decide to answer questions now, without the presence of an attorney, you still will have the right to quit answering questions whenever you want. You also have the right to quit answering questions whenever you want until you can speak with an attorney. Do you understand your ... your rights?

Defendant:    Yes.

Agent Villarreal:    Are you willing to waive these rights and speak with me?

Defendant:    Yes. . . .

3

1
2

| Agent Villarreal: | Are you willing to answer my questions at this ... at this time without the presence of an attorney? |

3

| Defendant: | Yes. |

4 See Bilingual Transcription and Translation, Interview on Digital Video File, prepared by Andrew J.

5 Hanson, Certified Interpreter by the Administrative Office of the United States Courts (Cert. # 95-036),

6 at 3-5 (Attached as Ex. 1). Defendant subsequently stated that he is a citizen of Mexico and that he did

7 not possess any documents allowing him to enter the United States. (Id. at 5-6.) According to

8 Defendant, he entered the United States from Mexico illegally approximately 3 hours before by climbing

9 over the fences separating the two countries. (Id. at 7.)

10 **III**

11 **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS THE**

12 **INFORMATION**

13 **(1) The Information Does Not Fail To Allege An Essential Element**

14 Defendant argues, citing United States v. Resendiz-Ponce, 549 U.S. 102 (2007), that the

15 information charging Defendant with attempted illegal entry must be dismissed for failure to allege that

16 Defendant committed an overt act. The Ninth Circuit, interpreting Resendiz-Ponce, has rejected this

17 exact argument. See United States v. Flores-Sanchez, 477 F.3d 1089, 1091 (9th Cir. 2007). As the

18 Flores-Sanchez court explained, the Supreme Court concluded that "the word 'attempt' carries with it

19 an implied allegation of an overt act in furtherance of the charged attempt," such that indictments or in

20 formations that charge an attempt crime without expressly alleging an overt act "satisfy the requirement

21 of Federal Rule of Criminal Procedure 7(c)(1) that an indictment [or information] 'shall be a plain,

22 concise, and definite written statement of the essential facts constituting the offense charged.'" Id.

23 Accordingly, the Court should deny Defendant's motion to dismiss based on the failure to allege an overt

24 act.

25 **(2) The Information is Not Unduly Duplicitous**

26 Defendant also argues that the information should be dismissed because it is duplicitous. An

27 information is duplicitous where a single count joins two or more distinct and separate offenses. See

28 United States v. Ramirez-Martinez, 273 F.3d 903, 913 (9th Cir.2001), overruled on other grounds by

1  United States v. Lopez, 484 F.3d 1186, 1191 (9th Cir.2007). The information charges Defendant with

2  violating subsections (1) and (2) of 18 U.S.C. § 1325(a).[1/] Rules restricting duplicity are merely pleading

3  rules, however, the violation of which is not fatal to a charging document. See id. at 915. Rather, a

4  defendant indicted pursuant to a duplicitous indictment may be properly prosecuted and convicted by

5  a jury if either (1) the government elects between the charges in the offending count, or (2) the court

6  provides an instruction requiring all members of the jury to agree as to which of the distinct charges the

7  defendant actually committed. See id. In the instant case, however, Defendant is not entitled to a jury

8  trial, but rather is to be tried before a Magistrate Judge. Therefore, there is no need for an instruction

9  to determine which of the distinct charges the defendant actually committed, the Magistrate Judge will

10  have no difficulty determining whether Defendant is guilty of violating 1325(a)(1) and/or 1325(a)(2).

11  However, in an abundance of caution, and without admitting any error, the United States will file

12  concurrently with this motion a superceding information charging Defendant with one count each of

13  violating 1325(a)(1) and (a)(2). According, for all of these reasons, the Court should deny Defendant's

14  motion to dismiss.

15                                                    **IV**

16  **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

17  **DEFENDANT'S ADMISSIONS**

18          Defendant moves to suppress admissions made by him to United States agents in the field prior

19  to be taken into custody, and at the Border Patrol station after receiving Miranda warnings. Such

20  motions necessarily require a predicate factual finding, and therefore require a supporting declaration

21  to be filed in conjunction with the motion. See CrimLR 47.1(g)(1). No required declaration has been

22  filed to support Defendant's arguments, and according the Court should deny them.

23          **(1) Defendant's Field Admissions Were Made During a Terry Stop**

24          Defendant argues that statements made by him in the field to Agent Kim were made while in

25  custody and therefore should be suppressed as Miranda's requirements were not met. A Border Patrol

26

27          [1/] 18 U.S.C. § 1325(a)(1) and (2) prohibits an "alien who (1) enters or attempts to enter the
United States at any time or place other than as designated by immigration officers, or (2) eludes
28  examination or inspection by immigration officers." While the United States agrees that these constitute
two distinct offenses, it disagrees with Defendant's argument that they constitute four.

officer, however, may question individuals reasonably detained near the border about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, as part of a <u>Terry</u> stop without requiring <u>Miranda</u> warnings. <u>See United States v. Cervantes-Flores</u>, 421 F.3d 825, 829-30 (9th Cir. 2005); <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 881-82 (9th Cir. 1975). An officer may conduct a limited protective "patdown" search of a suspect for concealed weapons during a <u>Terry</u> stop if there is a reason to believe the suspect may have a weapon. <u>See United States v. Mattarolo</u>, 209 F.3d 1153, 1158 (9th Cir. 2000). The Court should conclude that Defendant's admissions to Agent Kim were obtained as part of a <u>Terry</u> stop and deny Defendant's motion to suppress.

The safeguards prescribed by <u>Miranda</u> become applicable when a suspect's freedom of action is curtailed to a degree associated with formal arrest. <u>See Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984). "There is 'no bright-line for determining when an investigatory stop crosses the line and becomes an arrest,'" although "a distinction . . . may be drawn at the point of transporting the defendant to the police station." <u>United States v. Parr</u>, 843 F.2d 1228, 1231 (9th Cir. 1988); <u>see also Gallegos v. City of Los Angeles</u>, 308 F.3d 987, 992 (9th Cir. 2002) (no rigid time limitation on Terry stops, critical inquiry is whether officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions). Courts are instructed to considered the totality of the circumstances in determining whether a <u>Terry</u> stop has escalated to the point of the defendant being under arrest. <u>See United States v. Alvarez</u>, 899 F.2d 833, 838 (9th Cir. 1990). The use of force by an officer does not necessarily convert a <u>Terry</u> stop into the defendant being taken into custody, and thus does not necessarily require that <u>Miranda</u> warnings be given, if it is reasonable under the circumstances because of the risk of a physical confrontation or the suspect fleeing. <u>See Cervantes-Flores</u>, 421 F.3d at 830 (handcuffing suspect did not convert <u>Terry</u> stop questioning into a custodial interrogation); <u>see also</u>; <u>Parr</u>, 843 F.2d at 1231 (placing suspect in police car did not convert a <u>Terry</u> stop into defendant being in custody); <u>United States v. Buffington</u>, 815 F.2d 1292, 1300 (9th Cir. 1987) (forcing suspects to exit car and lie down on wet pavement at gunpoint did not convert <u>Terry</u> stop into arrest); <u>United States v. Greene</u>, 783 F.2d 1364, 1367-68 (9th Cir. 1986) (officers instructing suspects to put their hands on a car and drawing their weapons did not convert <u>Terry</u> stop into arrest). Moreover, when Border Patrol agents encounter suspected illegal aliens in the open prior to arrest, and shortly thereafter question the suspects

1   as to their citizenship, such encounters are ordinarily considered <u>Terry</u> stops, not custodial questioning,

2   and therefore do not require prior <u>Miranda</u> warnings.  <u>See, e.g.</u>, <u>Cervantes-Flores</u>, 421 F.3d at 829-30;

3   <u>United States v. Ramirez-Villalba</u>, 2007 WL 2044306, at *1 (9th Cir. 2007); <u>United States v.</u>

4   <u>Sauceda-Avalos</u>, 225 Fed. Appx. 646, 648 (9th Cir. 2007); <u>United States v. Galindo-Gallegos</u>, 244 F.3d

5   728, 732 (9th Cir.2001), as amended, 255 F.3d 1154 (9th Cir.2001).

6       Here, Agent Kim came upon Defendant after receiving a report that an individual had just

7   climbed both fences separating the United States and Mexico and entered the truck lanes just north of

8   the secondary fence.  Agent Kim soon thereafter discovered an individual attempting to conceal himself

9   in a nearby bush along the truck lane.  Agent Kim identified himself as a United States Border Patrol

10  Agent and asked the individual, later identified as Defendant, his country of citizenship.  Defendant

11  responded by admitting he was a Mexican citizen without immigration documents permitting him to

12  enter or remain in the United States legally.  Defendant's admission occurred during a lawful Terry stop,

13  and therefore the Court should deny Defendant's motion to suppress his statements made in the field.

14      Furthermore, under Ninth Circuit and Southern District precedent, as well as Southern District

15  Local Criminal Rule 47.1(g)(1)-(4), a defendant is entitled to an evidentiary hearing on a motion to

16  suppress his admissions only when the defendant adduces specific facts sufficient to require the granting

17  of the defendant's motion.  <u>See</u> <u>United States v. Howell</u>, 231 F.3d 615, 620-21 (9th Cir. 2000) ("An

18  evidentiary hearing on a motion to suppress [a confession for failure to comply with <u>Miranda</u>] need be

19  held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to

20  enable the trial court to conclude that contested issues of fact exist."); <u>United States v.</u>

21  <u>Rodriguez-Hernandez</u>, 2007 WL 135686, at * 1 (9th Cir. 2007) (court did not abuse discretion to refuse

22  to hold evidentiary hearing on motion to suppress when Defendant's declaration only made simple,

23  conclusory declaration that he "did not understand" his right to appointed counsel, rather than pointing

24  to any specific shortcomings in the particular warnings given); <u>United States v. Moran-Garcia</u>, 783 F.

25  Supp. 1266, 1274 (S.D. Cal. 1991) (boilerplate motion containing indefinite and unsworn allegations

26  was insufficient to require an evidentiary hearing on defendant's motion to suppress statements);

27  CrimLR 47.1(g).  Indeed, this district's local rules specifically provide that "the Court need not grant an

28  evidentiary hearing where either party fails to properly support its motion for opposition."   CrimLR

08-CR-1761

47.1(g)(1).

Any objection that 18 U.S.C. § 3501 requires an evidentiary hearing in every case is of no merit. Section 3501 requires only that the Court make a pretrial determination of voluntariness "out of the presence of the jury." Nothing in section 3501 reveals any intent by Congress to alter the longstanding rule vesting the form of proof on matters in the discretion of a court. See United States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986) ("Whether an evidentiary hearing is appropriate rests in the reasoned discretion of the district court.").

As Defendant in this case has failed to provide declarations alleging specific and material facts, the Court would be within its discretion to deny Defendant's motion without an evidentiary hearing. Indeed, such a denial may properly be made based solely on the statement of facts attached to the complaint in this case, without any further showing by the United States. Moreover, Defendant had an opportunity, in his moving papers, to proffer any facts alleging violations of his rights. However, Defendant failed to generate a disputed factual issue requiring an evidentiary hearing. See Howell, 231 F.3d at 623.

For all of the foregoing reasons, the Court should deny Defendant's motion to suppress his field admissions without an evidentiary hearing.

**(2) Defendant's Admissions at the Border Patrol Station Were Made after He Was Informed of His Miranda Rights**

Under Miranda, before questioning a suspect in custody, law enforcement officials must inform them "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda v. Arizona, 384 U.S. 436, 479 (1966). These are the only warnings that are required to be given. See United States v. Lares-Valdez, 939 F.2d 688, 690 (9th Cir. 1991). Although the Supreme Court has stressed that one virtue of Miranda is the fact that the giving of the warnings precludes the need for a case-by-case inquiry into the actual voluntariness of the accused's admissions, this does not suggests any desirable rigidity in the form of the required warnings. See California v. Prysock, 453 U.S. 355, 359 (1981). "Quite the contrary, Miranda itself indicated that no talismanic incantation [is] required to satisfy its strictures." Id.

Here, Defendant was not only specifically informed of all four of the required <u>Miranda</u> warnings, but rather the agents went above and beyond <u>Miranda's</u> requirements and informed Defendant of his right to quit answering questions after he started answering and to be able to stop answering questions at any time until he could speak with an attorney.  <u>Cf.</u> <u>Lares-Valdez</u>, 939 F.2d at 959-960 (concluding that <u>Miranda</u> did not require that defendant be informed of right to stop questioning after it had begun).  Therefore, the Court should deny Defendant's motion to suppress his admissions at the Border Patrol station based on the officers' alleged failure to comply with <u>Miranda</u>.

Furthermore, the Court should also deny Defendant's motion to suppress his admissions based on their being involuntary.  "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."  <u>United States v. Bautista</u>, 362 F.3d 584, 589 (9th Cir. 2004).  Again, Defendant has failed to support his motion with any declarations regarding whether any physical or psychological coercion was used to cause any doubt that his confessions were voluntary.  Therefore, since proper <u>Miranda</u> warnings were provided Defendant (as evidenced by the Bilingual Transcription and Translation (Ex. 1)), the Court should deny Defendant's motion to suppress his admissions due to an alleged lack of voluntariness without an evidentiary hearing.

### (3) Defendant's Admissions at the Border Patrol Station Were Made after it Was Made Clear That He Had the Right to an Appointed Attorney

Defendant argues, relying on <u>United States v. San Juan-Cruz</u>, 314 F.3d 384 (9th Cir. 2002), that his confession should be suppressed because his <u>Miranda</u> warnings, coming after he was previously provided administrative warnings, did not adequately convey that he had the right to an attorney at no expense.[2/]  In <u>San Juan-Cruz</u>, the Ninth Circuit determined that <u>Miranda</u> warnings read to a defendant handcuffed to a chair were invalid where they were read to him soon after he was advised of his administrative rights to have counsel present during questioning but not at the government's expense

---

[2/] Defendant filed this motion two days after the deadline imposed by this Court.  Accordingly, for this reason alone, the Court should deny Defendant's motion to suppress.  <u>See</u> CrimLR 47.1(b)(4) ("The clerk's office is directed not to file untimely motions and responses thereto without the consent of the judicial officer assigned to the case."); CrimLR 57.1 ("Failure of counsel or of any party to comply with these rules, with the Federal Rules of Criminal Procedure, or with any order of the court may be grounds for imposition by the court of any and all sanctions authorized by statute or rule or within the inherent power of the court.").

08-CR-1761

because the two sets of conflicting instructions, read one after the other, were confusing, and did not clearly convey to the defendant that he possessed the right to have an attorney present for free. See id. at 387-88. The San Juan-Cruz court explained that agents can easily rectify this confusion either by making clear that the defendant is entitled to a free attorney or by advising the defendant to disregard the administrative rights in favor of those read to him under Miranda. See id. at 389.

While the agents in San Juan-Cruz did neither of those things, see id., the Border Patrol agent in this case did both of them. Specifically, approximately forty minutes after Defendant was advised of his administrative rights, Defendant was told by Border Patrol Agent Villarreal, "You were previously informed of your rights, in which you asked to to [sic] return to your country as soon as possible. You should understand that those rights only apply in Immigration proceedings for removing you from the United States. Now you should understand that there has been a change in which you will not be returned to your country at this time. Eh, instead now you will be tried for a federal crime." Defendant indicated that he understood that there had been a change due to the fact that he was now being charged with a federal crime. The Border Patrol agent then explained to Defendant that before he asked Defendant any further questions, Defendant should understand his rights as they at that point existed. Specifically, Defendant was informed of his right to "speak with an attorney so that he may counsel [Defendant] before [the Border Patrol agents] ask [Defendant] questions, and [the attorney] can be present during the questioning." The Border Patrol Agent then specifically advised Defendant that "if you do not have the means to hire an attorney, one will be designated before any questioning if you so desire."

Although Defendant argues that being informed that an attorney would be "designated" is not the same as being told one would be appointed, that argument is belied by the fact that, even in English, the term "designate" is a synonym for "appoint." See Webster's Third New International Dictionary 612 (unabridged ed. 1981) (defining designate, *inter alia*, "to assign officially by executive or military authority," and stating that it is a synonym for "appoint" (see Ex. 2)). Certainly, in the context of Defendant being told that if he could not afford an attorney one would be "designated" for him, Defendant's right to a free attorney under Miranda was conveyed as well as if the word "appointed" was used. Furthermore, any understanding of the rights Defendant was provided from reading the English

10

1   translation of what he was told must take into account the constraints of the translation, including

2   context, the rules of grammar of the two languages, their writing conventions, and their idioms.

3   Although literally translated into English, the Border Patrol agent told Defendant that he had the right

4   to have an attorney "designated" to him, in the context of Defendant being told that if he did not have

5   the means to hire an attorney, "uno se designará antes de cualquier interrogacion si Ud desea," could be

6   translated as "one will be appointed before any questioning if you so desire."  See Decl. Andrew J.

7   Hanson, Certified Interpreter by the Administrative Office of the United States Courts (Cert. # 95-036)

8   (Attached as Ex. 3).

9        Therefore, Defendant was adequately informed of his right to an appointed attorney without any

10  confusion based on his previously being told of his administrative rights.  The San Juan-Cruz court

11  explained that an agent could easily rectify any potential confusion in either of two ways, and Agent

12  Villarreal did both: he made it clear that Defendant was entitled to a free attorney, and he advised

13  Defendant that the previously discussed administrative rights no longer applied because he was now

14  charged with a federal crime.  Accordingly, for all of these reasons, the Court should deny Defendant's

15  motion to suppress his confession.

16                                        **V**

17  **GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION FOR DISCOVERY**

18       The United States intends to fully comply with its discovery obligations under Brady v.

19  Maryland, 373 U.S. 83 (1963), the Jenks Act, 18 U.S.C. § 3500, and Rule 16 of the Federal Rules of

20  Criminal Procedure.  Thus far, the United States has produced twenty-six pages of discovery as well as

21  a DVD recording of the interview of Defendant at the Border Patrol station.  Defendant's specific

22  requests are addressed below.

23       **(1) The Defendant's Statements**

24       The United States recognizes its obligation under Rule 16(a)(1)(A) and 16(a)(1)(B) to provide

25  to Defendant the substance of Defendant's oral statements and Defendant's written statements.  The

26  United States has produced all of Defendant's oral and written statements that are known to the

27

28

undersigned Assistant U.S. Attorney at this date.[3/]  If the United States discovers additional written or oral statements that require disclosure under Rule 16(a)(1)(A) or Rule 16(a)(1)(B), such statements will be provided to Defendant.

Rule 16 does not require, however, the production of handwritten notes when the substance of the notes has been preserved in a formal memorandum. See United States v. Brown, 303 F.3d 582, 590 (5th Cir. 2002) (rule 16 does not grant a criminal defendant a right to preparatory interview notes where the content of those notes have been accurately captured in a report that has been disclosed to the defendant); United States v. Coe, 220 F.3d 573, 583 (7th Cir. 2000) (Rule 16 does not require disclosure of an agent's notes even where there are "minor discrepancies" between the notes and a report).  Neither does the confrontation clause require disclosure of rough notes when the substance of those notes are been preserved in formal memorandum, defendant fails to make a showing that the notes contained anything exculpatory or that would affect his trial, and defendant had full and fair opportunity to cross-examine agent who took notes.  See United States v. Williams, 291 F.3d 1180, 1186-87 (9th Cir.2002), overruled on other grounds by United States v. Gonzales, 506 F.3d 940 (9th Cir.2007) (en banc).  Similarly, neither the Jenks Act, or Brady require handwritten notes from which a formal report is produced and that does not include exculpatory information.  See United States v. Pisello, 877 F.2d 762, 768 (9th Cir. 1989) (concluding that neither Brady nor Jencks Act required Untied States to produce handwritten notes made by federal agents during interviews with witnesses, after Government produced typewritten, formal memoranda based on notes); United States v. Carrasco, 537 F.2d 372, 377 (9th Cir.1976) (finding that "preliminary notes of an agent from which he later prepares a report" are not subject to the Jencks Act).

The undersigned United States Attorney has instructed all of the agents in this case to preserve any handwritten notes they have taken in relation to this case.  Agent Villarreal took handwritten notes of Defendant's responses to his post-Miranda interview, which he gave to Agent Kim to assist him in the drafting of his Report of Investigation.  The content of those notes were written into Agent Kim's

---

[3/] Agent Villarreal reports that he had Defendant sign an I-826, Notification of Rights and Application for Resolution, at the time he informed Defendant of his administrative rights soon after his arrival at the Imperial Beach station.  A similar I-826 was provided to, and signed by, Defendant after his post-Miranda interview, at approximately 9:00 p.m., and was provided to Defendant.  The originally signed I-826 has not been found.

08-CR-1761

Report of Investigation, which has been disclosed to Defendant, but, at this time, Agent Villarreal's handwritten notes are missing.  The notes are not <u>Brady</u> material because the notes do not present any material exculpatory information, or any evidence favorable to Defendants that is material to guilt or punishment.  <u>Brown</u>, 303 F.3d at 595-96 (rough notes not <u>Brady</u> material because the notes were neither favorable to the defense nor material to defendant's guilt or punishment); <u>United States v. Ramos</u>, 27 F.3d 65, 71 (3d Cir. 1994) (mere speculation that agents' rough notes contained <u>Brady</u> evidence was insufficient).[4/]

**(2) Arrest Reports and Notes**

The United States has provided the Defendant with arrest reports and notes, except as previously described.

**(3) Brady Material**

The United States is well aware of, and will continue to perform, its duty under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>United States v. Agurs</u>, 427 U.S. 97 (1976), to disclose exculpatory evidence within its possession that is material to the issue of guilt or punishment.  Defendant, however, is not entitled to all evidence known or believed to exist which is, or may be, favorable to the accused, or which pertains to the credibility of the United States' case.  As stated in <u>United States v. Gardner</u>, 611 F.2d 770 (9th Cir. 1980), it must be noted that "the prosecution does not have a constitutional duty to disclose every bit of information that might affect the jury's decision; it need only disclose information favorable to the defense that meets the appropriate standard of materiality."  <u>Id.</u> at 774-775 (citation omitted).

The United States will turn over evidence within its possession which could be used to properly impeach a witness who has been called to testify.

Although the United States will provide conviction records, if any, which could be used to

_____

[4/] Evidence of the lack of any <u>Brady</u> material in the handwritten notes of the post-Miranda interview is evident from the tape of the interview (and accompanying transcription and translation), where there is no evidence of exculpatory material.  Furthermore, even if the Court were to determine that the handwritten notes were Jenks Act material, a court's decision to strike a witness' testimony for failure to comply with the Jencks Act should rest on: (1) a consideration of the culpability of the government for the unavailability of the material, and (2) the injury resulting to the defendants.  <u>See</u> <u>United States v. Riley</u>, 189 F.3d 802, 806 (9th Cir. 1999).  Here, there is no injury to Defendant, because he has the tape of the interview and the accompanying transcription and translation.

08-CR-1761

1    impeach a witness, the United States is under no obligation to turn over the criminal records of all

2    witnesses.  United States v. Taylor, 542 F.2d 1023, 1026 (8th Cir. 1976).  When disclosing such

3    information, disclosure need only extend to witnesses the United States intends to call in its case-in-

4    chief.  United States v. Gering, 716 F.2d 615, 621 (9th Cir. 1983); United States v. Angelini, 607 F.2d

5    1305, 1309 (9th Cir. 1979).

6        **(4) Sentencing Information**

7        Defendant claims that the United States must disclose any information affecting Defendant's

8    sentencing guidelines because such information is discoverable under Brady v. Maryland, 373 U.S. 83

9    (1963).  The United States respectfully contends that it has no such disclosure obligation under Brady.

10       The United States is not obligated under Brady to furnish a defendant with information which

11   he already knows.  United States v. Taylor, 802 F.2d 1108, 1118 n.5 (9th Cir. 1986).  Brady is a rule of

12   disclosure, and therefore, there can be no violation of Brady if the evidence is already known to the

13   defendant.  In such case, the United States has not suppressed the evidence and consequently has no

14   Brady obligation.  See United States v. Gaggi, 811 F.2d 47, 59 (2d Cir. 1987).

15       But even assuming Defendant does not already possess the information about factors which

16   might affect their guideline ranges, the United States would not be required to provide information

17   bearing on Defendant's mitigation of punishment until after Defendant's conviction or plea of guilty and

18   prior to his sentencing date.  See United States v. Juvenile Male, 864 F.2d 641, 647 (9th Cir. 1988) ("No

19   [Brady] violation occurs if the evidence is disclosed to the defendant at a time when the disclosure

20   remains in value.").  Additionally, the United States is unaware of any cooperation, or even attempted

21   cooperation, provided by Defendant.  Accordingly, Defendant's demand for this information is

22   premature.

23       **(5) Defendant's Prior Record**

24       The United States will provide the Defendant with a copy of his criminal record in accordance

25   with Federal Rule of Criminal Procedure 16(a)(1)(B).  Presently, it appears that Defendant does not have

26   a previous criminal record.

27       **(6) Proposed 404(b) and 609 Evidence**

28       Should the United States seek to introduce any similar act evidence pursuant to Federal Rules

14

of Evidence 404(b) or 609, the United States will provide Defendant with official notice of its proposed use of such evidence and information about such bad acts at the time the United States' trial memorandum is filed.

### (7) Evidence Seized

The United States has complied and will continue to comply with Rule 16(a)(1)(C) in allowing Defendant an opportunity, upon reasonable notice, to examine, copy and inspect physical evidence which is within the possession, custody or control of the United States, and which is material to the preparation of Defendant's defense or intended for use by the United States as evidence in chief at trial, or obtained from or belongs to Defendant, including photographs.

The United States, however, need not produce rebuttal evidence in advance of trial. United States v. Givens, 767 F.2d 574, 584 (9th Cir. 1984), cert. denied, 474 U.S. 953 (1985).

### (8) Preservation of Evidence

The United States will preserve all evidence to which Defendant is entitled pursuant to the relevant discovery rules. However, the United States objects to any blanket request to preserve all physical evidence.

The United States has complied and will continue to comply with Rule 16(a)(1)(C) in allowing Defendant an opportunity, upon reasonable notice, to examine, copy and inspect physical evidence which is within his possession, custody or control of the United States, and which is material to the preparation of Defendant's defense or intended for use by the United States as evidence in chief at trial, or obtained from or belong to Defendant, including photographs. The United States has made the evidence available to Defendant and his investigators and will comply with any request for inspection.

### (9) Henthorn Evidence

The United States will continue to comply with its obligations pursuant to United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991). To comply, the United States will request that all federal agencies involved in the criminal investigation and prosecution review the personnel files of the federal law enforcement inspectors, officers, and special agents whom the United States intends to call at trial and disclose information favorable to the defense that meets the appropriate standard of materiality. United States v. Booth, 309 F.3d 566, 574 (9th Cir. 2002) (citing United States v. Jennings, 960 F.2d

1488, 1489 (9th Cir. 1992)).  If the undersigned Assistant U.S. Attorney is uncertain whether certain incriminating information in the personnel files is "material," the information will be submitted to the Court for an <u>in camera</u> inspection and review.

**(10) Tangible Objects**

The United States has complied and will continue to comply with Rule 16(a)(1)(E) in allowing Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy all tangible objects seized that is within its possession, custody, or control, and that is either material to the preparation of Defendant's defense, or intended for use by the United States as evidence during its case-in-chief at trial, or obtained from or belongs to Defendant.  The United States need not, however, produce rebuttal evidence in advance of trial.  <u>United States v. Givens</u>, 767 F.2d 574, 584 (9th Cir. 1984).

**(11) Expert Witnesses**

The United States will comply with Rule 16(a)(1)(G) and provide Defendant with a written summary of any expert testimony that the United States intends to use during its case-in-chief at trial under Federal Rules of Evidence 702, 703 or 705.

**(12) Evidence of Bias or Motive to Lie**

The United States is unaware of any evidence indicating that a prospective witness is biased or prejudiced against Defendant.  The United States is also unaware of any evidence that prospective witnesses have a motive to falsify or distort testimony.

**(13) Impeachment Evidence**

The United States will turn over evidence within its possession which could be used to properly impeach a witness who has been called to testify.

**(14) Criminal Investigation of Government Witness**

Defendant is not entitled to any evidence that a prospective witness is under criminal investigation by federal, state, or local authorities.  "[T]he criminal records of such [Government] witnesses are not discoverable." <u>United States v. Taylor</u>, 542 F.2d 1023, 1026 (8th Cir. 1976); <u>United States v. Riley</u>, 657 F.2d 1377, 1389 (8th Cir. 1981) (holding that since criminal records of prosecution witnesses are not discoverable under Rule 16, rap sheets are not either); <u>cf.</u> <u>United States v. Rinn</u>, 586 F.2d 113, 118-19 (9th Cir. 1978) (noting in dicta that "[i]t has been said that the Government has no

16                                                                                                08-CR-1761

discovery obligation under Fed. R. Crim. P. 16(a)(1)(C) to supply a defendant with the criminal records of the Government's intended witnesses.") (citing <u>Taylor</u>, 542 F.2d at 1026).

The United States will, however, provide the conviction record, if any, which could be used to impeach witnesses the United States intends to call in its case-in-chief.  When disclosing such information, disclosure need only extend to witnesses the United States intends to call in its case-in-chief.  <u>United States v. Gering</u>, 716 F.2d 615, 621 (9th Cir. 1983); <u>United States v. Angelini</u>, 607 F.2d 1305, 1309 (9th Cir. 1979).

### (15) Evidence Affecting Perception, Recollection, Communication or Truth-Telling

The United States is unaware of any evidence indicating that a prospective witness has a problem with perception, recollection, communication, or truth-telling.

### (16) Jencks Act Material

The Jencks Act, 18 U.S.C. § 3500, requires that, after a United States witness has testified on direct examination, the United States must give the Defendant any "statement" (as defined by the Jencks Act) in its possession that was made by the witness relating to the subject matter to which the witness testified. 18 U.S.C. § 3500(b).  A "statement" under the Jencks Act is (1) a written statement made by the witness and signed or otherwise adopted or approved by him, (2) a substantially verbatim, contemporaneously recorded transcription of the witness's oral statement, or (3) a statement by the witness before a grand jury. 18 U.S.C. § 3500(e).  If notes are read back to a witness to see whether or not the government agent correctly understood what the witness was saying, that act constitutes "adoption by the witness" for purposes of the Jencks Act.  <u>United States v. Boshell</u>, 952 F.2d 1101, 1105 (9th Cir. 1991) (citing <u>Goldberg v. United States</u>, 425 U.S. 94, 98 (1976)).  While the United States is only required to produce all Jencks Act material <u>after</u> the witness testifies, the United States plans to provide most (if not all) Jencks Act material well in advance of trial to avoid any needless delays.

### (17) Giglio Information

As stated previously, the United States will comply with its obligations pursuant to <u>Brady v. Maryland</u>, 373 U.S.  83 (1963), the Jencks Act, <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

/ / /

17

1

### (18) Agreements Between the Government and Witnesses

2

The United States is unaware of any agreement between it and any cooperating witnesses, who

3

have committed crimes, but were not charged, so that they may testify for the Government in this case.

4

The United States will comply with all of its obligations under Brady, Giglio, Jencks Act, and Rule 16,

5

regarding any potential cooperating witness, including any of the material witnesses. Again, at this time,

6

the United States is unaware of any agreement between any of these potential witnesses, but will provide

7

any relevant and pertinent information if such an agreement arises.

8

### (19) Informants and Cooperating Witnesses

9

If the Government determines that there is a confidential informant whose identity is "relevant

10

and helpful to the defense of an accused, or is essential to a fair determination of a cause," it will disclose

11

that person's identity to the Court for in-chambers inspection. See Roviaro v. United States, 353 U.S.

12

53, 60-61 (1957); United States v. Ramirez-Rangel, 103 F.3d 1501, 1505 (9th Cir. 1997). The United

13

States has already stated it will comply with its Brady, Giglio, Jencks Act, and further Rule 16 discovery

14

obligations. The United States will comply with the structure of Roviaro if it determines that any

15

confidential informant information is "relevant and helpful to the defense of [the] accused, or is essential

16

to the fair determination of a cause." Roviaro, 353 U.S. at 60.

17

As the Court is aware, the Supreme Court has declined to adopt an absolute rule requiring

18

disclosure of an informant's identity whenever it is relevant or helpful to a defendant's case. See

19

Roviaro v. United States, 353 U.S. at 62. Indeed, as the D.C. Circuit stated in United States v. Skeens,

20

449 F.2d 1066, 1071 (D.C. Cir.1971), a "heavy burden ... rests on an accused to establish that the identity

21

of an informant is necessary to his defense." Id. at 1070. "Mere speculation" that an informant's

22

testimony may assist the defendant is not sufficient to meet this burden. United States v. Mangum, 100

23

F.3d 164, 172 (D.C. Cir.1996). In determining whether the Defendant has met this burden, the Court

24

must balance "the public interest in protecting the flow of information against the individual's right to

25

prepare his defense," all the while "taking into consideration the crime charged, the possible defenses,

26

the possible significance of the informer's testimony, and other relevant factors." Roviaro, 353 U.S. at

27

62. The United States will comply with its Rovario obligations, but it also requests that any information

28

provided to the Defendants be subject to in camera review by the Court.

1

### (20) Bias by Informants or Cooperating Witnesses

2

3

4

5

6

7

As stated in Section III(12), the United States is unaware of any evidence indicating that any prospective witness, whether Government agent, Informant, or Cooperating Witness, is biased or prejudiced against Defendant.  The United States is also unaware of any evidence that prospective witnesses, whether Government agent, Informant, or Cooperating Witness, have a motive to falsify or distort testimony.  The Untied States will comply with its <u>Giglio</u> obligations if it becomes aware of any indication of bias on behalf of any of its witnesses.

8

### (21) A-File

9

10

11

12

13

The United States will provide defense counsel with all documents to be used in the case-in-chief, as well as any documents that might be <u>Brady</u> material, <u>Jenks</u> material, or come under any other discovery obligations of Rule 16.  The United States notes that, at the present time, it appears that Defendant's arrest was his first contact with federal officials and that it appears that his associated newly issued A-number is his first A-number.

14

### (25) Residual Request

15

16

The United States will continue to comply with all of its discovery obligations, but objects to the broad nature of Defendant's further discovery requests.

17

VI

18

<u>NO OPPOSITION TO DEFENDANT'S REQUEST FOR LEAVE TO FILE FURTHER<br>MOTIONS</u>

19

20

21

22

The United States does not object to the granting of leave to allow Defendants to file further motions, as long as the order applies equally to both parties and additional motions are based on newly discovered evidence or discovery provided by the United States subsequent to the instant motion at issue.

23

VII

24

<u>MOTION FOR RECIPROCAL DISCOVERY</u>

25

26

27

28

The United States hereby moves for reciprocal discovery from the Defendant.  To date Defendant has not provided any.  The United States, pursuant to Rule 16 of the Federal Rules of Criminal Procedure, requests that Defendant permit the United States to inspect, copy, and photograph any and all books, papers, documents, photographs, tangible objects, or make copies of portions thereof, which

19

1    are within the possession, custody or control of Defendant and which Defendant intends to introduce as

2    evidence in their case-in-chief at trial.

3    　　　　The United States further requests that it be permitted to inspect and copy or photograph any

4    results or reports of physical or mental examinations and of scientific tests or experiments made in

5    connection with this case, which are in the possession or control of Defendant, which Defendant intend

6    to introduce as evidence-in-chief at the trial, or which were prepared by a witness whom Defendants

7    intend to call as a witness. Because the United States will comply with Defendant's request for delivery

8    of reports of examinations, the United States is entitled to the items listed above under Rule 16(b)(1) of

9    the Federal Rules of Criminal Procedure. The United States also requests that the Court make such order

10   as it deems necessary under Rules 16(d)(1) and (2) to ensure that the United States receives the discovery

11   to which it is entitled.

12   　　　　In addition, Rule 26.2 of the Federal Rules of Criminal Procedure requires the production of prior

13   statements of all witnesses, except a statement made by Defendant. This rule thus provides for the

14   reciprocal production of <u>Jencks</u> statements. The time frame established by the rule requires the

15   statement to be provided after the witness has testified. To expedite trial proceedings, the United States

16   hereby requests that Defendant be ordered to supply all prior statements of defense witnesses by a

17   reasonable date before trial to be set by the Court. Such an order should include any form in which these

18   statements are memorialized, including but not limited to, tape recordings, handwritten or typed notes

19   and/or reports.

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

08-CR-1761

V

## CONCLUSION

For the above stated reasons, the Court should deny Defendant's motions to dismiss the information and to suppress Defendant's statements, and grant the United States motion for reciprocal discovery.

DATED: June 9, 2008

Respectfully Submitted,

KAREN P. HEWITT
United States Attorney

*s/George V. Manahan*
GEORGE V. MANAHAN
Assistant U.S. Attorney

21                                                                                08-CR-1761

1
2                         UNITED STATES DISTRICT COURT
3                       SOUTHERN DISTRICT OF CALIFORNIA
4
5   UNITED STATES OF AMERICA,            )    Criminal Case No. 3:08-CR-01761-JM (AJB)
                                         )
6                    Plaintiff,          )
                                         )
7           v.                           )    CERTIFICATE OF SERVICE
                                         )
8   JAVIER GARCIA-VILLEGAS,              )
                                         )
9                    Defendants.         )
10  _____)
11
12  IT IS HEREBY CERTIFIED THAT:
13          I, George V. Manahan, am a citizen of the United States and am at least eighteen years of age.
    My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.
14
            I am not a party to the above-entitled action.  I have caused service of Government's Response
15  and Opposition to Defendants' Motions: to Dismiss the Information; to Suppress Statements; to Compel
    Discovery; and for Leave to File Further Motions; Together with a Statement of the Facts and the
16  Memorandum of Points and Authorities, and Government's Motions For: Reciprocal Discovery on the
    following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF
17  System, which electronically notifies them.
18          John C Ellis, Jr., and
            James Michael Chavez
19          Federal Defenders of San Diego
            225 Broadway
20          Suite 900
            San Diego, CA 92101-5008
21          Attorneys for Defendant
22          I declare under penalty of perjury that the foregoing is true and correct.
23          Executed on June 9, 2008.
24
                                    s/ George V. Manahan
25                                  GEORGE V. MANAHAN
26
27
28

                                          22                                        08-CR-1761



**SOUTHERN DISTRICT OF CALIFORNIA**

**U.S. ATTORNEY'S OFFICE**

**BILINGUAL**
**TRANSCRIPTION AND TRANSLATION**

**Interview on Digital Video File**

# United States vs. Javier Garcia-Villegas
## 08MJ1604

Prepared for Assistant U.S. Attorney George V. Manahan

by Andrew J. Hanson, Language Specialist
U.S. Attorney's Office

| **SUMMARY** |
| :--- |
| A subject in an Immigration case is interviewed in Spanish on May 21, 2008.  The interview is transcribed and translated.<br><br>The interview is reproduced on a DVD in a VOB file labeled: VTS_01_1; size: 695,878 KB.<br><br>The times in the middle column refer to the time as played back on Media Player Classic, version 6.4.8.4. |
| **LEGEND** |
| **RSP**          MALE VOICE – Respondent Javier Garcia-Villegas  (Self-identifies)<br><br>**AGT**          MALE VOICE -- Border Patrol Agent Ramon Villareal  (Self-identifies)<br><br><br>[IA]      INAUDIBLE<br><br>[OL]:      OVERLAP<br><br>[UI]:      UNINTELLIGIBLE<br><br>[*ph*]:      PHONETIC<br><br>/:      Two or more words separated by a "/" are options, due to lack of clarity or specificity in the original language.<br><br>[ ]:      Text within brackets are inserts by the translator to aid in comprehension.  After "you", [*pl*] indicates the plural form used in Spanish.<br><br>...:      Pause in utterance.  Unfinished or interrupted.<br><br>*Italics:*                    *Source language is English*<br><br>**Normal font:**          **Source language is Spanish** |

I, Andrew J. Hanson, Interpreter Certified by the ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS, Certificate Number 95-036, declare that I am fluent in the English and Spanish languages, and that I transcribed and translated a video recording, the contents of which appear below, to the best of my ability on or about June 3, 2008, in San Diego, CA.

_____

Andrew J. Hanson

<Andrew.Hanson@usdoj.gov>

(619)557-5178

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | *The following is a statement under oath* | 00:12 | *AGT* | *The following is a statement under oath* |
| 2 | *before Border Patrol Agent Ramon* | | | *before Border Patrol Agent Ramon* |
| 3 | *Villareal and witnessed by Border Patrol* | | | *Villareal and witnessed by Border Patrol* |
| 4 | *Agent Alfonso Hernandez, at the Imperial* | | | *Agent Alfonso Hernandez, at the* |
| 5 | *Beach Border Patrol Station in San Diego,* | | | *Imperial Beach Border Patrol Station in* |
| 6 | *California. The statement is.... is being* | | | *San Diego, California. The statement* |
| 7 | *given by Javier Garcia-Villegas.  Today's* | | | *is.... is being given by Javier Garcia-* |
| 8 | *date is May 21, 2008 and the time is 8:09* | | | *Villegas.  Today's date is May 21, 2008* |
| 9 | *pm.  Both agents are in uniform and no* | | | *and the time is 8:09 pm.  Both agents* |
| 10 | *weapons are visible.* | | | *are in uniform and no weapons are* |
| 11 | | | | *visible.* |
| 12 | Señor, ¿quiere hablar conmigo en inglés | | | Sir, do you want to talk to me in English |
| 13 | o en español? | | | or in Spanish? |
| 14 | En español, como... como Ud. guste. | 01:05 | *RSP* | In Spanish, how... however you want. |
| 15 | Señor, los siguientes Avisos de Derechos | | *AGT* | Sir, the following Notifications of Rights |
| 16 | y sus... en sus declaraciones están | | | and your... in your statements are being |
| 17 | siendo grabadas en la audio y video cinta. | | | recorded on the audio and video tape. |
| 18 | ¿Entiende Ud.? | | | Do you understand? |
| 19 | Sí. | | *RSP* | Yes. |
| 20 | ¿Está bajo la influencia de algunas | | *AGT* | Are you under the influence of any |
| 21 | drogas o alcohol en este tiempo, señor? | | | drugs or alcohol at this time, sir? |
| 22 | No. | 01:25 | *RSP* | No. |

| Transcription | Time | | Translation |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 1 Okey, señor.  Ahm, anteriormente se le | | **AGT** | Okay, sir.  Uhm, you were previously |
| 2 avisó de sus derechos, en cuales Ud. | | | informed of your rights, in which you |
| 3 pidió a regresar a su país lo más pronto | | | asked to to [sic] return to your country |
| 4 posible.  Debe de entender que esos | | | as soon as possible.  You should |
| 5 derechos solamente aplican en | | | understand that those rights only apply |
| 6 procedimientos de Imigración para | | | in Immigration proceedings for |
| 7 sacarlo de los Estados Unidos.  Ahora | | | removing you from the United States. |
| 8 Ud. debe de entender que ha habido un | | | Now you should understand that there |
| 9 cambio en cual Ud. no lo regresarán a su | | | has been a change in which you will not |
| 10 país en este momento.  Eh, en vez ahora | | | be returned to your country at this time. |
| 11 será procesado para un delito federal. | | | Eh, instead now you will be tried for a |
| 12 ¿Entiende lo que acabo de explicar? | | | federal crime.  Do you understand what |
| | | | I have just explained? |
| | | | |
| 13 Sí. | | **RSP** | Yes. |
| 14 Señor, como no es ciudadano de los | 02:13 | **AGT** | Sir, since you are not a citizen of the |
| 15 Estados Unidos, al ser arrestado o | | | United States, upon being arrested or |
| 16 detenido tiene derecho a pedirnos que | | | detained you have a right to ask us to |
| 17 notifíquemos a los representantes | | | notify the consular representatives of |
| 18 consulares de su país aquí en los | | | your country here in the United States if |
| 19 Estados Unidos si lo desea.  Entre otras | | | you so desire.  Among other things, a |
| 20 cosas, un funcionario consular de su país | | | consular official from your country can |
| 21 puede ayudarle a obtener asesoramiento | | | help you obtain legal counsel, put you in |
| 22 legal, ponerse en contacto con su familia | | | contact with your family and visit you in |
| 23 y visitarle en la cárcel.  Si Ud. desea que | | | jail.  If you want us to notify the consular |
| 24 notifíquemos a los funcionarios | | | officials from your country you can |
| 25 consulares de su país puede solicitarlo | | | request it now or at any opportunity in |
| 26 ahora o en cualquier oportunidad en el | | | the future.  After the consular officials |
| 27 futuro.  Despúes de que se haya | | | from your country have been notified, |
| 28 notificado a los funcionarios consulares | | | they will be able to call you or visit you. |
| 29 de su país, ellos podrán llamarle o | | | Do you understand? |
| 30 visitarle.  ¿Entiende? | | | |
| 31 Sí. | 02:51 | **RSP** | Yes. |
| 32 ¿ [UI] al Consulado Mexicano este | | **AGT** | [UI] to the Mexican Consulate this |
| 33 tiempo? | | | time? |

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | No. | | **RSP** | No. |
| 2 | Okey.  Señor, antes de que le hagamos | 02:58 | **AGT** | Okay.  Sir, before we ask you any |
| 3 | pregunta, Ud. debe de comprender sus | | | question, you should understand your |
| 4 | derechos.  Ud. tiene el derecho de | | | rights.  You have the right to remain |
| 5 | guardar silencio.  Cualquier cosa que Ud. | | | silent.  Anything that you say can be |
| 6 | diga puede ser usada en contra de Ud. en | | | used against you in court or in any |
| 7 | la corte o en cualquier procedimiento de | | | Immigration or administrative |
| 8 | Inmigración o administrativo.  Ud. tiene | | | proceeding.  You have the right to |
| 9 | derecho de hablar con un abogado para | | | speak with an attorney so that he may |
| 10 | que él le aconseje a Ud. antes de que | | | counsel you before we ask you |
| 11 | nosotros le hagamos preguntas, y él | | | questions, and he can be present |
| 12 | puede estar presente durante la | | | during the questioning.  If you do not |
| 13 | interrogación.  Si Ud. no tiene los medios | | | have the means to hire an attorney, one |
| 14 | para emplear a un abogado, uno se | | | will be designated before any |
| 15 | designará antes de cualquier | | | questioning if you so desire.  If you |
| 16 | interrogación si Ud. desea.  Si Ud. se | | | decide to answer questions now, |
| 17 | decide a contestar preguntas ahora, sin la | | | without the presence of an attorney, you |
| 18 | presencia de un abogado, Ud. todavía | | | still will have the right to quit answering |
| 19 | tendrá el derecho de dejar de contestar | | | questions whenever you want.  You |
| 20 | preguntas cuando Ud. quiera.  Ud. | | | also have the right to quit answering |
| 21 | también tiene el derecho de dejar de | | | questions whenever you want until you |
| 22 | contestar preguntas cuando Ud. quiera | | | can speak with an attorney.  Do you |
| 23 | hasta que hable con un abogado. | | | understand your... your rights? |
| 24 | ¿Entiende su... Ud. sus derechos? | | | |
| 25 | Sí. | 03:59 | **RSP** | Yes. |
| 26 | ¿Está Ud. dispuesto a renunciar estos | | **AGT** | Are you willing to waive these rights and |
| 27 | derechos y hablar conmigo? | | | speak with me? |
| 28 | Sí. | | **RSP** | Yes. |

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | Señor, soy oficial del Departamento de | 04:12 | AGT | Sir, I am an officer from the |
| 2 | Aduanas y Protección Fronteriza, | | | Department of Customs and Border |
| 3 | autorizado por la ley para administrar | | | Protection, authorized by law to |
| 4 | juramentos y tomar testimonio con la | | | administer oaths and take testimony in |
| 5 | conexión con la je... ejecución de las | | | connection with the x... execution of the |
| 6 | leyes de Inmigración y Naturalización de | | | Immigration and Naturalization laws of |
| 7 | los Estados Unidos.  Deseo tomar su | | | the United States.  I want to take your |
| 8 | declaración jurada con respecto a su | | | sworn statement with respect to your |
| 9 | ingreso ilegal a los Estados Unidos. | | | illegal entry into the United States. |
| 10 | [*PAUSE*]  Okey, señor.  Vamos a [*UI*] | | | [*PAUSE*]  Okay, sir.  We're going to [*UI*] |
| 11 | pregunta.  ¿Está Ud. bajo la influencia de | | | question.  Are you under the influence |
| 12 | drogas en este tiemp... en este momento, | | | of drugs at this time... at this moment, |
| 13 | señor? | | | sir? |
| 14 | No. | | RSP | No. |
| 15 | ¿No? [*PAUSE*] ¿Está Ud. dispuesto a | | AGT | No?  [*PAUSE*]  Are you willing to |
| 16 | contestar mis preguntas en este... en este | | | answer my questions at this... at this |
| 17 | momento sin la presencia de un | | | time without the presence of an |
| 18 | abogado? | | | attorney? |
| 19 | Sí. | 05:11 | RSP | Yes. |
| 20 | ¿Jura Ud. que todas las declaraciones | | AGT | Do you swear that all of the statements |
| 21 | que va a... va a hacer es la verdad y nada | | | that you're going... going to make is |
| 22 | más que la verdad, que Dios le ayude? | | | [*sic*] the truth and nothing but the truth, |
| | | | | may God help you? |
| 23 | Sí. | | RSP | Yes. |
| 24 | ¿Cuál es su nombre verdadero y | | AGT | What is your true and correct name? |
| 25 | correcto? | | | |
| 26 | Javier García Villegas. | 05:24 | RSP | Javier Garcia Villegas. |
| 27 | ¿Ha usado Ud. algunos otros nombres? | | AGT | Have you ever used any other names? |
| 28 | Ah, no. | | RSP | Uh, no. |
| 29 | ¿De qué país es Ud. ciudadano? | | AGT | Of what country are you a citizen. |
| 30 | De Guadalajara, Jalisco, México. | | RSP | From Guadalajara, Jalisco, Mexico. |

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | [*PAUSE*]  Señor, ¿tiene Ud. papeles de | 05:49 | *AGT* | [*PAUSE*]  Sir, do you have papers from |
| 2 | Inmigración, documentos de Inmigración | | | Immigration, documents from |
| 3 | para dejarlo parmenecer en los Estados | | | Immigration to allow you to remain in |
| 4 | Unidos legalmente? | | | the United States legally? |
| 5 | No. | 05:56 | *RSP* | No. |
| 6 | ¿Cuál es su día de nacimiento? | | *AGT* | What is your day of birth? |
| 7 | ¿Mi fecha de nacimiento? | | *RSP* | My date of birth? |
| 8 | Fecha de nacimiento. | | *AGT* | Date of birth. |
| 9 | 3/2 del ´80. | | *RSP* | 3/2 of ´80. |
| 10 | ¿Dónde nació, señor? | 06:06 | *AGT* | Where were you born, sir? |
| 11 | En Guadalajara, Jalisco. | | *RSP* | In Guadalajara, Jalisco. |
| 12 | ¿Ha sido Ud. alguna vez ordenado | | *AGT* | Have you ever been ordered deported? |
| 13 | deportado? | | | |
| 14 | Nunca, no. | 06:13 | *RSP* | Never, no. |
| 15 | [*PAUSE*]  ¿Cuándo entró Ud. a los | | *AGT* | [*PAUSE*]  When did you enter the |
| 16 | Estados Unidos esta última vez? | | | United States this last time? |
| 17 | ¿Cómo, la "última vez"? | | *RSP* | What do you mean, the "last time"? |
| 18 | [*UI*]  ¿Cuántas veces...? | | *AGT* | [*UI*]  How many times ...? |
| 19 | ¿La primera vez que yo llegué aquí a | 06:37 | *RSP* | The first time that I arrived here in the |
| 20 | Estados Unidos? | | | United States? |
| 21 | Sí.  ¿Por dónde entró? | | *AGT* | Yes.  Where did you enter through? |
| 22 | Ah, por la línea. | | *RSP* | Uh, through the border. |
| 23 | ¿Por la línea? | | *AGT* | Through the border? |
| 24 | Por aquí, Tijuana. | | *RSP* | Through here, Tijuana. |
| 25 | ¿Por la garita? | | *AGT* | Through the Port of Entry? |
| 26 | Sí. | | *RSP* | Yes. |
| 27 | ¿Nomás cruzó...? | | *AGT* | You just crossed...? |
| 28 | Ah, yo estaba niño.  Tenía... | | *RSP* | Uh, I was a child.  I was... |
| 29 | Oh, estaba niño. | | *AGT* | Oh, you were a child. |
| 30 | Sí. | | *RSP* | Yes. |
| 31 | Okey. | | *AGT* | Okay. |

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | Hace como 20 años. | | *RSP* | About 20 years ago. |
| 2 | Okey.  Y, ¿cuándo entró Ud. a Estados | | *AGT* | Okay.  And when did you enter the |
| 3 | Unidos esta, esta vez? | | | United States this, this time? |
| 4 | ¿Cómo?  Es la primera vez que salgo yo | 07:05 | *RSP* | What do you mean?  It's the first time |
| 5 | para acá. | | | that I'm leaving for here. |
| 6 | Okey.  Y... | | *AGT* | Okay.  And. |
| 7 | Para... para México. | | *RSP* | For... for Mexico. |
| 8 | ¿Y cuando fue Ud. arrestado fue como | | *AGT* | And when you were arrested was about |
| 9 | unas 3 horas? | | | some 3 hours? |
| 10 | Pos, más o menos. | 07:15 | *RSP* | Well, more or less. |
| 11 | Más o menos.  ¿Acababa Ud. de entrar | | *AGT* | More or less.  You had just illegally |
| 12 | ilegalmente a los Estados Unidos esa | | | entered into the United States that |
| 13 | vez? | | | time? |
| 14 | Uhm. | | *RSP* | Uhm. |
| 15 | ¿Hace 3 horas atrás? | 07:22 | *AGT* | Back 3 hours ago? |
| 16 | Es la primera vez que... apenas. | | *RSP* | It's the first time that... barely. |
| 17 | Apenas. | | *AGT* | Barely. |
| 18 | Sí, [*UI*] . | | *RSP* | Yes, [*UI*] . |
| 19 | ¿Y cruzó ilegalmente? | | *AGT* | And you crossed illegally? |
| 20 | Sí. | | *RSP* | Yes. |
| 21 | ¿Cómo cruzó, señor? | | *AGT* | How did you cross, sir? |
| 22 | Ah, brincando las... [*UI*] los *fences*. | | *RSP* | Uh, hopping the... [*UI*] the *fences*. |
| 23 | Okey.  ¿Y había alambrado o algo? | | *AGT* | Okay.  And was there a wire fencing or |
| | | | | something? |
| 24 | Sí. | | *RSP* | Yes. |
| 25 | ¿Cuánto le iban a cobrar? | | *AGT* | And how much were you going to be |
| | | | | charged? |
| 26 | Ah, no.  Me iba a pasar con un amigo | 07:50 | *RSP* | Uh, no.  I was just going to cross with a |
| 27 | nomás. | | | friend. |
| 28 | Okey. | | *AGT* | Okay. |
| 29 | Con un amigo [*IA*] . | | *RSP* | With a friend [*IA*] . |

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | ¿Quién le puso la escalera, señor? | | **AGT** | Who put up the ladder, sir? |
| 2 | Ah, mi amigo.  [*OL*]  [*UI*] | | **RSP** | Uh, my friend.  [*OL*]  [*UI*] |
| 3 | ¿Y su amigo se regresó a México? | 07:56 | **AGT** | And your friend returned to Mexico? |
| 4 | No sé.  Ya, ya no lo miré yo. | | **RSP** | I don't know.  I... I didn't see him again. |
| 5 | Okey.  ¿Adónde iba Ud. hoy, señor? | | **AGT** | Okay.  Where were you going today, sir? |
| 6 | Ah, yo iba a llamar a alguien para que | | **RSP** | Uh, I was going to call someone for my |
| 7 | viniera a recogerme mi familia. | | | family to come and pick me up. |
| 8 | Okey.  ¿Y a qué ciudad iba? | | **AGT** | Okay.  And what city were you going to? |
| 9 | A Pomona. | 08:11 | **RSP** | To Pomona. |
| 10 | Pomona ahí está en California, ¿verdad? | | **AGT** | Pomona is here in California, right? |
| 11 | Sí, Pomona, California. | | **RSP** | Yes, Pomona, California. |
| 12 | ¿A qué iba a Pomona? | | **AGT** | Why were you going to Pomona? |
| 13 | Ah, allá vivo. | | **RSP** | Uh, I live there. |
| 14 | ¿Allá vive? | 08:20 | **AGT** | You live there? |
| 15 | Allá vivía, sí. | | **RSP** | I used to live there, yes. |
| 16 | [*PAUSE*]  ¿Hay algo más en este | | **AGT** | [*PAUSE*]  Is there anything else at this |
| 17 | momento que le gustaría a Ud. agregar o | | | time that you would like to add or say? |
| 18 | decir? | | | |
| 19 | Ah, nada más que saber, este, cuánto | | **RSP** | Uh, only to find out, uh, how long I'm |
| 20 | tiempo me voy a quedar. | | | going to stay. |
| 21 | En este tiempo, 24 horas.  [*UI*] que va a | | **AGT** | At this time, 24 hours.  [*UI*] that it's |
| 22 | ser muy poco. | | | going to be very little. |
| 23 | Sí. | 08:52 | **RSP** | Yes. |
| 24 | Sí.  Oye, señor, ¿tiene Ud. miedo de | | **AGT** | Yes.  Hey, sir, are you afraid of |
| 25 | regresar a México si es sacado de los | | | returning to Mexico if you´re removed |
| 26 | Estados Unidos? | | | from the United States? |
| 27 | No. | | **RSP** | No. |
| 28 | ¿Que lo torturen o lo... o lo persigan? | | **AGT** | That you'll be tortured or... or persecuted? |
| 29 | ¿Si tengo miedo? | 09:01 | **RSP** | Am I afraid? |

|   | **Transcription** | **Time** | | **Translation** |
|---|---|---|---|---|
| 1 | Sí. | | *AGT* | Yes. |
| 2 | No. | | *RSP* | No. |
| 3 | [*PAUSE*]  Okay,  This concludes the | 09:19 | *AGT* | [*PAUSE*]  Okay,  This concludes the |
| 4 | sworn statement.  The time now is, uh, | | | sworn statement.  The time now is, uh, |
| 5 | 8:19 pm. | | | 8:19 pm. |
| 6 | [END OF RECORDED INTERVIEW] | 09:25 | | [END OF RECORDED INTERVIEW] |
| 7 | | | | |

**de·sign** \di-ˈzīn\ *vt* : used as a basis for anticipating practical problems and solving them at the inception stage : used chiefly in highway designing (the ~ speed of a highway)

**de·sign·a·ble** \ˈdezignəbəl, -ˌⁱg-, -ˌⁱtə- *sometimes* -es\ *adj* : capable of being designated

**des·ig·nate** \-ˌnāt, -nət, *noun* also -ik+V\ *adj* [L designatus, past part. of designare] 1 : chosen for an office but not yet installed — used after the noun (called president-elect or president-*designate*) (the pledges of the governor ~)

**des·ig·nate** \-ˌnāt, usu -ād+V, *vt* -ED/-ING/-S [L designatus, past part. of designare, lit., to mark out — more at DESIGN] 1 a : to point out the location of (a marker designating the crest of the flood waters) b : to make known directly as if by sign : SIGNIFY, INDICATE (any reasonable task designated by the employer) c : to distinguish as to class : DENOMINATE, IDENTIFY, LABEL (the area we ~ as that of spiritual values — J.B.Conant) d : SPECIFY, STIPULATE (sending food packages to designated recipients in Europe) (a gift designated by the donor to be used for faculty compensation) 2 a : to call by a distinctive title, term, or expression (a particle having approximately the mass of a proton but having no charge and so designated as a neutron —W.V.Houston) (the four parts were designated A, B, C, and D in the diagram) b : to declare to be : CHARACTERIZE (areas designated as strategic) 3 : to name esp. to a post or function 4 a : to mode point : NOMINATE, DELEGATE, APPOINT; esp : to assign officially by executive or military authority (the operating agency last designated by the employer) c : to distinguish and been designated to exploit a breakthrough of the enemy's defenses —R.D.Gardner) b : to induct in a rank or position (the supreme council is designated as the highest organ of state power) (the duke had been designated as king of a puppet state) c : to choose and set apart (as by public will or in the process of government administration) (a successful designating petition places the name of the candidate on the primary ballot —Bk. of Civic Definitions) (control dams designated for construction) (finally Queen Victoria was asked to ~ a site —B.K.Sandwell) 5 : to serve as a name of : stand for : DENOTE (associate . . . the names with the persons they ~ —Weldon Kees) (names are now given bacteria as a sort of shorthand to ~ a whole series of complicated reactions —Justina Hill) 6 *logic* : to refer to (an abstract or a concrete entity) — used of a sign, word, or linguistic expression

**syn** NAME, NOMINATE, ELECT, APPOINT: DESIGNATE may apply to choosing or detailing a person or group for a certain post by a person or group having power or right to choose (the following deputies were designated by the three ministers to carry on the council's work —Americana Annual) (the vice-chairman is elected from among the commissioners, and the president designates the chairman —Current Biog.) NAME differs little from DESIGNATE except that it may more strongly imply public announcement and less strongly suggest official action (the president-elect has not yet named his secretary of state) (named to the position of general manager) (a council of the realm to advise him and to name his successor in the event of his death —Current Biog.) NOMINATE today often indicates presentation of a candidate for the approval of or rejection by those who make final decisions (the parties nominate their presidential candidates during the summer) (President Truman nominated him for promotion to full admiral, in an advancement confirmed by the Senate —Current Biog.) ELECT may apply to definitive selection by a qualified group from among persons nominated or offering themselves as candidates (elected by a large majority of the voters) (elected to membership in a general meeting of the club) APPOINT indicates selection without election by a qualified person or group, with or without confirmation by another instrumentality (the president appoints postal officials) (by constitutional provision the chief executive appoints, but independently (except in a few instances as indicated above), but "by and with the advice and consent of the senate"; to speak with complete accuracy, he nominates, the Senate confirms by a majority vote of the members present), and he thereupon appoints —F.A.Ogg & P.O.Ray)

**des·ig·na·tion** \ˌ+ᵉⁿˈnāshən\ *n* -s [ME designacion, fr. L designation-, designatio, fr. designatus + -ion-, -ion] 1 : the act of indicating or identifying by a mark, letter, or sign or by classification or specification (contriving new characters for the ~ of sounds akin to the language) (anciently the law was that the mere repetition of a slander was not actionable if the repetition was accompanied by a ~ of the author —R.N.Cardozo) 2 a : a distinguishing name : a title earned or awarded (for years the county seat had no proper ~) (as a writer of light verse; but this ~ isn't good enough —Charles Jackson) b : NAMING (during his tenure that touched him most deeply was the ~ during his last years of the new laboratory —C.H.Herty) (the ~ of degrees for women graduates puzzled the more liberal educators —Amer. Guide Series: Texas) 3 a : appointment or assignment to a post (his next ~ was a second secretaryship at Panama City); also : nomination for a political office (seeking to win the Republican primary ~) b : delegation, engagement, or allocation for a service (his ~ by Chile and Argentina as umpire of a commission) (the revision of the rest of Matthew and of Genesis and of Exodus by the ~ of different sections to various members of the committee —J.M.Price) c archaic : a natural leaning that contributes to one's fitness 4 also rard in view 5 : an allotment of bottom for planting oysters; also : the space so allotted 6 logic : the relation between a sign, word, or linguistic expression and the thing that it designates —compare DESCRIPTIO PRONINA

**des·ig·na·tive** \ˈdezigˌnād-iv, -ᵊg-, -nət-, ᵊv\ *adj* [ML designativus, fr. L designatus + -ivus] 1 : serving to designate or indicate

**des·ig·na·tor** \ˈdezigˌnād-ə(r), -ᵊtᵊr\ *n* -s [L designator] 1 : one that designates 2 a : a designative sign in semantics

**des·ig·na·tum** \ˌdezigˈnäd-əm\ *n, pl* **des·ig·na·ta** \-d-ə\

**de·signed** \di-ˈzīnd, dē-\ *adj* : done, performed, or made with purpose or intent (the careful grouping of figures in designed pattern)

**de·sign·ed·ly** \-nədlē, -ᵊd-\ *adv* : with definite purpose : PURPOSELY, DELIBERATELY

**de·sign·ee** \ˌdezigˈnē *sometimes* -esi-\ *n* -s [designate + -ee] : one who is designated or delegated (the favorite-son ~ of the New York delegation) (one of the plant supervisors is a union ~)

**de·sign·er** \di-ˈzī·nə(r), dē-\ *n* -s 1 : one who conceives plans (as large-scale plans or those for public or private projects) (the ~ of the Fourth Republic provided what France wanted —Time) (it is strange that resistance to this proposition seems strongest among some of the most audacious social ~s —Curt Stern) (the planners and ~s, the inciters and leaders without whose evil architecture the world would not have been so long scourged —R.H.Jackson) 2 : one whose work is creating or laying out designs or reproducing designs made by others for products of mechanical, industrial, or practical arts or for architectural structures (a famous industrial ~) (better planners, urban ~s, and landscape artists in our schools —J.L.Sert) 3 a : one who plans, produces, or creates utilitarian or aesthetic objects (ceramic ~s) (an outstanding book ~ planned the format) (dress ~s) b : one who plans and directs the fashioning of theatrical stage settings, costumes, and ballet settings

**de·sign·er·ship** \-ˌship\ *n* -s : the office or function of a designer : accomplishment as designer

**de·sign·ful** \-nfᵊl\ *adj* : full of design : INTENTIONAL — **de·sign·ful·ly** \-(ᵊ)lē\ *adv*

**¹de·sign·ing** \-niŋ\ *n* [fr. gerund of ¹design] : the art of making designs or sketches (studied ~ under experts)

**²de·sign·ing** *adj* [fr. pres. part. of ²design] 1 : practicing forethought 2 : scheming under a complaisant manner crafty or evil designs esp. for advancing one's own interests : SCHEMING (~ woman) (a selfish and ~ nation, obsessed with the dark schemes of European intrigue —Sir Winston Churchill) (a ~ Providence) — **de·sign·ing·ly** *adv*

**de·sign·less** \-nlᵊs\ *adj* : being without a design — **de·sign·less·ness** *n* -es

**design patent** *n* : a patent granted to one who has invented any new, original, and ornamental design for an article of manufacture (under a design patent the appearance of the article rather than its mechanical function receives protection —Harvard Law Rev.)

**designs** *pres 3d sing of* DESIGN, pl of DESIGN

**de·sil·i·cate** \(ˌ)dē+\ *vt* [de- + silicate] : to remove silica or silicate from; esp : to cause to undergo desilication

**de·sil·i·ca·tion** \(ˌ)dē+\ *n* -s : removal of silica from a magma esp. by interaction with limestone and its transfer to the enveloping wall rock where it is fixed in the form of various silicates

**de·silt** \(ˌ)dē+\ *vt* [de- + silt (n.)] : to remove suspended silt from (the water of a stream) (a basin for ~ing water)

**de·sil·ver·iza·tion** \(ˌ)dē+\ *n* -s : the act or a process of desilverizing

**de·sil·ver·ize** *also* **de·silver** \(ˌ)ⁿ+\ *vt* [desilverize fr. de- + silver + -ize; desilver fr. de- + silver] : to remove the silver from : free from silver (desilverizing lead ores) — **de·sil·ver·izer** \(ˌ)ⁿ+\ *n* -s

**des·i·nence** \ˈdezənən(t)s, -es-\ *n* -s [MF, fr. ML desinentia, fr. L desinent-, desinens + -ia] : TERMINATION (the ~ of a verse); *often* : ENDING 2 (1) (any human inflectional form comprehends a stem and a ~ —Roman Jakobson)

**des·i·nent** \-nant\ *adj* [L desinent-, desinens, pres. part. of desinere to leave off, cease, fr. de- + sinere to leave — more at SITE] : TERMINAL

**des·i·nen·tial** \ˌ+ᵊnenchal\ *adj* 1 : TERMINAL 2 : of, relating to, or being an inflectional ending

**de·sip·i·ence** \di-ˈsipē·ᵊn(t)s, dē-\ *n* also **de·sip·i·en·cy** \-nsē\ *n, pl* **desipiences** also **desipiencies** [L desipientia, fr. desipient-, desipiens + -ia] 1 : relaxed dallying in enjoyment of foolish trifles

**de·sip·i·ent** \-ᵊnt\ *adj* [L desipient-, desipiens, pres. part. of desipere to be foolish, fr. de- + sipere (fr. sapere to have taste, be wise) — more at SAGE] 1 : indulging in desipience (and smiled to see ~ Horace play —Timothy Dwight)

**de·sir·abil·i·ty** \də̇ˌzīrəˈbiləd-ē, dē-, -lət-, -ᵊd-, -lᵊt-, -i\ *n* -es 1 : the quality, fact, or degree of being desirable or of having worth (they considered the ~ of ~ and of revolution) 2 desirabilities *pl* : a desirable condition (we had understood and studied certain desirabilities in a truly integrated staff —D.D. Eisenhower)

**¹de·sir·able** \(ᵊ)ˈzīrəbᵊl, -bᵊl\ *adj* [ME, fr. MF, fr. desirer + -able] 1 : capable of arousing desire : a : having the power to attract or bring into demand 2 of such properties or qualities as to be wished for or sought (one of the city's most ~ neighborhoods) (a plant species that may prove to be commercially ~); *often* : so valuable or excellent as to assure being desired or selected 3 : such as to awaken urgent or passionate longing or craving (there are circumstances in which a scoop of dirty water can be supremely ~); esp : exciting erotic longing (she was never more ~ than at this moment) 2 : worth seeking or doing as advantageous, beneficial, or wise : ADVISABLE, EXPEDIENT (having the footnotes at the back of the book is not nearly so ~) (even if the highest education were ~ for all, which I doubt —Bertrand Russell) (~ freedom and individual responsibility of the elective system —Official Register of Harvard Univ.) b : suited to the purposes and objectives of normal society (however ~ a common language for all the world may be —J.A.Richards) (the personal opinion of the judge as to what is ~ or undesirable legislation —M.R.Cohen)

**²desirable** \"\ *n* -s : one that is desirable (a balanced diet and adequate rest are basic ~s for any convalescent) 2 a person or thing that merits or attracts desire or favorable attention and consideration (fostering the ~ and weeding out the undesirables); *often* : a person regarded as of high social standing and eligibility (moving always in a small circle of ~s he scarcely knew the lower world of clubs and theaters and balls existed)

**de·sir·able·ness** \-bᵊlnᵊs\ *n* -es : the fact or quality of being desirable : DESIRABILITY (L means is ready to accept the ~ of government liability —Q.Wright) 1

**de·sir·ably** \-blē, -bli\ *adv* : in a desirable place or manner : to a desirable extent or degree (it seems unfortunate which is so considered desirable (land ~ situated in a good residential ~)

**¹de·sire** \də̇ˈzī(ᵊ)r, dē-\ *vb* -ED/-ING/-S [ME desirer, fr. OF desirer, fr. L desiderare to long for, miss, desire, fr. de- + sidere-, sidus star, constellation] — more at SIDEREAL] *vt* 1 : to long or hope for : wish for earnestly : exhibit or feel desire for : COVET (men who ~ success must be prepared to work) (he desired her approval above all things) (desiring only a peaceful haven) 2 1 : to ask or call for (something) : express a wish for : REQUEST (maid servants available if desired) (they ~ an immediate answer) b : to express a wish to (someone) : ASK, REQUEST, ENTREAT (~ him to come in) (they desired the conference to reconsider its decision) 3 *obs* 1 INVITE 4 *archaic* 1 : to feel the loss of ~ *vi* 1 : to desire something or the fulfillment of some aim (he can be, if he so ~s, the complete master of his own cabinet —H.J.Laski)

**²de·sire** \"\ *n* -s [ME, fr. MF, fr. desirer] 1 : conscious impulse toward an object or experience that promises enjoyment or satisfaction in its attainment (with French behavior seems to be the outcome of ~ — that is, for pleasure —H.M.Kallen) (in the land of Buddhism, the original sin has been ~, which spirit in material incarnation —Weston La Barre) (enduring and passionate longing or intense urgently impelling motive toward attainment : APPETENCY (a ~ of serfs to get rid of the feudal held them in a vise from one end of the world ~) (the ~ for adventure) (if a plebiscite confirms if for independence —Vera M. Dean) (humility difficult of all virtues to achieve; nothing is so ~ to think well of oneself —T.S.Eliot) b (1) : a call inclination (2) : erotic urge : sexual attractic (the full lips thrust out and taut like the flesh distended by fear or ~ —Willa Cather) (~ the consequence of the sexual instinct —W.S.Maur striving after in intent : a deliberate choice or purpose conductor's ~ to follow the composer's instru letter) (my ~ is to avoid compulsion at every point 3 : an asking or formal request for some action : yeas and nays of the members being determined of shall, at the ~ of one fifth of those present, be entered on the journal —U.S. Constitution) 4 : something that : object of longing (then the leader's got hold of pieces and remodeled it closer to the heart's ~ — 

**syn** APPETITE, APPETENCY or APPETENCE, COVET, PASSION, URGE: DESIRE is a general term applying to wish or longing of any sort (the desire for change for a relief from the monotony of every day —A.t (a desire for admiration in general —Herbert S geisha is only what she liked to learn in answ human desire for the illusion of love inward wi grace, but without regrets or responsibilities —Hearn) APPETITE applies to a desire strongly call faction; it may be wide in its application (in familiarity with the method and outline of Ari and whetted their appetite for more —R.W.Sout Nathaniel Bowditch, the future navigator, first fe for mathematical science —S.E.Morison & H.S.C is likely to be used in reference to sensual desi (he collected guns and women, and his sexual awesome —E.D.Radin) (appetites for expensive jewelry, good food, strong liquor and weak w Hynd) APPETENCY and APPETENCE may sug marked by strong craving (the liquid shine of th eyes, like the eyes of drinking men when they bright with appetence —Mary Austin) (that gra faction which his purely physical appetence again and again —R.W.Stallman) CONCUPISCEN to any strong craving but commonly applies to ordinate sexual desire (the principle of sin was c the Schoolmen as "concupiscence", which includ desires in general, the sexual passion being th element —D.J.Fisher) LUST may apply to any f but commonly is used in reference to crass cravi thing unsanctioned, esp. illicit or inordinate sex the land or wealth of any other people, no vul no morbid lust for material gain at the expense o Winston Churchill) (he had the lust for money had for women —Willa Cather) (in his morning li pray to be kept from lasciviousness, but when ni might come with it —Carl Van Doren) PASS compelling, intense emotion or desire (in the passi often in matters sexual (this consuming passion him govern himself, keeps in restraint the fierc leaped up within him —H.E.Scudder) (the passio and Annabella is not shown as an affinity of tem to identity of blood; it hardly rises above the infatuation —T.S.Eliot (and she loved him with passion that responded frankly and generously t Macaulay) URGE is used of a persistent desire s seeking satisfaction (the urge of "backward" peo rapidly from feudalism to industrialism, to acc and expensive technology in a hurry and thus dr their living standards —W.G.Carleton) (the urge hired girls, prostitutes who didn't want to be shiftless husbands —Barbara E.Law)

**desired** *adj* [ME, fr. past part. of desiren] 1 : tha hoped for 2 : predetermined to be suitable o 1 prescribed as requisite 1 EXPECT (give the ~ le the helicopter is in a standstill or hovering at Constantino) (sawed to the ~ width) — d \-(ᵊ)ᵊrdns, -ˈzīᵊrd-, -ˈzīᵊrᵊd-\

**de·sire·ful** \-(ᵊ)ᵊrfᵊl, -ᵊrd-, -ᵊd-\ *adj* [ME, fr. de fr. ᵉ archaic : possessed of desire 1 : filled with d

**de·sire·less** \-(ᵊ)ᵊrlᵊs, -ᵊd-\ *adj* : being withou

**de·sir·er** \-ᵊrᵊr\ *n* -s [ME, fr. desiren + -er]

**desires** *pres 3d sing of* DESIRE, pl of DESIRE

**de·sir·ing·ly** \-ᵊriŋlē, -li\ *adv* [ME, fr. present p desir- + -ous, -ous-ous] 1 : impelled or govern : eagerly wishing | SOLICITOUS (the committee is select a suitable speaker) (~ of many things) ( help) b 1 : eager to obtain 1 COVETOUS 2 obs 1 : DESIRABLE, DESIRABLE ~ desire 2 obs 1 : eager and spirited esp. in combi 1 DESIRABLE, DELECTABLE — **de·sir·ous·ly** *adv* — **ness** *n* -es

**desist** *pl of* DESIST

**de·sist** \di-ˈsist, -ˈzist\ *vi* [MF, fr. L desistere, to cease, fr. de- + sistere to stand — more at STA one's efforts) (the legislative body could not ~) (

**de·sist·ance** \-ᵊtᵊns\ *also* **de·sist·ence** \-ᵊn(t)s\ *n* -s pt : a desisting : cessation of action (pending ~ from

**de·si·tion** \-ˈzishᵊn, -ᵊsh\ *n* -s [L de-, di-, de- + -ition]: ENDING 1 *obs* : a cessation or e **de·sire** \(ᵊ)dē+\ *vt* [de- + size (n.)] : to re sizing from printed

**desk** \ˈdesk\ *n* -s [ME deske, fr. ML desca

1  KAREN P. HEWITT
   United States Attorney
2  GEORGE V. MANAHAN
   Assistant U.S. Attorney
3  California State Bar No. 239130
   United States Attorney's Office
4  880 Front Street, Room 6293
   San Diego, California 92101-8893
5  Telephone: 619 557-5610 (Office); 557-5551 (Fax)
   Email: george.manahan@usdoj.gov
6
   Attorneys for Plaintiff
7  United States of America

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10 UNITED STATES OF AMERICA,          )    Criminal Case No. 08-CR-1761-JM (AJB)
                                      )
11              Plaintiff,            )
                                      )
12      v.                            )    DECLARATION OF ANDREW J. HANSON,
                                      )    CERTIFIED  INTERPRETER  OF  THE
13 JAVIER GARCIA-VILLEGAS,            )    ADMINISTRATIVE OFFICE OF THE UNITED
                                      )    STATES COURTS (CERT. # 95-036)
14              Defendant.            )
                                      )
15                                    )
                                      )
16                                    )
                                      )
17 _____)

18 I, ANDREW J. HANSON, declare:

19      1.    I am a certified interpreter of the administrative office of the United States Courts (Cert.

20            # 95-036).

21      2.    On or about June 3, 2008, I transcribed and translated a video recording of an interview

22            of Defendant Javier Garcia-Villegas.

23      3.    On lines 13-16 of page 4 of that transcription and translation, I translated Border Patrol

24            Agent Ramon Villarreal's statement in Spanish as follows: "If you do not have the means

25            to hire an attorney, one will be designated before any questioning if you so desire."

26 ///

27 ///

28 ///

1    4.    Although that translation is literally correct, in the context of the sentence, another

2          possible translation would be, "If you do not have the means to hire an attorney, one will

3          be appointed before any questioning if you so desire.

4    I declare under penalty of perjury that the forgoing is true and correct.

5

6    Dated:  Jun 9, 2008

7    ANDREW J. HANSON
     CERTIFIED INTERPRETER OF THE ADMINISTRATIVE
8    OFFICE OF THE UNITED STATES COURTS
     (CERT. # 95-036)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

08-CR-1761-JM (AJB)