1  **JAMES M. CHAVEZ**
   California State Bar No. 255766
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California  92101-5008
   Telephone:  (619) 234-8467
4

5

   Attorneys for Mr. Vazquez-Lopez
6

7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10             **(HONORABLE JEFFREY T. MILLER)**

11  UNITED STATES OF AMERICA,        )    D.C. No. 08CR1761-JM
                                     )    Mag. Case No. 08MJ1604-AJB
12          Plaintiff-Appellee,      )
                                     )
13               v.                  )    APPELLANT'S OPENING BRIEF
                                     )
14  JAVIER GARCIA-VILLEGAS,          )
                                     )
15                                   )
            Defendant-Appellant.     )
16  _____ )

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    Statement of Subject Matter Jurisdiction in the Magistrate Court   . . . . . . . . . . . . . . . . . . . . . . 1

B.    Basis for Jurisdiction in the District Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

C.    The Notice of Appeal Was Timely Filed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

D.    The Judgment Is Appealable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BAIL STATUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.    The Arrest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.    The Interrogation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C.    The Court's Rulings At Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I. THERE WAS INSUFFICIENT EVIDENCE TO PROVE ALIENAGE. . . . . . . . . . . . . . . . . . . . . 6

A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B.    The Ninth Circuit Has Never Approved a Finding of Alienage on a Record as Limited as
      Mr. Garcia's. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      1.    Alienage Is An Essential Element of the Crime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      2.    Mr. Garcia's Conviction Violates the *Corpus Delicti* Rule Because Confessions
            Alone Are Never A Sufficient Basis For A Criminal Conviction. . . . . . . . . . . . . . . . . . . 7

      3.    Statements Alone Were Not Sufficient To Prove That Mr. Garcia
            Was An Alien. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      4.    Statements and Border Fence Scaling Together Were Not Sufficient To
            Prove Alienage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.   MR. GARCIA'S STATEMENTS WERE ADMITTED IN VIOLATION OF THE FIFTH
      AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

A.   Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B.   Mr. Garcia's Field Statements Should Have Been Suppressed Because He Was in Custody, Interrogated and Had Not Been Given <u>Miranda</u> Warnings. . . . . . . . . . . . . . . . . . . . . . 11

 1.   The Magistrate Court Correctly Found That Mr. Garcia Was In Custody At The Time Agent Kim Questioned Him. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

 2.   The Field Statements That Mr. Garcia Made While In Custody Were In Response To Interrogation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

 3.   Mr. Garcia's Field Statements Should Have Been Suppressed Because He Was Interrogated In Custody And Was Not Advised Of, Or Given The Opportunity To Waive His <u>Miranda</u> Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

C.   Mr. Garcia's Post-<u>Miranda</u> Statements Should Have Been Suppressed. . . . . . . . . . . . . . . . . 13

 1.   Mr. Garcia was not properly advised of his <u>Miranda</u> rights. . . . . . . . . . . . . . . . . . . . . . 14

 2.   This Court should suppress  Mr. Garcia's post-<u>Miranda</u> statements under <u>San Juan Cruz</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

 3.   This Court should suppress Mr. Garcia' post-<u>Miranda</u> statements under <u>Seibert</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

D.   Mr. Garcia Was Prejudiced By The Erroneous Admission Of The Statements. . . . . . . . . . . . . . 16

III.   <u>THE GOVERNMENT DID NOT PROVE THE IDENTITY OF THE DEFENDANT BEYOND A REASONABLE DOUBT.</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

B.   The defendant at trial was not identified as the person who scaled the border fence. . . . . . . . . . 17

 1.   Here, as in <u>United States v. Darrell</u>, the government failed to prove the  identity of Mr. Garcia beyond a reasonable doubt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV.   <u>ALL INFORMATION RELATED TO MR. GARCIA'S DNA SHOULD BE DESTROYED.</u> . . 18

V.   <u>CONCLUSION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Exhibit A *(TBT transcript of bench trial of June 11, 2008 before the Honorable J. Battaglia.)* . . . .  1-146

Exhibit B *(BTT Bilingual Transcript and Translation of the interrogation of Mr. Garcia on May 21, 2008.)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148-158

## TABLE OF AUTHORITIES

### FEDERAL CASES

Chapman v. California, 386 U.S. 18 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18

Coyote v. United States, 380 F.2d 305 (10th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . 15

Derrick v. Peterson, 924 F.2d 813 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Edwards v. Arizona, 451 U.S. 477 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Gay v. United States, 408 F.2d 923 (8th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . 8

Leonard v. United States, 278 F.2d 418 (9th Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . 8

Miranda v. Arizona, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14, 15

Miranda v. Arizona, 386 U.S. 434 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Missouri v. Seibert, 542 U.S. 600 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 11, 17

Rhode Island v. Innis, 446 U.S. 291 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Smith v. United States, 348 U.S. 147 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Ahumada-Aguilar, 295 F.3d 943 (9th Cir. 2002) . . . . . . . . . . . . . 10, 11

United States v. Alexander, 48 F.3d 1477 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 18

United States v. Darrell, 629 F.2d 1089 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . 19, 20

United States v. Garibay, 143 F.3d 534 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Gonzalez, 528 F.3d 1207 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . 7

United States v. Heldt, 745 F.2d 1275 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Hernandez, 105 F.3d 1330 (9th Cir. 1997) . . . . . . . . . . . . . . 6, 7, 9, 10

United States v. Hernandez, 476 F.3d 791 (9th Cir. 2007) . . . . . . . . . . . . . . . . . 6, 12, 13

United States v. Lopez-Alvarez, 970 F.2d 583 (9th Cir. 1992) . . . . . . . . . . . . . . . . . 8, 9

United States v. Ramirez, 608 U.S. 1261 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . 18, 20

United States v. Ramirez-Cortez, 213 F.3d 1149 (2000) . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Rodriguez, 518 F.3d 1072 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . 11

United States v. San Juan Cruz, 314 F.3d 384 (9th Cir. 2002) . . . . . . . . . . . . 6, 7, 11, 15

United States v. Shi, 525 F.3d 709 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

United States v. Sotelo, 109 F.3d 1446 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

iii

United States v. Stewart, 420 F.3d 1007 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Williams, 435 F.3d 1148 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . 17, 18

**FEDERAL STATUTES**

8 C.F.R. § 287.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

8 U.S.C. § 1325 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 6, 8, 9, 19, 21

8 U.S.C. § 1326 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

42 U.S.C. § 14135a(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. § 3401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. §§ 3402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

18 U.S.C. § 3563 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. 3583(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

8 U.S.C. §1325(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**FEDERAL RULES**

Fed. R. Crim. P. 58(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7

# STATEMENT OF JURISDICTION

## A.    Statement of Subject Matter Jurisdiction in the Magistrate Court

Mr. Garcia appeals from the judgment and commitment imposed on June 11, 2008, as entered on June 13 and amended July 3, 2008,  after the magistrate court imposed a sentence of one year of unsupervised probation. The magistrate court has original jurisdiction under 18 U.S.C. § 3401.

## B.    Basis for Jurisdiction in the District Court

This Court has jurisdiction to review any final decisions of the magistrate court below pursuant to Federal Rule of Criminal Procedure 58(g) and 18 U.S.C. §§ 3402 and 3742(h).

## C.    The Notice of Appeal Was Timely Filed

The final judgment and commitment order imposing a sentence of one year of unsupervised probation was entered on June 13, 2008.  Mr. Garcia filed a notice of appeal on June 17, 2008, per Rule 4(b) of the Federal Rules of Appellate Procedure.

## D.    The Judgment Is Appealable

A judgment imposing probation is a final decision subject to appeal pursuant to 18 U.S.C. §§ 3402 and 3742(h).

# BAIL STATUS

Mr. Garcia was released  from the Bureau of Prisons, according to their website,  on June 12, 2008.

**ISSUES PRESENTED FOR REVIEW**

(1)    Whether there was sufficient evidence to prove alienage, an essential element of the crime of illegal entry under 8 U.S.C. § 1325?

(2)    Whether the Magistrate Court erred in admitting into evidence the post-<u>Miranda</u> statements taken from Mr. Garcia ?

(3)    Whether the Magistrate Court erred in admitting into evidence the pre-<u>Miranda</u> field statements taken from Mr. Garcia?

(4)    Whether the Magistrate Court erred in denying the motion for acquittal based on the sufficiency of the evidence in proving identity?

(5 )    Whether the DNA evidence collected from Mr. Garcia should be ordered destroyed?

## STATEMENT OF FACTS

Mr. Garcia was sentenced to a year of probation after he was convicted of violating 8 U.S.C. § 1325(a) for being an alien who attempted to enter the United States at a time and place other than designated by an immigration officer.

**A.    The Arrest.**

On May 21, 2008, a remote surveillance system operator, Sergeant Alan Gomer of the California National Guard, saw two individuals coming over the border fence from Mexico to the United States. TBT 33-34.[1] Sergeant Gomer saw one person come through the concertina wire on top of the secondary fence and one person return to Mexico. TBT 34.

Sergeant Gomer immediately notified Border Patrol Agent Kim. TBT 35. Agent Gomer was able to zoom and move his camera. TBT 40. He never lost sight of the person that climbed the fence until Agent Kim arrested him. TBT 43-44.

At trial, Agent Gomer was unable to identify Mr. Garcia as the person he saw climb over the fence. TBT 44. Agent Kim never identified the defendant at trial as the person he arrested on May 21st, 2008. Agent Kim arrested the person who came over the fence within minutes. TBT 44. He approached the person and ordered him to put his hands in the air. TBT 50. Agent Kim put the individual in handcuffs. TBT 50. He arrested this person as was his duty according to his knowledge of immigration law and training. TBT 46. Agent Kim had no intention of releasing Mr. Garcia. TBT 104. He handcuffed Mr. Garcia and patted him down. TBT 50-51. As Agent Kim explained at trial, he would arrest anyone who had jumped over the border fence to elude examination and inspection. TBT 58. Agent Kim knew a crime had been committed because he knew the only legal way to walk from Mexico to the United States is through the port of entry. TBT 54.

After Agent Kim arrested this person, he asked him questions regarding his alienage, including which state in Mexico he was born in. TBT 51. He did not advise this individual of his Miranda or administrative rights. TBT 73. Further, Agent Kim asked this individual why he had never applied for immigration papers. TBT 52. He also asked questions about his family. TBT 51. In the field, Agent Kim allegedly entered some of this information into a I-826 form. TBT 59. However, Agent Kim lost this form. TBT 59.

---

[1]TBT refers to transcript of bench trial of June 11, 2008 before the Honorable J. Battaglia.

**B.    The Interrogation.**

On May 21, 2008, Agent Villareal processed and interrogated Mr. Garcia. <u>See</u> TBT 77-99. He processed him, took his fingerprints, and advised him of his administrative rights. TBT 79. Agent Villareal testified as to how he generally made use of an I-826 form that was filled out in the field during later interrogation and investigation. TBT 79.  However, he did not state whether or not he used any I-826 form filled out in the field for Mr. Garcia. TBT 79.

Forty minutes after Agent Villareal processed Mr. Garcia, he was interrogated because he had been selected for criminal prosecution. TBT 80. The transcript and translation of this interrogation was admitted into evidence at trial as Government's Exhibit Number 3 and a hard copy has been attached to this brief to this Court.

On page three of the transcript, Agent Villareal told Mr. Garcia that his administrative rights only applied in immigration proceedings. However, he never told Mr. Garcia to "disregard" these rights. TBT 96. Agent Villareal never told Mr. Garcia that he had the right to an appointed attorney, he only told Mr. Garcia that an attorney would be "designated" for him.  BTT 4.[2] Then, Agent Villareal referenced Mr. Garcia's prior statements, by telling Mr. Garcia on page 3 of the interrogation transcript that Mr. Garcia was "not a citizen of the United States," even though it is not until page 5 of the transcript that Mr. Garcia makes any statement regarding alienage.  BTT 3, BTT 5.

During the interrogation, Agent Villareal eventually asked about the first time Mr. Garcia came to the United States. BTT 6. Mr. Garcia  stated he came through the port of entry in Tijuana twenty years ago as a child. BTT 6. He then explained that this was the first time he had returned to Mexico. BTT 7. Further, Mr. Garcia stated that his family was going to pick him up to take him to his home in Pomona. BTT 8.

At the end of the interview, Mr. Garcia was asked if he had anything "to add or say." BTT 8. He replied, "Uh, only to find out, uh, how long I'm going to stay." BTT 8. His answer, "At this time, 24 hours. [UI] that it's going to be very little." BTT 8.

**C.    The Court's Rulings At Trial.**

On May 29, 2008, Mr. Garcia was charged by information with a violation of 8 U.S.C. § 1325, and

---

[2] BTT refers to the Bilingual Transcript and Translation of the interrogation of Mr. Garcia on May 21, 2008.

1   a superceding information was filed on June 10, 2008.  On June 11, 2008, Mr. Garcia was tried for a violation
2   of 8 U.S.C. § 1325 before Magistrate Judge Anthony J. Battaglia.  Before and at trial, Mr. Garcia moved to
3   suppress his statements under <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966); <u>United States v. San Juan Cruz</u>,
4   314 F.3d 384 (9th Cir. 2002); and <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004).  The court did not suppress the
5   field statements. The trial court find that Mr. Garcia was in custody and interrogated in the field by Agent
6   Kim. TBT 104-05. However, the magistrate court admitted the statements because they were voluntarily
7   made. TBT 105.

8          The magistrate court also admitted the statements allegedly made by Mr. Garcia during interrogation.
9   TBT 29.

10          The magistrate court found Mr. Garcia guilty of violating 8 U.S.C. § 1325. TBT 133. The court
11  concluded that the government has proved all the elements of the crime. TBT 131. Thus, the court found that
12  the government had proved that the individual in the courtroom was the same individual who climbed the
13  border fence. TBT 132. Further, the court concluded the government had proved the element of alienage. TBT
14  131.

15                              <u>**SUMMARY OF ARGUMENT**</u>

16          There was insufficient evidence to prove alienage. The only evidence the government presented was
17  1) Mr. Garcia's statements and 2) testimony regarding border fence climbing.  Under <u>United States v.</u>
18  <u>Hernandez</u>, 105 F.3d 1330, 1333 (9th Cir. 1997) and <u>United States v. Sotelo</u>, 109 F.3d 1446, 1449 (1997),
19  this is insufficient.  The government brought no evidence of a prior deportation. The government failed to
20  provide the court with a birth certificate, an A-File for Mr. Garcia, or anyone in his family.

21          The pre-<u>Miranda</u> field statements should have been suppressed. The Magistrate Judge found that
22  Mr. Garcia was in custody.  TBT 104-05.  No <u>Miranda</u> warnings were provided in the field after Mr. Garcia
23  was placed in custody.  The questions asked him were reasonably likely to elicit incriminating responses.
24  Therefore, they should have been suppressed.  <u>United States v. Hernandez</u>, 476 F.3d 791, 796 (9th Cir. 2007)
25  (where officer directly questioned defendant based upon his belief that the individual had committed a crime,
26  the officer "knew or should have known his question could reasonably lead to an incriminating response").

27          The post-<u>Miranda</u> statements should have been suppressed. The warnings Agent Villareal read Mr.
28  Garcia prior to initiating interrogation did not properly explain that Mr. Garcia should disregard his

1  administrative rights.  <u>San Juan Cruz</u>, 314 F.3d 384.  The interrogation was also tainted by reference to the

2  pre-<u>Miranda</u> statements.  <u>Seibert</u>, 542 U.S. 600.

3        The trial court's errors in admitting these statements were not harmless beyond a reasonable doubt.

4  The statements were essential to the government's case, as they had no further evidence of alienage besides

5  border-fence scaling, which is not sufficient evidence of alienage.  <u>Hernandez</u>, 105 F3d at 1333.  The

6  conviction and sentence should be vacated.

7        There was insufficient evidence to prove that the person who climbed the border fence was the person

8  who was prosecuted. Neither of the individuals who were a part of the original arrest identified Mr. Garcia.

9  Sergeant Gomer could not identify the defendant. Agent Kim did not identify the defendant. The form that

10  Agent Kim originally filled out in the field connecting the person in the field to the person interrogated was

11  lost.

12        Finally, any DNA information taken or retained by the government or any of its agents should be

13  destroyed because the court did not have the statutory authority to order its collection.

14  <strong><u>ARGUMENT</u></strong>

15  <strong>I.</strong>

16  <strong><u>THERE WAS INSUFFICIENT EVIDENCE TO PROVE ALIENAGE.</u></strong>

17     **A. Standard of Review.**

18        On appeal, a lower court's denial of a defendant's motion for judgment of acquittal pursuant to Federal

19  Rule of Criminal Procedure 29, is reviewed *de novo*.[3]  <u>United States v. Gonzalez</u>, 528 F.3d 1207, 1211 (9th

20  Cir. 2008) (citing <u>United States v. Stewart</u>, 420 F.3d 1007, 1014 (9th Cir. 2005).  There is sufficient evidence

21  to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational

22  trier of fact could have found the essential elements of the crime beyond a reasonable doubt. <u>Gonzalez</u>, 528

23  F.3d at 1211 (citing <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)).

24  *//*

---

26       [3] Mr. Garcia moved for a judgment of acquittal pursuant to Rule 29 at the close of
   evidence.  TBT 102.

28

**B.    The Ninth Circuit Has Never Approved a Finding of Alienage on a Record as Limited as Mr. Garcia's.**

      **1.    Alienage Is An Essential Element of the Crime.**

According to the plain language of the statute, alienage is an essential element of both counts charged in this case. Mr. Garcia-Villegas was charged under both sub-paragraphs (1) and (2) of Title 8 U.S.C. § 1325(a). This statute provides:

> Any *alien* who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers.

8 U.S.C. § 1325(a) (emphasis added).

      **2.    Mr. Garcia's Conviction Violates the *Corpus Delicti* Rule Because Confessions Alone Are Never A Sufficient Basis For A Criminal Conviction.**

Mr. Garcia's confession alone was not sufficient to prove that he was an alien.

The government's evidence here fails the *corpus delicti* test. Without the defendant's admissions to government agents, the government has no proof that a crime occurred. <u>See</u> <u>Gay v. United States</u>, 408 F.2d 923, 929-30 (8th Cir. 1969) ("[T]he government will not be permitted to prove an essential element of the crime (or of the corpus delicti) solely by extrajudicial admission of the defendant made after the commission of the alleged crime, unless the admission is corroborated by substantial independent evidence."). Under the *corpus delicti* rule, the government must produce "corroborative evidence," which "must implicate the accused in order to show that a crime has been committed." <u>See</u> <u>Smith v. United States</u>, 348 U.S. 147, 154 (1954).

The Ninth Circuit has explained that "the corroboration requirement is two-pronged." <u>See</u> <u>United States v. Lopez-Alvarez</u>, 970 F.2d 583, 592 (9th Cir. 1992). First, the government must "introduce sufficient evidence to establish that the criminal conduct at the core of the offense has occurred." <u>Id.</u> Second, the government must "introduce independent evidence tending to establish the trustworthiness of the admissions, unless that confession is, by virtue of special circumstances, inherently reliable." <u>Id.</u>; <u>see also</u> <u>Leonard v. United States</u>, 278 F.2d 418, 423 (9th Cir. 1960) (The corroborating evidence must "support[] the essential facts admitted sufficiently to justify a jury inference of their truth"). The necessity of independent corroboration "arises from the high incidence of false confessions and the resulting need to prevent errors in

1  convictions based upon untrue confessions alone." Lopez-Alvarez, 970 F.2d at 589.

2  The government did not meet either prong of the Lopez-Alvarez test. Without Mr. Garcia's statements

3  that he was an alien, the government could not and did not prove alienage, an essential element of § 1325.

4  Mr. Garcia's statements, which the government adopted as confessions to the crime, are the only evidence

5  "that the criminal conduct at the core of the offense . . . occurred." Lopez-Alvarez, 970 F.2d at 592.

6  There are many reasons that an individual might falsely admit to being an alien. As was stated at trial,

7  along the United States-Mexico border the vast majority of individuals who state that they are Mexican

8  citizens are returned to Mexico in a few short hours. TBT 91.  A speedy return to Mexico, and out of the

9  hands of United States law enforcement agents, is a strong reason that an individual caught crossing into the

10 United States might falsely state their country of origin.  As a legal matter, however, questions of alienage also

11 involve complex issues of immigration law that most lay people are unqualified to answer.   Therefore,

12 statements of alienage are not "inherently reliable." Lopez-Alvarez, at 592.  Neither were they supported by

13 corroborating evidence of alienage, the essential fact their were introduced to prove.

14       **3.**      **Statements Alone Were Not Sufficient To Prove That Mr. Garcia**
15               **Was An Alien.**

16 More specifically, the Ninth Circuit has clearly, explicitly, and repeatedly held that statements alone

17 are not sufficient to prove alienage in a criminal case. See e.g.,  United States v. Ramirez-Cortez, 213 F.3d

18 1149, 1158 (2000) (stating "neither a deportation order . . . nor the defendant's own admissions . . . standing

19 alone, will support the conclusion that a defendant is an alien");  Hernandez, 105 F.3d at 1333 ("when the

20 primary evidence of citizenship offered by the Government consists of the defendant's own admissions, those

21 admissions require 'some independent corroborating evidence in order to serve as the basis for a conviction'")

22 (quoting Lopez-Alvarez, 970 F.2d at 589.[4]

23       **4.**      **Statements and Border Fence Scaling Together Were Not Sufficient To**
24               **Prove Alienage.**

25 In Hernandez, 105 F.3d at 1333 the Ninth Circuit specifically declined to hold that an individual

26 scaling a border fence was sufficient independent corroboration to prove that the reliability of an admission

27

28 [4]While the decisions cited here were of proof of alienage in criminal proceedings under 8 U.S.C. § 1326, there is no principled reason why the law would differ in the 8 U.S.C. § 1325 context.

1  of alienage.  In that case, a clear record establishing the existence of a prior deportation order was essential

2  to the court's finding that alienage had been proved beyond all reasonable doubt.  And that same year, in

3  United States v. Sotelo, 109 F.3d 1446, 1449 (1997), the Ninth Circuit again concluded that statements of

4  alienage had been sufficiently corroborated *only* where there was *both* a prior deportation order and an

5  admission of alienage.

6        Here, there was no prior deportation order.  Therefore, the government did not prove, as a matter of

7  law, that Mr. Garcia was an alien because it did not produce sufficient, independent, corroboration of

8  Mr. Garcia's statements.  All the government presented to corroborate the alleged statements were allegations

9  of border fence scaling.  The government produced no records of any immigration history.  Mr. Garcia had

10  never had been through deportation proceedings. He had never had the advice of an immigration attorney. Nor

11  had he seen an immigration judge, who by training and experience, is in a better situation to make the complex

12  (at times verging on esoteric) determination of alienage. In fact, the only immigration evidence before the

13  magistrate court was that the one other time Mr. Garcia had entered the United States, he entered legally

14  through the port of entry from Tijuana.  BTT 6.

15        The only "corroborating" evidence the government has are allegations Mr. Garcia climbed the border

16  fence. However, the Ninth Circuit in Hernandez, 104 F.3d at 1333, refused to hold that "the mode of a

17  defendant's entry is sufficient corroboration of an admission that the defendant is an alien."  The evidence of

18  alienage presented by the government consisted of: 1) alleged statements and 2) alleged fence climbing. This

19  is not enough to prove alienage.[5]  See id.  Mr. Garcia was entitled to a judgement of acquittal because the

20  _____

21      [5] Indeed, statements of alienage and border fence scaling may be motivated by same
mistaken belief. As this Court is well aware, charges under 8 U.S.C. § 1326 are not infrequently

22  dismissed because a defendant turns out to have a valid claim to United States citizenship. These
claims are adjudicated by the Department of Homeland Security after a petitioner files a N-600

23  application and supporting documentation. Until the day their N-600 applications are granted,
most of these individuals mistakenly believe that they are citizens and nationals of Mexico

24  illegally present in the United States with no immigration documentation permitting them to
enter or remain in the United States legally. Yet, as a matter of law these individuals are United

25  States citizens. Cf. United States v. Ahumada-Aguilar, 295 F.3d 943, 950 (9th Cir. 2002) (stating
"With only a small degree of hyperbole, the immigration laws have been termed second only to

26  the Internal Revenue Code in complexity.") (internal quotation marks omitted).

27

28        The issue of alienage is not merely academic in this case because Mr. Garcia very may
well have been a United States citizen.  During his interrogation by border patrol, Mr. Garcia

government did not meet its burden of proving beyond a reasonable doubt that he was an alien.[6]

**II.**

**MR. GARCIA'S STATEMENTS WERE ADMITTED IN VIOLATION OF THE FIFTH AMENDMENT**

All of Mr. Garcia's statements admitted at trial should have been suppressed. The pre-<u>Miranda</u> statements should have suppressed because they were unwarned statements resultant from custodial interrogation, and thus obtained in violation of <u>Miranda v. Arizona</u>, 386 U.S. 434, 479 (1966). The post-<u>Miranda</u> statements should have been suppressed under <u>Miranda</u>, <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), and <u>United States v. San Juan Cruz</u>, 314 F.3d 384 (9th Cir. 2002). Because they were elicited in violation of the constitution the government must prove beyond a reasonable doubt that their admission was harmless error. <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967). Given that admissions were the crux of the government's case, <u>see</u> <u>supra</u>, the error were not harmless.

**A.    Standard of Review**.

Whether a person was "interrogated" or was "in custody" for purposes of <u>Miranda</u> are mixed questions of law and fact warranting *de novo* review. <u>United States v. Rodriguez</u>, 518 F.3d 1072, 1076 (9th Cir. 2008) However, the factual findings underlying a trial court's decision will only be disturbed if they are clearly made in error. <u>Id</u>.

---

stated that he crossed the border the first time when he was very small child. BTT 6. Further, he stated he came through the port of entry. BTT 6. This suggests he could have come to the United States legally. Further, he stated that this was 20 years ago. BTT 7. During these two decades, he may have as a matter of law become eligible for immigration relief or entitled to a certificate of citizenship. Additionally, Mr. Garcia stated that he was going to call for someone in his family to come pick him up. BTT 8. This suggests that members of his family may be citizens. Border patrol did no investigation into any of these issues. The government presented no evidence. They provided no birth certificate or anything else to prove alienage. It was the government's burden and they did not carry it.

[6] According to the Department of Homeland Security website, individuals must present documentation of identity and citizenship to walk into the United States. These documents must include a photo, name and date of birth. Acceptable documents to prove citizenship include: birth certificate, passport, and certificate of naturalization. Surely, the government must present comparable evidence in a criminal prosecution to prove someone is an alien beyond all reasonable doubt. <u>See</u> http://www.dhs.gov/xtrvlsec/crossingborders/index.shtm.

**B.    Mr. Garcia's Field Statements Should Have Been Suppressed Because He Was in Custody, Interrogated and Had Not Been Given <u>Miranda</u> Warnings.**

Mr. Garcia's first set of statements should have been suppressed because he was not advised of, nor did he waive, his <u>Miranda</u> rights prior to the custodial interrogation. To admit inculpatory statements made by a individual during custodial interrogation, the individual must have voluntarily, knowingly, and intelligently waived his Miranda rights. <u>United States v. Shi</u>, 525 F.3d 709, 727 (9th Cir. 2008). Mr. Garcia did not waive his rights in the field because he was never read his rights in the field.

**1.    The Magistrate Court Correctly Found That Mr. Garcia Was In Custody At The Time Agent Kim Questioned Him.**

Under Ninth Circuit and Supreme Court precedent, Mr. Garcia was in custody because a reasonable person in his situation would not have felt free to leave. <u>See</u>  <u>United States v. Hernandez</u>, 476 F.3d 791, 796 (9th Cir. 2007) (stating "a person is in custody if 'a reasonable person ... felt he or she was not at liberty to terminate the interrogation and leave'") (quoting <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995)). The circumstances that should be considered in this analysis include, "the language used by the officers, the physical characteristics of the place where the question occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the extent to which the person was confronted with evidence of guilt." <u>Hernandez</u>, 476 F.3d at 798-87 (quoting <u>United States v. Butler</u>, 249 F.3d 1094, 1099 (9th Cir. 2001)).

Here, the trial court correctly concluded Mr. Garcia was in custody when he was arrested by Border Patrol Agent Kim. TBT 104. The court stated, "I think from the agent's own mouth, his job was to arrest people at the border. It clearly made it clear that he had every intention of holding Mr. Garcia, and he was not going to let him get away." TBT 104. Mr. Garcia was arrested within yards of where he allegedly jumped over the border. TBT 104. Upon approaching  Mr. Garcia, Agent Kim ordered him to put his hands in the air, he handcuffed him and patted him down; at no point did Agent Kim do anything that would have suggested to Mr. Garcia or any objective observer that  Mr. Garcia would be permitted to terminate the interrogation and leave. TBT 50-51. Finally, at trial, Agent Kim admitted that he would arrest anyone who had jumped over the border fence. TBT 58. He explained he would make this arrest because of his training as a Border Patrol agent. TBT 57-58.  The magistrate court's finding that Mr. Garcia was in custody was correct.

//

**2.     The Field Statements That Mr. Garcia Made While In Custody Were In Response To Interrogation**.

Agent Kim asked Mr. Garcia questions reasonably designed to elicit incriminating responses while Mr. Garcia was in custody.  This interrogation occurred in violation of <u>Miranda</u>.  In <u>Hernandez</u>, 476 F.3d at 796, the Ninth Circuit affirmed that interrogation is "express questioning" by law enforcement agents that they "*should* know are reasonably likely to elicit an incriminating response from the suspect." (emphasis added, internal quotation marks omitted).  Thus, whether interrogation occurred is determined by an objective standard.

Here, the trial court also appears to have concluded that Garcia was asked incriminating questions. TBT 105. The court found that Mr. Garcia had been asked questions about his alienage, such as, where he was from, and whether he had immigration documents. TBT 105.

However, the trial court applied the wrong legal analysis. It appears to have mistakenly concluded that the incriminating questions must have been asked with the *purpose* of eliciting incriminating information. TBT 105. The court stated "the officer did not do it for the purpose of gaining incriminating evidence." TBT 105. It is not the subjective intent, or purpose, of a law enforcement officer that is relevant to determining interrogation under Miranda.  <u>See</u>  <u>Hernandez</u>, 476 F.3d at 796 (appropriate question was whether officer "knew or should have known his question could reasonably lead to an incriminating response. . . ").  Whether custodial questioning constitutes custodial interrogation for purposes of <u>Miranda</u> is an objective one. <u>Id</u>.

A reasonable officer, especially a reasonable Border Patrol agent, should have known that the questions he asked Mr. Garcia were "reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980); <u>Hernandez</u>, 476 F.3d at 796.  As the court found, the officer asked Mr. Garcia the incriminating questions as part of his "basic investigation duties."  TBT 105. Agent Kim was a United States Border Patrol Agent.  TBT 45.  His job was to protect "our nation's borders." TBT 46.  He had extensive training in "immigration law, naturalization law, U.S. statutory laws, how to arrest." TBT 46.  More importantly, Agent Kim admitted that he would *arrest* any alien who had jumped over the border fence and thereby eluded examination and inspection.  TBT 58.  Thus, Agent Kim was well aware, as any well trained Border Patrol agent would have been, that any statements Mr. Garcia made regarding alienage would likely be incriminating.

12

1    **3.    Mr. Garcia's Field Statements Should Have Been Suppressed Because He Was Interrogated In Custody And Was Not Advised Of, Or Given The Opportunity To Waive His <u>Miranda</u> Rights.**

2

3    To admit inculpatory statements made by a individual during custodial interrogation, the individual

4    must have voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights. <u>United States v. Shi</u>, 525 F.3d

5    709, 727 (9th Cir. 2008). Mr. Garcia did not waive his <u>Miranda</u> rights, and the government brought no

6    evidence that he did. In fact, there was no evidence that he was informed of his rights. As such, the

7    statements should be suppressed.

8    **C.    Mr. Garcia's Post-<u>Miranda</u> Statements Should Have Been Suppressed.**

9    The trial court introduced post-arrest statements made by Mr. Garcia that allegedly occurred following

10   <u>Miranda</u> warnings. However, The government failed to prove effective <u>Miranda</u> warnings or a valid waiver

11   by Mr. Garcia. For any statements made by Mr. Garcia to be admissible against him, the government must

12   demonstrate that they were obtained in compliance with <u>Miranda</u>. When interrogation continues without the

13   presence of an attorney, and a statement results, the government has a heavy burden of proving an intelligent

14   and voluntary waiver of the privilege against self-incrimination. <u>Miranda</u>, 384 U.S. at 475. The court must

15   indulge every reasonable presumption against waiver of fundamental constitutional rights, so the burden on

16   the government is great. <u>United States v. Heldt</u>, 745 F. 2d 1275, 1277 (9th Cir. 1984).

17   In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the totality

18   of the circumstances surrounding the case. <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981); <u>United States v.</u>

19   <u>Garibay</u>, 143 F.3d 534 (9th Cir. 1998). The Ninth Circuit has held that determination of the validity of a

20   <u>Miranda</u> waiver requires a two prong analysis: the waiver must be both (1) voluntary and (2) knowing and

21   intelligent. <u>Derrick v. Peterson</u>, 924 F. 2d 813 (9th Cir. 1990). The second prong requires an inquiry into

22   whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and

23   the consequences of the decision to abandon it." <u>Id.</u> at 820-821 (quoting <u>Colorado v. Spring</u>, 479 U.S. 564,

24   573 (1987)). Not only must the waiver be uncoerced, then, it must also involve a "requisite level of

25   comprehension" before a court may conclude that <u>Miranda</u> rights have been legitimately waived. <u>Id.</u> (quoting

26   <u>Colorado v. Spring</u>, 479 U.S. at 573). Unless and until <u>Miranda</u> warnings and a knowing and intelligent

27   waiver are demonstrated by the prosecution, no evidence obtained as a result of the interrogation can be used

28   against the defendant. <u>Miranda</u>, 384 U.S. at 479.

13

1          **1.      Mr. Garcia was not properly advised of his <u>Miranda</u> rights.**

2          Prior to the post-arrest interrogation, government agents attempted to advise Mr. Garcia of his <u>Miranda</u>

3   rights. <u>Miranda</u> affords all individuals the right to be informed, prior to custodial interrogation, "that [they

4   have] the right to the presence of an attorney, and that if [they] cannot afford an attorney one will be appointed

5   for [them] prior to any questioning if [they] so desire[ ]." 384 U.S. at 479. In order to be in compliance with

6   <u>Miranda</u>, a person must receive "advice [that is "meaningful"] to the unlettered and unlearned in language

7   which [they] can comprehend and on which [they] can knowingly act." <u>Coyote v. United States</u>, 380 F.2d 305,

8   308 (10th Cir. 1967).

9          In this case, Mr.Garcia was advised, in part,

10         You have the right to speak with an attorney so that he may counsel you before we ask you
           questions, and he can be present during the questioning. If you do not have the means to hire
11         an attorney, one will be designated before any questioning, if you wish.

12   BTT 4.

13         The above advisement is insufficient because being informed that an attorney will be *designated* is

14   not the same as one being *appointed*. <u>San Juan-Cruz</u>, 314 F.3d at 388 ("the warning . . . must make clear that

15   if the arrested party would like to retain an attorney, the Government is obligated to <u>appoint</u> an attorney <u>for</u>

16   <u>free</u>") (emphases added). Designation does not state or imply appointment, it does not state or imply an

17   "obligation" to appoint, and it does not state or imply "free" appointment. Accordingly, because the

18   advisement does not substantially comply with <u>Miranda</u>, all of Mr. Garcia's statements from the interrogation

19   must be suppressed.

20         **2.      This Court should suppress Mr. Garcia's post-<u>Miranda</u> statements
                     under <u>San Juan Cruz</u>.**
21

22         Here as in <u>San Juan-Cruz</u>, 314 F.3d at 387-88, two different and conflicting sets of warning were read

23   to the defendant. In <u>San Juan-Cruz</u> was informed of his administrative rights pursuant to 8 C.F.R. § 287.3.

24   <u>Id</u>. Mr. San Juan-Cruz was then advised, under <u>Miranda</u>, that if he could not afford an attorney, one would

25   be appointed for him. <u>Id</u>. The Ninth Circuit unambiguously held:

26         [T]o be valid, a <u>Miranda</u> warning must convey *clearly* to the arrested party that he or she
           possesses the right to have an attorney present prior to and during questioning. The warning
27         also must make clear that if the arrested party would like to retain an attorney but cannot afford
           one, the Government is obligated to appoint an attorney for free.

28

1  Id. at 388 (citation omitted, emphasis in original). The Ninth Circuit determined that the two sets of warnings

2  were confusing because the defendant could not reasonably ascertain from the warnings provided whether he

3  could or could not retain the services of an attorney for free. Id. To rectify the situation, the interrogating

4  agent should have *clarified* his statements or advised San Juan to *"disregard"* the administrative rights in

5  favor of those read to him under Miranda. Id. at 389.

6      There was no clarification here, there was no advisal to disregard, and therefore the Miranda warning

7  provided following the administrative warning was not only ineffective on its face, it was confusing because

8  it conflicted with a different set of rights read to Mr. Garcia minutes before. San Juan Cruz, 324 F.3d at 389.

9  As Agent Villareal candidly acknowledged at trial, at no point did he tell Mr. Garcia to *disregard* the

10  administrative rights. TBT 96. Mr. Garcia had been made aware or his administrative rights a mere forty

11  minutes earlier as he was being initially processed for removal. TBT 80. Further, Agent Villareal never stated

12  that he attempted to clarify the differences between the administrative and criminal rights. See TBT 77-98.

13      Mr. Garcia was confused. Thus, his waiver of rights was neither knowing or intelligent. Although the

14  trial court concluded that the Spanish verb "designar" translated to "appoint," there was no expert testimony

15  as to the meaning of the verb "designar" within either the Mexican or Mexican-American Spanish-speaking

16  community. Further, Mr. Garcia submitted a declaration at trial stating that if he had known he had the right

17  to a free lawyer, then he would not have answered questions at that time. More tellingly, at the very end of

18  the interrogation, after which Mr. Garcia had supposedly been advised of all his rights, told that he was going

19  to be criminally prosecuted, and then waived his rights, he asked: "how long I'm going to stay?" TBT 93.

20  Thus, it is clear that Mr. Garcia thought he would be returned to Mexico within hours like the vast majority

21  of people caught at the border every day. See TBT 91.

22      Based upon this record, the trial court clearly erred in admitting the statements. Further, upon a de

23  novo review of this mixed question of fact and law, the government cannot meet its heavy burden of proving

24  effective warnings or a valid waiver.

25      **3.    This Court should suppress Mr. Garcia' post-Miranda statements under Seibert.**

26

27      Even if the Miranda warnings were effective and there was a valid waiver, the post-Miranda

28  statements must be suppressed because they were the result of a deliberate two-step interrogation of Mr.

1 Garcia.  Therefore they must be suppressed under <u>Seibert</u>, 542 U.S at 617.  There is ample evidence that the

2 two-step process was deliberate.  First, there was no legitimate reason to not immediately provide Miranda

3 warnings to Mr. Garcia upon apprehension.  Second, Agent Villareal referenced Mr. Garcia's pre-<u>Miranda</u>

4 statements in the process of obtaining the post-<u>Miranda</u> statements.  Third, any curative measures taken were

5 ineffective.

6     In <u>Seibert</u>, 542 U.S. at 617, the court held that post-Miranda statements are inadmissable if law

7 enforcement officers conduct a deliberate two-step interrogation process.  A two-step interrogation process

8 involves eliciting an un-warned confession, then administering the <u>Miranda</u> warnings, obtaining a waiver, and

9 eliciting a repeated confession.  <u>Id.</u> at 609-10.  If the interrogators deliberately employ the two-step strategy,

10 the post-warning statements must be suppressed, absent evidence that the interrogators took curative measures

11 to apprise the defendant of his rights.  <u>See United States v. Williams</u>, 435 F.3d 1148, 1157-58 (9th Cir. 2006).

12     In order to determine whether a two-step process was deliberate, a court should consider both objective

13 evidence and subjective intent.  <u>Id.</u> at 1160.  In <u>Williams</u>, the court stated that during a custodial interrogation,

14 "there is rarely, if ever, a legitimate reason to delay giving a <u>Miranda</u> warning until after the suspect has

15 confessed."  435 F.3d at 1159.  The court went on to explain, "the most plausible reason for the delay is an

16 illegitimate one."  <u>Id</u>

17     Here, the two step method was deliberate because there was no legitimate reason for not giving Mr.

18 Garcia warnings immediately upon apprehension. The arresting officer testified that he would arrest anyone

19 who jumped over the border fence, which is what he believed Mr. Garcia had done. TBT 57. Further, the trial

20 court concluded that Mr. Garcia was subject to custodial interrogation upon his arrest. TBT 104.

21     To compound the failure to provide warnings in the field, Agent Villareal referenced Mr. Garcia'

22 admission of alienage during the second step of the interrogation process (post-<u>Miranda</u>). TBT 94-95. This

23 reference to his admission of alienage occurred before Mr. Garcia had been asked any questions regarding his

24 alienage. TBT 95.

25     Further, any curative measures were ineffective, as discussed above when considering <u>San Juan Cruz</u>

26 error. The <u>Miranda</u> warnings themselves were not enough to effectively communicate to Mr. Garcia that he

27 was being held to face criminal charges.

28 //

1  Mr. Garcia's statements should have been suppressed because of <u>Seibert</u> error because they were the

2  result of a deliberate two-step interrogation and no effective curative measures were taken.

3  **D.    Mr. Garcia Was Prejudiced By The Erroneous Admission Of The Statements.**

4  Mr. Garcia's conviction and sentence should be vacated because the unlawfully obtained confession

5  of alienage was not harmless beyond a reasonable doubt.  As the Supreme Court set out 41 years ago, the

6  government bears the burden of proving beyond all reasonable doubt that a constitutional error was harmless.

7  <u>Chapman</u>, 386 U.S. at 24 (placing the burden on "the beneficiary of [the] constitutional error").  Recently, the

8  Ninth Circuit explained in the context of confessions that inculpatory statements are only harmless when they

9  do not go the heart of the case. <u>See</u> <u>Williams</u>, 435 F.3d at 1157-58.  Here, the heart of the case was alienage.

10  Mr. Garcia unlawfully obtained confessions regarded alienage. These statements were essential the

11  governments case.  The constitutional error was not harmless beyond all reasonable doubt, and Mr. Garcia's

12  conviction and sentence should be vacated.

13  **III.**

14  <u>**THE GOVERNMENT DID NOT PROVE THE IDENTITY OF THE DEFENDANT BEYOND A REASONABLE DOUBT.**</u>

15

16  The government had the burden of proving beyond all reasonable doubt that the defendant present in

17  the court room was the same person who committed the charged crime. <u>United States v. Alexander</u>, 48 F.3d

18  1477, 1490 (9th Cir. 1995). The arresting agent never identified the individual present in court as being the

19  same person that he arrested for climbing the border fence. The government did not meet its burden. The trial

20  court erred in denying Mr. Garcia's motion of acquittal. The conviction should be vacated.

21  The government could have moved to re-open its case, but it did not. <u>See</u> <u>United States v. Ramirez</u>,

22  608 U.S. 1261, 1267 (9th Cir. 1979). Under the deferential abuse of discretion standard of review, the trial

23  judge would have had wide latitude in deciding whether to permit the government to present more evidence.

24  <u>Id</u>.

25  **A.    Standard of Review**

26  This Court is to apply the same test that the trial court was required to apply in deciding to grant the

27  motion for acquittal.  <u>Alexander</u>, 48 F.3d at 1490. As discussed above, in considering a motion for judgment

28  of acquittal, this Court must consider all the evidence in the light most favorable to the government. <u>Id</u>. In this

1  context, the court must determine whether any rational trier of fact could have determined that the government

2  met its burden or proving beyond all reasonable doubt that the defendant was the person who violated 8

3  U.S.C. 1325(a).

4  **B.  The defendant at trial was not identified as the person who scaled the border fence.**

5
6  **1.  Here, as in <u>United States v. Darrell</u>, the government failed to prove the identity of Mr. Garcia beyond a reasonable doubt.**

7  Where there is limited evidence identifying the defendant as the person who committed the crime,

8  there is insufficient evidence of identification.  <u>See</u> <u>United States v. Darrell</u>, 629 F.2d 1089 (5th Cir. 1980).

9  In <u>Darrell</u>, the court concluded that there was "no evidence" permitting the inference that the defendant was

10  the person who committed the crime.  <u>Id</u>. at 1091.

11  In <u>Darrell</u>, the Fifth Circuit concluded that there was insufficient evidence of identification despite

12  there being an abundance of circumstantial evidence of identity. <u>Id</u>. at 1091.  The defendant, James R. Darrell,

13  was charged under a mail fraud statute for attempted bank fraud.  <u>Id</u>. at 1090. The government presented

14  evidence that multiple bank accounts were opened at different times in the name of "James R. Darrell." <u>Id</u>.

15  Further, the government presented evidence that multiple bad checks had been written and signed "J. Darrell".

16  <u>Id</u>. Then, at least one of these accounts  was effectively closed by a check for cash signed by a "James R.

17  Darrell". <u>Id</u>. Additionally, the banks received correspondence signed by a James R. Darrell on James R.

18  Darrell letterhead.  <u>Id</u>. at 1091. Finally, four bank officials took the stand to testify about their experiences

19  with Mr. Darrel. <u>Id</u>. at 1090.

20  Further, there were many rational inferences that could have been made from the evidence presented

21  that would have supported a finding of identification. Presumably, someone had to go into the bank to open

22  these accounts, present identification, and sign. There was no suggestion in the court's opinion that any of the

23  four bank officials said that the defendant was not the person who committed the crime.

24  Yet, the trial court concluded that the evidence in the record did not support the inference of

25  identification. <u>Id</u>. at 1091.  The Court of Appeals affirmed the District Court's finding that the government

26  had not met its burden. <u>Id</u>.

27  Here, as in <u>Darrell</u>, there was some evidence of identity, but not enough for the government to meet

28  its burden of proving identity beyond a reasonable doubt.  During closing arguments, the government argued

1  that there was evidence suggesting that Agent Kim believed the defendant was the person who committed the

2  crime. TBT 130.  The same was true in <u>Darrell</u>. However, in both cases the information was limited and

3  insufficient for the government to meet its burden of proving identity beyond all reasonable doubt. Mr. Garcia'

4  conviction and sentence should be reversed.

5          Not one witness identified Mr. Garcia as the person who scaled the fence. The scope operator—who

6  allegedly watched Mr. Garcia scale the border fence—was in fact unable to identify Mr. Garcia in the

7  courtroom as the individual he had seen scaling the border fence.  TBT 44. The scope operator testified that

8  he had sight of the fence-scaler until the arresting officer arrived, TBT 44, suggesting that he had a good look

9  at the individual.  Further, the arresting officer, Agent Kim, did not identify Mr. Garcia as the person he had

10 arrested several weeks before.  Additionally, Agent Kim acknowledged that he had lost the I-826 form that

11 could have provided evidence of a connection between the person arrested and the person in court.  TBT 59.

12 The government was entitled to reopen its case, but failed to even make that request.  <u>See</u> <u>Ramirez</u>, 608 U.S.

13 at 1267.

14         Officer Villareal, who took the post-Miranda statements, was the only individual who identified the

15 defendant. TBT 85. He identified him merely as the person he "interviewed." TBT 84. He did not identify him

16 as the person who scaled the fence. <u>See</u> TBT 77-99. 629 F.2d at 1091.

17         The evidence here is no better than the court had in <u>Darrell</u>, 629 F.3d at 1091.  Because the

18 government has not met its burden of proving identity beyond all reasonable doubt, Mr. Garcia is entitled to

19 a judgment of acquittal.

20                                                    **IV.**

21 **ALL INFORMATION RELATED TO MR. GARCIA'S DNA SHOULD BE DESTROYED.**

22         The trial court did not have statutory authority to order Mr. Garcia to submit DNA samples. These

23 DNA samples and any information derived from them and retained by the federal government or its agents

24 should be destroyed.

25         The original judgment in this case was filed June 13, 2008. As part of the sentence of probation, the

26 trial court ordered Mr. Garcia to "cooperate in the collection of DNA as directed by the probation officer

27 //

28 //

1   pursuant to 18 USC 3583(d).[7]

2       18 U.S.C. § 3583(d) governs imposition of a term of supervised release after incarceration. While §

3   3583 specifically enumerates when the government has authority to collect DNA samples, Mr. Garcia was

4   not sentenced to a term of imprisonment of supervised release. Thus, this statute did not apply to give the

5   court or the government the authority to take a DNA sample from Mr. Garcia.

6       18 U.S.C. § 3563 is the statute that describes both mandatory and discretionary conditions of

7   probation. Under sub-paragraph (a)(9), a court must order "the defendant to cooperate in the collection of a

8   DNA sample from the defendant if the collection of such a sample is authorized pursuant to section 3 of the

9   DNA Analysis Backlog Elimination Act of 2000."

10       In turn, the DNA Analysis Backlog Elimination Act of 2000 is codified in relevant part at 42 U.S.C.

11   § 14135a(a)(2). The statue provides:

12       The probation office responsible for the supervision under Federal law of an individual on
       probation, parole, or supervised release shall collect a DNA sample from each such individual
13       who is, or has been, convicted of a qualifying Federal offense (as determined under subsection
       (d) of this section) or a qualifying military offense, as determined under section 1565 of Title
14       10.

15   The statute further provides that the qualifying Federal offense are:

16       (1) Any felony.

17       (2) Any offense under chapter 109A of Title 18.[8]

18       (3) Any crime of violence (as that term is defined in section 16 of Title 18.

19       (4) Any attempt or conspiracy to commit any of the offenses in paragraphs (1) through (3).

20   42 U.S.C. § 14135a(d).  Under this act, the Court did not have the statutory authority to order Mr. Garcia to

21   submit to DNA collection. Mr. Garcia was convicted of a misdemeanor in violation of 8 U.S.C. § 1325.  This

22   conviction was not a felony, a sex crime, a crime of violence or an attempt or conspiracy to commit any of

23   these offenses.

24       Any DNA samples taken from Mr. Garcia and any records containing any information about it should

25   _____

26       [7] The trial court filed an Amended Judgment on July 11, 2008 which did not include the
    condition that Mr. Mr. Garcia submit to DNA collection. Defense counsel has no information as
27     to whether or not DNA evidence was actually taken from Mr. Garcia. Regardless, the
    government should be ordered to investigate if the DNA was taken and to destroy it if found.
28

      [8] Chapter 109A of Title 18 defines crimes of sexual abuse.

1 │ be destroyed.  The government should destroy not just the actual sample taken, it should also delete all records

2 │ in its possession or in the possession of any of its private contractors.

3 │ **V.**

4 │ **<u>CONCLUSION</u>**

5 │          For the foregoing reasons, Mr. Garcia respectfully requests that this Court vacate the magistrate court's

6 │ judgment of conviction and imposition of probation.

7 │                                        Respectfully submitted,

8 │

9 │ DATED:          August 11, 2008                    ___s/JAMES M. CHAVEZ_____

10 │                                        **JAMES M. CHAVEZ**
                                         Federal Defenders of San Diego, Inc.

11 │                                        225 Broadway, Suite 900
                                         San Diego, California 92101
                                         Telephone: (619) 234.8467

12 │                                        Attorneys for Defendant-Appellant

# Exhibit A

1              UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF CALIFORNIA

3

4  UNITED STATES OF AMERICA,    )  Case No. 08CR1761-JM
                        )
5         Plaintiff,    )  San Diego, California
                        )
6  vs.                 )  Wednesday,
                        )  June 11, 2008
7  JAVIER GARCIA-VILLEGAS,    )  9:00 a.m.
                        )
8         Defendant.    )
  _____)
9

10         TRANSCRIPT OF MOTION HEARING/BENCH TRIAL
        BEFORE THE HONORABLE ANTHONY J. BATTAGLIA
11           UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiff:         GEORGE V. MANAHAN, ESQ.
                        Assistant United States
14                         Attorney
                        880 Front Street
15                        San Diego, California 92101

16  For the Defendant:         FEDERAL DEFENDERS OF SAN DIEGO
                        By:  JOHN ELLIS, ESQ.
17                        BY:  JAMES M. CHAVEZ, ESQ.
                        225 Broadway, Ninth Floor
18                        San Diego, California 92101
                        (619) 234-8467
19

  Transcript Ordered by:     JAMES M. CHAVEZ, ESQ.
20

  Transcriber:            Jordan Keilty
21                        Echo Reporting, Inc.
                        6336 Greenwich Drive, Suite B
22                        San Diego, California 92122
                        (858) 453-7590
23

24

25  Proceedings recorded by electronic sound recording;
  transcript produced by transcription service.

ii

1                          I N D E X

2  WITNESSES:                DIRECT   CROSS   REDIRECT   RECROSS

3  Alan Gomer                  32      37        --         --

4  Andrew Kim                  45      54        73         75

5  Ramon Villarreal            77      85        97         --

6  Alfonso Hernandez           99      --        --         --

7

8  EXHIBITS:                            IDENTIFIED   RECEIVED

9  Plaintiff's

10  1     Photograph                        47          48

11  2     Photograph                        48          49

12  3     Transcript of interview           81          81

13  Defendant's

14  A     I214                              15          --

15  B     Printout                          38          --

16  C     I213                              55          63

17  D     Notice of rights                  55          --

18  E     Notice to appear                  56          72

19  F     Warrant of arrest                 56          --

20  G     Secondary processing document     56          --

21

22

23

24

25

1

1    SAN DIEGO, CALIFORNIA  WEDNESDAY JUNE, 11, 2008 9:00 A.M.

2                          --oOo--

3        (Call to order of the Court.)

4            THE CLERK:  Number one on calendar, Case Number

5    08CR1761-JM, United States of America versus Javier Garcia-

6    Villegas.

7            MR. ELLIS:  Good morning, your Honor.  John Ellis,

8    Federal Defenders, James Chavez, Federal Defenders, on

9    behalf of Mr. Garcia-Villegas, present before the Court in

10   custody, being assisted by the Spanish language interpreter.

11           THE COURT:  Okay.  Good morning all.

12           Mr. Manahan.

13           MR. MANAHAN:  Good morning, your Honor.  George

14   Manahan for the United States.  Sitting at my table is case

15   agent, Border Patrol Agent Villarreal.

16           THE COURT:  Okay.  Good morning, gentlemen.

17           And in the -- this is a day set for the bench

18   trial I take it -- and the motion hearing.  I take it both

19   sides are ready.

20           MR. ELLIS:  We are, your Honor.

21           MR. MANAHAN:  Yes, your Honor.

22           THE COURT:  And the -- there has been a

23   superseding information filed.  So why don't we as a first

24   order of business arraign Mr. Garcia on that and then go

25   forward from there.

2

```
 1           THE CLERK:  Javier Garcia-Villegas, is that your
 2    true name?
 3           THE DEFENDANT (Through interpreter):  Yes.
 4           THE CLERK:  You are informed that a superseding
 5    information has been filed charging you with attempted
 6    illegal entry and eluding examination or inspection by
 7    immigration officers.
 8           Counsel have you received a copy of the
 9    superseding and waive further reading?
10           MR. ELLIS:  Received and so waived.
11           THE CLERK:  You are further informed that you have
12    the right to be represented by counsel at all stages of the
13    proceedings before the Court.  You have the right to remain
14    silent.  You have the right to a trial by jury.  You have
15    the right to confront and cross examine any witnesses who
16    testify against you, and you have the right to have
17    witnesses subpoenaed to testify on your behalf.
18           How do you now plead to the superseding
19    information?
20           MR. ELLIS:  Not guilty.
21           THE COURT:  All right.  Not guilty plea is
22    entered, Mr. Garcia.  And you may sit down sir.
23           Let's address the motions first.  The Defendant's
24    first motion was that the information that was on file
25    failed to allege an essential element.  Has that been made
```

3

1  moot by the superseding information, Mr. Ellis, or is there

2  still a concern?

3        MR. ELLIS:  Your Honor, that motion would now

4  apply to Count 1 of the superseding information.

5        THE COURT:  Okay.  And since it's -- we've heard

6  from the Government by way of opposition, anything you'd

7  like to say in terms of this -- this particular count or the

8  issue in response?

9        MR. ELLIS:  The only thing I'd add, your Honor, is

10  that the Supreme Court and the Ninth Circuit have only

11  addressed this issue in the context of 1326.  It hasn't been

12  addressed on the issue of 1325.  It makes sense in the

13  context of 1326 that the overt act is assumed because the

14  language of the two statutes is very different.

15        The way the statute is written in this case, it's

16  critical that the information charge the overt acts taken by

17  the Defendant.  It's not done in this case, and that's

18  important because the language of the information simply

19  states that he entered the United States at a time and place

20  other than designated by immigration officers.  It doesn't

21  list the time, place, or indicate why it wasn't designed to

22  immigration officers.  I think it's distinguishable from the

23  Supreme Court case law.  I think it's deficient, and it

24  should be dismissed.

25        THE COURT:  Okay.  And, Mr. Manahan, anything

4

1  further you'd like to say on it?

2          MR. MANAHAN:  Just to reiterate, your Honor, that

3  the Supreme Court held the word "attempt" carries with it an

4  implication of an overt act in furtherance of the charge

5  attempt.  It doesn't say anything about the other language

6  of the statute.  It simply talks about the word "attempt."

7          THE COURT:  Right.  And I think that that's right,

8  and I'll deny the motion to dismiss Count 1.  I think the

9  Supreme Court gave us guidance on what the meaning is as to

10  attempt in a criminal context.  I think it's as applicable

11  here as it would be in a 1326, even though they're -- the

12  statutes are characterized differently or had different

13  characteristics to them.  And so that motion is denied.

14          Motion number two is about the information being

15  duplicitous, and has that now been cured by the superseding

16  indictment or does an issue remain there, Mr. Ellis?

17          MR. ELLIS:  Your Honor, I would just for the

18  record indicate that, as our motion has made clear, we

19  believe that by using the word "and" in both Count 1 and

20  Count 2 now that it still is duplicitous.  1325 could be

21  based on entering at a time or a place other than

22  designated.  I believe that for those reasons, Count 1 is

23  still duplicitous.

24          Regarding Count 2, your Honor, it also -- it's

25  eluded examination and inspection, and it's examination or

5

1  inspection.  So we'd still reiterate that Count 1 and Count
2  2 of the superseding information are duplicitous.
3         THE COURT:  Okay.  Although you said time or
4  place.  It actually says time and place in Count 1 now.
5         MR. ELLIS:  That's what would make it two.  I
6  think under the statute it would really be time or place.
7         THE COURT:  Time or place.  Okay.
8         MR. ELLIS:  And so I think that's the problem.
9         THE COURT:  Okay.  Good.  Fair enough.  Mr.
10 Manahan, anything further you want to say on that?
11        MR. MANAHAN:  Your Honor, although 1325(a) breaks
12 down into three different subparts, the counts in the
13 superseding information clearly mirror the first and the
14 second subpart.  I don't think it's duplicitous.
15        Regardless, your Honor, as I mentioned in my
16 brief, even if it was duplicitous, that's not a reason to
17 dismiss the information.  It's simply a matter not to
18 confuse a jury.  We have a bench trial.  I'm certain your
19 Honor will be able to understand the elements that have to
20 be met.
21        THE COURT:  Yeah.  I'm going to deny that motion
22 too.  Whether or not it would be duplicitous in a jury
23 context, this is a bench trial, and I don't find it
24 confusing, and I think I understand what the Government's
25 burden of proof is on that.  So that's denied.

6

1        The third motion deals with the motion to suppress
2  the field statements, and --
3        MR. ELLIS:  Your Honor, can -- sorry to interrupt.
4        THE COURT:  Did I miss something?  I'm sorry.
5        MR. ELLIS:  The agents are present in court today.
6  I have no problem with the case agent staying.  I would ask
7  prior to this motion that the other agents be asked to
8  leave.
9        THE COURT:  Okay.  Any objection, Mr. Manahan?
10        MR. MANAHAN:  No, your Honor.
11        THE COURT:  All right.  The agents that are
12  sitting in the gallery, except for the case agent at counsel
13  table, need to wait outside.  Thank you very much, folks,
14  and thanks for mentioning that, Mr. Ellis.  I was thinking
15  that but didn't act on it before you mentioned it.
16        Go ahead.  So we've got the first issue as to the
17  field statement, and there's a second issue as to the post-
18  Miranda statement.  Anything you want to say further, Mr.
19  Ellis?
20        MR. ELLIS:  I do, your Honor.  I wanted to --
21        THE COURT:  Is this another case agent?
22        MR. ELLIS:  No, your Honor.  That's my
23  investigation.
24        THE COURT:  Okay.
25        MR. ELLIS:  He's not testifying.

1          THE COURT:  All right.  Fair enough.

2          MR. ELLIS:  Your Honor, the Miranda rights are

3    driven by two questions, was there custody and was there

4    interrogation.  The cases relied upon by the Government say

5    in essence if Border Patrol encounters people near the

6    Mexican border that appear to be Hispanic, it's fair enough

7    for agents to ask them where are you from.

8          That's not what we have here.  What we have here

9    is the following.  I believe that what makes this

10   significant as far as custody is that the evidence that the

11   Government will put on today apparently is that a scope

12   operator saw someone who later turned out to be Mr. Garcia

13   cross two fences and then hide in a bush.  He was then

14   approached by Agent Kim who said "Get out."  Agent Kim

15   approached, handcuffed him, patted him down, and then said

16   words to the effect of "Are you a U.S. citizen?"

17         This is materially different than cases like

18   Galindo-Gallegos that the Government relied upon.  I think

19   the recent Ninth Circuit case of United States v. Hernandez

20   is instructive.  In Hernandez an individual was in secondary

21   inspection at the port of entry.  He was asked to get out of

22   the vehicle, to put his on top of the vehicle.  He was

23   subjected to a pat down, and in that pat down, the agent

24   found drugs, and he asked "What's this?"  The Ninth Circuit

25   reversed and found that the Court erred in letting that

8

statement in because his Fifth Amendment rights were
implicated because he was in custody, and a normal person
wouldn't have felt free to leave in that situation.  There
were other agents around him.  He'd been pulled out of the
car, subject to a pat down.

　　　　We have more than that here.  We have an order,
"Get out from behind that bush," a detention with handcuffs
and a pat down.  That's custody.  And considering Agent Kim
knew that Mr. Garcia-Villegas had just entered the United
States by jumping two fences, he had reason to believe that
his question "Are you a citizen of the United States" would
lead to an incriminating answer.  That's why these
statements must be suppressed, because they were received in
the absence of Miranda.

　　　　THE COURT:  Okay.  And, although I get a different
flavor from the briefing in terms of what the question was,
and maybe the disadvantage on this issue because we don't
have a transcript like we do for the second issue, but the
Government characterizes the question as -- the inquiry as
to country of citizenship, which would be a little
different.

　　　　But I don't know.  Mr. Manahan, you tell me, any
further response you have on this?  I'm wondering if we
don't need to hear from the agent before we get to that --
to the ruling on this, but go ahead.

9

1      MR. MANAHAN:  My understanding is the question was

2 either what country are you a citizen from or where were you

3 born, something to that effect, but I think the two cases

4 the Court should look at are <u>Cervantes-Flores</u>, which is a

5 2005 Ninth Circuit case, and <u>Butler</u>, which is a 2001 Ninth

6 Circuit case, and both of these cases address this exact

7 scenario where a Border Patrol or other immigration agent

8 encounters a suspected illegal alien and then starts asking

9 questions.

10      And, first of all, in <u>Butler</u>, the Ninth Circuit

11 made clear that Miranda is triggered by custody.  It is not

12 determined by the existence of probable cause but by looking

13 to the objective circumstances of an interrogation, and the

14 -- at least some of the circumstances the Court is to look

15 to is the language used by the officers, the physical

16 characteristics of the place where the questioning occurred,

17 the degree of pressure applied to detain the individual, the

18 duration of detention, and the extent to which the person

19 was confronted with evidence of guilt.

20      Now, in <u>Cervantes-Flores</u>, the Defendant was

21 handcuffed, and yet the Court made clear that that was still

22 a Terry stop and that the immigration agent was able to ask

23 about citizenship.  He as allowed to ask about place of

24 birth, citizenship, whether he had permission to be in the

25 United states, and how he had crossed into the United

10

1  States.  All those were appropriate questions to ask during

2  a Terry stop after he was handcuffed.

3      MR. ELLIS:  Your Honor, can I respond to the

4  Cervantes-Flores argument?

5      THE COURT:  Was that it, Mr. Manahan, or -- I

6  don't want to interrupt your train of thought, but we just

7  did.

8      MR. MANAHAN:  So just really briefly, in Butler,

9  where the Court did find the Defendant was in custody, the

10 Defendant was -- while the agents were searching his car, he

11 was placed in a locked inspection station security office,

12 and his shoes and his belt were confiscated.  At that point

13 they found that he was in custody, and that was in

14 opposition to another similar case where he was placed in an

15 unlocked room and that wasn't custody.

16      Your Honor, between these two cases, I think the

17 facts of this case are closer to Cervantes-Flores, and as in

18 that case, I think you should find that the field admissions

19 were made during an appropriate Terry stop and that Miranda

20 warnings were not necessary.

21      THE COURT:  All right.  Go ahead, Mr. Ellis, and

22 address the --

23      MR. ELLIS:  I apologize that I tried to interrupt.

24      THE COURT:  Well, he paused, and that made us

25 think that he was done.  But that's okay.  Go ahead.

1          MR. ELLIS:  Your Honor, the key to Cervantes-Lopez

2   and the other cases cited by the Government is this.  In not

3   one of those cases the Government cites did an officer see

4   or have collective knowledge that the crime had already

5   occurred if entering into the United States.  That's the

6   first distinguishing factor.

7          In this case they knew he had just broken the law.

8   They're going to testify that he jumped two fences,

9   including one that has razor wire at the top of it.

10          The second thing that I think is very important

11   about the handcuffing is this.  In Cervantes-Flores, the

12   Court made clear that where a suspect threatens physical

13   danger or flight, officers may use handcuffs in the course

14   of a Terry stop.

15          That's not what we have here, and the evidence

16   will show that Mr. Garcia was hiding in a bush.  He was not

17   trying to run.  He was ordered out, handcuffed, and patted

18   down.  This was not a Terry stop.  A reasonable person would

19   not have felt free to leave.  That's the test for custody,

20   and a reasonable person would not have felt free to leave,

21   and we have custody.

22          I think that's really -- the argument in this case

23   really comes down to custody more so than the questions

24   asked, and so I think it would be appropriate to even have

25   Agent Kim testify to this limited point.  From speaking with

1 Government counsel, just so the Court is aware, we don't

2 anticipate the trial portion of this lasting much more than

3 three hours, and so I think we would have time to at least

4 do some limited evidentiary hearings in regards to the

5 Miranda issues.

6          THE COURT:  Okay.  We could certainly do that.

7 Mr. Manahan?

8          MR. MANAHAN:  We could do that.  But just to

9 reiterate, the idea that he had reason to believe that he

10 had jumped two fences has nothing to do with custody.  The

11 Ninth Circuit makes clear it's not probable cause that goes

12 to custody, and it is the question that is asked.  That is

13 one of the specific characteristics the Ninth Circuit asked

14 us to look at in determining whether a defendant is in

15 custody.

16          THE COURT:  Well, I don't know that the -- it

17 wasn't Agent Kim that saw him jump the fence.  It was --

18          MR. MANAHAN:  No, but I believe that Agent Kim

19 will testify that he was informed by the remote video

20 surveillance system operator that someone had just -- and

21 maybe even helps him find the Defendant.

22          THE COURT:  Okay.

23          MR. MANAHAN:  We could have an evidentiary

24 hearing.  You could also deny it without prejudice, hear the

25 testimony, and then rule on it at the end of --

1        THE COURT:  That might be the more efficient.  I

2  mean, I would say this.  I think that we can't look at this

3  in a vacuum.  In a very technical way, Mr. Ellis makes some

4  very good points.  But we're here at the border in a

5  situation where common knowledge is there are -- you know,

6  it's a dangerous area.  The officer I don't think has

7  immediate backup in his presence, and it's not unusual to

8  restrain and pat down folks for purposes of the Terry type

9  of stop in this type of an area.  It's not like it's

10 downtown San Diego or somewhere where the circumstances

11 suggestive of danger based on experience would -- would

12 figure in.

13       So, I mean, I do think we need to hear from Agent

14 Kim, and so I'm going to deny the motion without prejudice

15 and we can hear the testimony in the trial portion, and the

16 motion can be renewed at that time.  If you want to take him

17 on voir dire first before we get too far into a lot of other

18 things, we can do that.  Otherwise, we'll just do it all in

19 one context.

20       MR. ELLIS:  Fair enough, your Honor.

21       THE COURT:  So that's denied without prejudice on

22 that basis at this time, and are we going to have the same

23 issue with the post-Miranda statements or -- I mean, that

24 seems a little more clear, but you tell me.

25       MR. ELLIS:  It depends on if you mean clear I win

14

1  or clear I lose.

2          THE COURT:  Well, I mean, we know what was said.

3          MR. ELLIS:  Yes, your Honor.  If I --

4          THE COURT:  There's two parts to that.  I mean, I

5  think --

6          MR. ELLIS:  Yes, your Honor.

7          THE COURT:  -- one is the relative coincidence of

8  the immigration advisal and then some 40 minutes later, if I

9  remember right, in my reading, the Miranda warning after

10 circumstances had changed in the minds of the prosecuting

11 agents, the agents -- and then, secondly, the use of the

12 word "designate" rather than appoint.  That's how I

13 understand the two focal points that you feel make the

14 statement subject to suppression.

15         MR. ELLIS:  Yes, your Honor.

16         THE COURT:  You tell me if I'm wrong.

17         MR. ELLIS:  Your Honor, I think you hit the nail

18 on the head on that one.  The -- I do have two things I

19 would like to add, though.

20         THE COURT:  Of course.  This is the time.  Go

21 ahead.

22         MR. ELLIS:  Based on the Government's reply on

23 Monday, I got a further declaration from my client.  I

24 called and relayed the substance of that declaration

25 yesterday to the prosecutor and gave him a copy of it today.

15

1  I'd like to approach at this time, your Honor.

2          THE COURT:  Okay.  Sure.

3          MR. ELLIS:  I'd ask if I could just file this.

4  It's declaration in support of the motion.

5          THE COURT:  Okay.  I've now reviewed that, and we

6  will go ahead and file that in support of the motion.  And

7  next?

8          MR. ELLIS:  The second thing I do, your Honor,

9  this is a -- for the record, I'm going to mark this as

10 Defense Exhibit A.  It's been provided to Government

11 counsel.  It's an I214, which is -- and it's in Spanish, and

12 this is the what I understand a fairly normal Spanish as

13 possible that's given.  With the Court's permission, what

14 I'd like to do is bring this to the Court and then ask if

15 the Court certified interpreter in court can just read that

16 one line so we can talk about the differences between the

17 word that's normally used and the word that was used in this

18 case.

19         THE COURT:  Okay.  Any objection, Mr. Manahan?

20         MR. MANAHAN:  No, your Honor.

21         THE COURT:  Okay.

22         MR. ELLIS:  I'll approach, your Honor, with the --

23         THE COURT:  Yeah, go ahead, and let me take a peek

24 at that.  Okay.  And do we have a copy for the interpreter?

25 So we just work from Exhibit A.

16

1           MR. ELLIS:  Yes, your Honor.

2           THE COURT:  Okay.  And if you'd like to have the

3  interpreter then read the appropriate -- or translate the

4  appropriate line or portion.

5           MR. ELLIS:  And, for the record, your Honor, this

6  would be the fourth asterisk on the page.

7           THE COURT:  Okay.  All right.  Mr. Interpreter, go

8  ahead and read the fourth asterisk line, translate it for

9  us.

10          THE INTERPRETER:  If you do not have the money to

11 employ an attorney, one can be provided before we ask you

12 any questions if you so desire.

13          THE COURT:  Okay.

14          MR. ELLIS:  I think that what's key about this,

15 your Honor, is the word "designated," and I know the

16 Government provided a declaration from one of their in-house

17 interpreters saying, well, that word could be used to mean

18 appoint, but, again, it's the Government that has the burden

19 of proving that the person who was read the rights

20 understood those rights, and I don't think that the word

21 "designate" really shows what the meaning of the term means

22 to receive an attorney.

23          We don't have that in this case.  It would have

24 been different if he would have been told one would be

25 provided to him.  I think that's also why his declaration is

17

1  key, because it's clear he reviewed the transcript in the

2  Spanish language.  He didn't take that to mean that he would

3  be provided a free attorney.  Had he have been told that, he

4  would have asked -- he would not have answered questions.

5          THE COURT:  Okay.  And, Mr. Manahan, anything

6  you'd like to add, sir?

7          MR. MANAHAN:  Yes, your Honor.  I didn't mention

8  it in my papers because I didn't have the declaration at the

9  time, but I think the key Ninth Circuit case is <u>United</u>

10 <u>States v. Amano</u>.  It's 229 F.3d 801.  It deals with a

11 Japanese defendant who was read his Miranda rights in

12 English, but in that case the Ninth Circuit stated:

13          "In a case involving a foreign national,

14          the Court should assess voluntariness by

15          examining among other things, whether

16          the Defendant signed a written waiver,

17          which we don't have in this case,

18          whether the advice of rights was in the

19          Defendant's native language, which it

20          was, whether the Defendant appeared to

21          understand those rights."

22          And we have a transcript, your Honor, where the

23 Defendant -- when the Defendant was asked "Do you understand

24 your rights," he said yes, and I believe the testimony later

25 on will show -- actually, we have a video if the Court would

18

1 like to look at the Defendant's demeanor when he was

2 answering those questions.

3         Whether the Defendant had the assistance of a

4 translator, yes.  Whether the Defendant's rights were

5 explained painstakingly, and I would argue that they were

6 here, your Honor.  If you could read the transcript, they

7 went over his right to an attorney not just in a simple

8 statement the way the Ninth Circuit said is all that's

9 required under Miranda, but they were -- it was about three

10 or four seconds his saying you have the right to an

11 attorney.  Even if you start talking to us, you could stop

12 and get an attorney.  And then later on they asked again

13 before they started asking question, "Is it okay if we asked

14 you questions without an attorney?"

15         And the last is whether the Defendant had

16 experience with the American criminal justice system, and

17 although this does appear to be the Defendant's first

18 contact with law enforcement officials, I believe that the

19 admissions that he gave in that post-Miranda interview were

20 such that he's lived in the United States for about 20

21 years.  He knows -- it's certainly not dispositive, but I

22 think living in the United States for 20 years, you're going

23 to get an understanding that if you don't -- can't afford an

24 attorney, you'll get one in this country.

25         I'd also think in order to understand that word

19

1  "designate," you have to look at the context of the

2  sentence.  When anyone is trying to understand the meaning

3  of a term, whether it be a constitutional scholar, whether

4  it be an interpreter, whether it be a literary critic, you

5  look at the context, and the context of this sentence was if

6  you do not have the means to afford an attorney, one will be

7  designated for you.

8        It doesn't -- that word doesn't make any sense

9  logically unless it has something to do with if you can't

10  afford an attorney one would be given to you.  Also, your

11  Honor, I think the Rules of Evidence are clear that you

12  could take judicial notice of dictionaries, and I could cite

13  some law if you would like me to, but I've already provided

14  you the definition from the Webster's Third New

15  International Dictionary.  And as said that designate is a

16  synonym for appoint, and it also defined -- excuse me for

17  just a second, your Honor.

18        THE COURT:  The definition --

19        MR. MANAHAN:  It defined --

20        THE COURT:  Go ahead.

21        MR. MANAHAN:  It defined the English term

22  designate as to decide upon, nominate, delegate, appoint,

23  especially to assign officially by executive or military

24  authority.

25        In addition, your Honor, you can take judicial

20

notice of the Spanish English Dictionary which I have which
defines the Spanish verb designar.  It's first definition is
appoint, and it's only its second definition is designate,
and then it gives multiple examples of how the verb designar
can be used to appoint.  And, clearly -- so clearly I think,
your Honor, we have a statement that's the exact same as if
you don't have the means to afford an attorney, one will be
appointed for you, which has been used a million times or
more in our criminal justice system.  I think we have
basically the same statement.

　　　　THE COURT:  Right.  And why don't you go ahead and
tell us the publisher and the year and, Mr. Ellis, let's
take a look at that definition too if you'd like, but why
don't you read into the record the --

　　　　MR. ELLIS:  The Spanish English Dictionary, your
Honor?

　　　　THE COURT:  Yeah, who published it, what hear,
and --

　　　　MR. ELLIS:  Yeah.  That's <u>Harper Collins Spanish
Unabridged Dictionary Sixth Edition</u>, and the year is -- the
last reprint was 2000.

　　　　THE COURT:  Okay.

　　　　MR. ELLIS:  And the record could reflect that I'm
showing it to defense counsel now.

　　　　THE COURT:  And the page that designar --

```
 1          MR. ELLIS:  It's page 336.

 2          THE COURT:  Okay.

 3          MR. MANAHAN:  I have seen it.  I have some more

 4  comments.

 5          THE COURT:  Before you comment, just let me say

 6  for the record that the transcript of the subject interview,

 7  Exhibit 1 to the Government's opposition, page four of the

 8  nine-page transcript, line 15 does use the word "designara"

 9  in the context of the sentence translated on that same page

10  on the right-hand column as designated.  So we're -- make

11  sure we're talking about the same thing.

12          Go ahead, Mr. Ellis.

13          MR. ELLIS:  Yes, your Honor.

14          The -- I guess the few points I have is this.

15  Again, the agent used the wrong word in this case.  The

16  Government is Monday morning quarterbacking and saying,

17  well, you know, it could have -- it could have meant this as

18  well.  That's not the burden the Government has.  Again,

19  there is no talismanic incantation as to what Miranda rights

20  or words are used.  It's whether or not the person

21  understood it.

22          I think in the context of the transcript, of the

23  video, and the declaration, it's clear he didn't understand,

24  and they didn't endeavor to make sure that he did, and I

25  think this is further problematic by the fact that prior to
```

1 getting the Miranda warnings, he had been told and I believe

2 -- I'll mark this in a moment.  It's the notice to appear

3 that he received in this case.  It's unclear at this point

4 if he received this before or after, but the warnings I

5 think he would have received, in important part, says if you

6 choose, you may be represented in this proceeding at no

7 expense to the Government by an attorney or other individual

8 authorized and qualified to represent persons for the

9 executive office of immigration review.

10         That's what he'd been told earlier, and that's

11 what we have.  That's where San Juan Cruz comes into play.

12 We also have to look at not just what he's told at the time

13 Miranda is given but what he was told prior to that.  He was

14 never told specifically disregard those previous rights.  He

15 was never specifically told if you do not have money we will

16 give you an attorney.

17         These rights were insufficient in this case, and

18 that statement should be suppressed.

19         THE COURT:  Okay.  The -- I understand San Juan

20 Cruz, of course, was not an absolute, and that's been

21 pointed out by Judge Lorenz as recently as March of this

22 year in a case U.S. v. Oscar Garcia-Hernandez, which is

23 cited at 2008 West Law 744248.

24         MR. ELLIS:  I was counsel on that case as well.

25         THE COURT:  So you can probably tell -- could know

23

1  where I'm going.  I mean, Judge Lorenz pointed out the
2  salient portion of <u>San Juan Cruz</u>, that really the issue is
3  whether or not there was confusion and that the agents could
4  by clarifying statements or advising to disregard the
5  administrative rights in favor of Miranda, it could save the
6  statement.

7       Now, the interesting thing about the discussion --
8  and it's true it happened over time and there were several
9  advisals either immigration wise or criminal law wise, but
10 there was a 40-minute gap between the -- I think the
11 critical advisals wherein the Government changed its course
12 as to where they were going.  In fact, at page three of the
13 nine-page transcript, starting at line one, they say you
14 were previously informed of your rights and that those
15 rights only apply in immigration proceedings.  I'm
16 paraphrasing, granted.  And then the agent goes on to say:

17       "Now, you should understand there has
18       been a change and you are not going to
19       be returned to your country at this
20       time.  Instead, now you will be tried
21       for a federal crime.  Do you understand
22       that?"

23       And then we -- so I think that looking at what
24 Judge Lorenz in terms of his factual context there was six
25 and a half hours, granted, a little longer, but the same

24

1  basic premise of clarification within the contours of the
2  San Juan Cruz, and it's not dissimilar to Judge Gonzalez's
3  case in Garcia-Hernandez, another Garcia-Hernandez, which I
4  can provide you the cite for here in a moment, or Sanchez-
5  Russel, a case out of the district of Arizona.

6        I mean, as I read all of these cases, it seems to
7  me the salient portion is that there was a break in the
8  process and the Government agent made the statement that
9  things are now different and you're not going to be treated
10  in the way the immigration proceedings we advised you about
11  previously.  Now we're going a different direction.

12        Suarez-Russel is 112 Fed Appendix 612.  It's
13  Arizona 2004, and Judge Gonzalez's case, Jose Garcia-
14  Hernandez is 180 Fed Appendix 653.  I think under the
15  totality the combination of advisals in the context of the
16  agent's comments and direction and the understanding that
17  Mr. Garcia-Villegas indicates in the -- in the transcript,
18  Exhibit 2 to the Government's opposition, that the -- the
19  problem associated with the San Juan Cruz case does not
20  exist in here and that without looking at the demeanor
21  evidence of the tape which may make a difference, at least
22  as to that aspect of the motion, I would deny the request
23  without prejudice.  I'd also say that I'd like to see the
24  demeanor as it relates to the designar or designara in the
25  context of what was said, although, as you again read the

25

1 totality of the conversation, I mean, what the agent is

2 saying is if you can't afford to hire a lawyer, you will

3 have one designated.  That seems to be the alternative that

4 where you are impecunious, you're going to get a lawyer.

5 That would be the plain reading of the words, and I think

6 taking judicial notice of the English and Spanish

7 dictionaries, particularly the Spanish, if the first of the

8 definitions under designar is to appoint, I think taking it

9 in the context of the language of Mr. Garcia's country of

10 origin on its face, it would not appear that there was

11 confusion or anything but a voluntary waiver.  Again,

12 without prejudice to seeing his demeanor on the tape.  Maybe

13 it's clear he's confused from the whites of his eyes or

14 something else.

15         MR. MANAHAN:  Your Honor, I was not intending to

16 show the video in my case in chief because it's in Spanish,

17 but if you'd like to watch it now, that's fine.

18         THE COURT:  Okay.  Well, why don't we so we can

19 finish that loop and see because I think that that's --

20 that's the only missing piece.  You folks have seen it and

21 can comment, and I appreciate your interpretation, but as

22 the trier of fact, I should look at it myself.  So why don't

23 we play at least the portion -- unless, Mr. Ellis, you want

24 the entire thing played, let's play the portion that's

25 critical to the analysis maybe starting at 258.

1      MR. MANAHAN:  Your Honor, technologically wise, I

2 don't think I have the ability to --

3      THE COURT:  Well, then let's start from the

4 beginning.

5      MR. ELLIS:  We can start at the beginning, your

6 Honor, and then I think just read down to page four, line

7 28.  I mean, that really seems to be --

8      THE COURT:  Okay.

9      MR. ELLIS:  -- the meat and potatoes of it.

10      THE COURT:  Fair enough, and recognizing our

11 technical --

12      MR. MANAHAN:  Although, your Honor, if you have

13 any question, there is a point later on I believe where the

14 Defendant did have some confusion about a question that was

15 asked on page six, where he then asked questions, what do

16 you -- I think they asked him about the first time he

17 crossed, and he said "What do you mean, first time?"  So you

18 could compare that as to a point where he does, you know,

19 obviously show confusion.

20      THE COURT:  Yeah.  That's a good point.  Okay.

21 Well, let's just -- let's do that, at least get to that

22 point.  If there's anything further beyond that, Mr. Ellis,

23 you think bears on this --

24      MR. ELLIS:  Well, considering it's almost at the

25 end, your Honor, maybe we --

27

1          THE COURT:  Is that close enough to the end, just

2  do it?

3          MR. ELLIS:  Yeah.

4          THE COURT:  Let's just do it.

5          MR. ELLIS:  The only point that -- procedure I'd

6  like to note, your Honor, as I think your clerk informed

7  you, we had brought clothes so that he could dress out.  We

8  have clothes present now.  Would it be okay with the Court

9  and the marshals prior to beginning with the trial portion

10  if we could take a brief recess?

11          THE COURT:  Sure.  That's fine with me.  And if

12  the marshals can accommodate that, I'd appreciate it.

13          MR. ELLIS:  Thank you, your Honor.

14          THE COURT:  We'll do that.  Let's go see the video

15  and --

16          MR. MANAHAN:  Permission to approach?

17          THE COURT:  Yeah, please.  You guys can feel free

18  to enter the well or walk about as you need to since there's

19  no jury to work around.  If you don't mind, we'll put the

20  lights down to help enhance the -- yeah, that's good.

21      (Video played.)

22          MR. ELLIS:  Can we pause this for a second?  Thank

23  you, your Honor.

24          THE COURT:  Sure.  Yeah.

25          MR. ELLIS:  I know the Government attorney, Mr.

1  Manahan, is saying that there's other parts where he clearly

2  looks confused.  My only concern about this part is that if

3  they're going to get into the substance of the statement

4  now, I prefer to be able to do it controlled a little better

5  between direct and cross.

6          THE COURT:  Okay.

7          MR. ELLIS:  And so I think at least the Court got

8  a sense about it.  If Mr. Manahan wants to show the part at

9  the end where he thinks he looks confused, I have no

10  objection to him fast-forwarding to the part to show that

11  part.  I think that might be fair, but I would ask that the

12  rest of it not be played at this time.

13          THE COURT:  I understand your point.  You don't

14  want to get too far into the evidence before we get to the

15  trial.

16          MR. ELLIS:  Yes, your Honor.

17          THE COURT:  I will say this, though.  Based on

18  what I've seen, I think it's clear he understood and

19  knowingly and voluntarily waived his Miranda rights.  I've

20  already indicated my feeling and ruling as to the designar

21  being used.  Although I wouldn't say that's the best term,

22  it's certainly not a confusing term inconsistent with the

23  Spanish language and the context of a statement.  So I don't

24  think we need to go to the rest of the tape.

25          MR. MANAHAN:  I agree, your Honor.

1          THE COURT:  So I'll deny, again, without prejudice
2   to if the testimony comes out differently on the stand, then
3   the defense can renew the motion as to either or both of
4   those factors.

5          All right.  So are we at a point where we should
6   take a break to allow Mr. Garcia to then prepare for trial
7   with his wardrobe?

8          MR. ELLIS:  That would be my preference, your
9   Honor.

10         THE COURT:  Okay.  How long do you folks think you
11  need as far as a break, 10 minutes good or you need 15?

12         MR. ELLIS:  I think 10 minutes would be
13  sufficient, your Honor.

14         THE COURT:  Okay.  I show 9:50, although I can't
15  see the clock.  My watch shows 9:50.  So why don't we recess
16  until 10:00 and reconvene at that time with the trial.

17         MR. ELLIS:  Thank you, your Honor.

18         THE COURT:  All right.  So we'll be in recess for
19  10 minutes.

20      (Proceedings recessed briefly.)

21         THE COURT:  We're back on the record.  Counsel and
22  the parties are present.  And before we get to the trial,
23  here were still a few motions that we hadn't dealt with in
24  the discovery arena.  And so why don't we attend to those
25  and then move to the next step.

1          MR. ELLIS:  Your Honor, I believe all discovery

2 issues have been worked out amongst the parties, and at this

3 point I don't think the motion -- I think the motion's moot

4 at this point.  The Government's informed me they've

5 provided all discovery that I'm entitled to.

6          THE COURT:  Okay.  So those are all then rendered

7 moot by the Government's performance --

8          MR. MANAHAN:  I agree, your Honor.

9          THE COURT:  -- and then the concurrence of

10 counsel?  Okay.  So those will all be denied as moot since

11 there's been compliance.

12          That turns us then to the matter of the trial, and

13 in terms of any sort of opening, Government want to

14 supplement its trial brief by way of an opening statement or

15 just proceed?

16          MR. MANAHAN:  Your Honor, the parties agreed to a

17 brief opening statement each, but I'll waive mine.

18          THE COURT:  Okay.  Mr. Ellis, do you want to make

19 an opening statement now or defer that or Mr. Chavez?

20          MR. ELLIS:  Mr. Chavez, your Honor, I believe

21 wants to make one at this time.

22          THE COURT:  Okay.  Go ahead, Mr. Chavez.

23          OPENING STATEMENT ON BEHALF OF THE DEFENDANT

24          MR. CHAVEZ:  This case is about alienage, your

25 Honor.  The Government explained in their trial brief that

31

1  an essential element of both of the counts that Mr. Garcia

2  is charged with is alienage and the Government is not going

3  to be able to meet its burden in this case in proving

4  alienage.  They're not going to be able to meet that burden

5  because they didn't do the investigation, and they're not

6  going to bring the evidence before this Court.

7          The Government could have gotten a birth

8  certificate for Mr. Garcia.  They supposedly had some

9  information about where he was born, specifically, where he

10  was born in Mexico.  They had some information about where

11  he had been living here in the United States, and they have

12  done no investigation to get any information to confirm

13  their allegations that Mr. Garcia is, in fact, an alien.

14  And because they have not done these investigations, they're

15  not going to be able to meet their burden.

16          What they may have if this Court admits the

17  statements and if this Court believes the statements that

18  Mr. Garcia made about his alienage, that will be all the

19  Court has before it, and Ninth Circuit law is pretty clear

20  that the Government needs to prove more, that statements

21  alone are not sufficient to prove alienage beyond a

22  reasonable doubt.

23          And so after all the evidence is heard, I think

24  the law will only permit one verdict, and that would be a

25  verdict of not guilty of both counts, your Honor.

32

1          THE COURT:  Okay.  Thanks, Mr. Chavez.

2          And then, turning to the Government's case, Mr.

3    Manahan, do you want to call your first witness?

4          MR. MANAHAN:  Yes.  My first witness will be

5    California National Guardsman Sergeant Gomez.

6          THE COURT:  All right.  And go ahead and get -- is

7    he going to get Agent Gomez or Officer Gomez?  Somebody

8    will.

9          MR. MANAHAN:  I'm sorry.  It's Sergeant Gomer.

10          THE COURT:  Gomer, okay.

11          MR. MANAHAN:  I misspoke.

12       TIMOTHY A. GOMER - PLAINTIFF'S WITNESS - SWORN

13          THE CLERK:  State your full name and spell your

14    last name for the record.

15          THE WITNESS:  Full name is Sergeant Timothy Alan

16    Gomer.  Last name is spelled G-O-M-E-R.

17          THE COURT:  All right.  Mr. Manahan, you may

18    inquire.

19          MR. MANAHAN:  Thank you, your Honor.

20                    DIRECT EXAMINATION

21    BY MR. MANAHAN:

22    Q    Sergeant Gomer, what is your current occupation?

23    A    I'm sorry, sir?

24    Q    What is your current occupation?

25    A    I'm working on the Southwest Border Mission with the

33

California Army National Guard.

Q    How long have you been employed with the California
National Guard?

A    I'm in my 25th year.

Q    And what are your current duties with the California
National Guard?

A    Currently I work in the Remote Video Surveillance and
Sensor Room in the Chula Vista Border Patrol Station San
Diego Sector in support of field operations for the Border
Patrol.

Q    And did you receive any specialized training regarding
your duties with the remote video surveillance system?

A    Yes, sir, I did.

Q    Can you explain those to us, please?

A    Our raining at the beginning of the mission included
how to speak on a Border Patrol frequency to the agents,
learning all the landmarks within the sector that we
observe, and learning procedures that need to be followed
when there's illegal entries into the U.S.

Q    Thank you.  Directing your attention to May 21st, 2008,
at approximately 5:39 p.m., were you working at that time?

A    Yes, sir.

Q    Did anything unusual happen at that time?

A    Yes, sir.

Q    And what was that?

34

1  A    We had just turned a group back south that had come

2  north in an area called 625.  As that group was going south

3  back into Mexico, I observed another group approximately 100

4  yards east of the first group in an area called Druckers,

5  and this group was climbing down the north side of the

6  primary border fence.

7  Q    When you -- can you explain what you mean by the first

8  group that you saw, what you mean by turn back?

9  A    Yes, sir.  The first group that we observed at 625 came

10  into the U.S. over the primary border fence, but we were

11  able to get agents there before they came over the secondary

12  fence.  So they ran back south before they were apprehended.

13  Q    Okay.  Now, turning to the second group of which you

14  spoke --

15  A    Yes, sir.

16  Q    -- how many members were in that group?

17  A    Two.

18  Q    And where were those two individuals when you first

19  noticed them?

20  A    Climbing down the north side of the primary border

21  fence.

22  Q    And what did those two individuals do after they

23  climbed down the fence?

24  A    One of them picked up a ladder that had already been

25  placed north of the fence, and then they both ran to the

35

1  secondary fence that's approximately 60, 65 yards north of

2  the primary fence.

3  Q    And what did he do with that ladder?

4  A    The individual carrying the ladder utilized it by

5  hooking the ladder onto the top of the secondary fence.

6  Then the other member of the group climbed the ladder as the

7  first individual steadied the ladder from the bottom.

8  Q    And what did that second individual do when he got to

9  the top of the ladder?

10 A    When he got to the top, he negotiated the concertina

11 wire that's on the top of the secondary fence and then

12 dropped down to the north side of the secondary fence.

13 Q    During this time, did you communicate your observations

14 to anyone?

15 A    Yes, sir.  When I first observed the group coming down

16 the north side of the primary fence, I alerted agents that

17 are in that area on the appropriate Border Patrol frequency.

18 Q    Okay.  And did an agent respond?

19 A    Yes, sir.

20 Q    Do you know who that agent was?

21 A    That was Agent Kim, sir.

22 Q    What did the individual -- did you continue to observe

23 the individual after he reached the bottom of the north side

24 of the secondary fence?

25 A    Yes, sir.

36

1  Q    What did he do next?

2  A    He crossed the road, which is just north of the

3  secondary fence, and about 10 yards north of the secondary,

4  he hid in some brush.

5  Q    Did you continue to observe the individual?

6  A    Yes, sir.

7  Q    Did you continue to communicate with Agent Kim?

8  A    I did, sir.

9  Q    Did -- what happened next?

10 A    Agent Kim advised me that he was en route, and as soon

11 as he entered the frame of the picture that I had the

12 individual in who came over the fence, Agent Kim went to the

13 brush per my direction and it took approximately one minute

14 for the agent to find the individual who entered without

15 inspection.

16 Q    Did you continue to observe what happened next?

17 A    Yes, sir.

18 Q    What happened next?

19 A    Agent Kim took the illegal entry into custody and held

20 him in his custody until the transportation van arrived.

21          MR. MANAHAN:  No further questions, your Honor.

22          THE COURT:  Okay.  Cross examine, Mr. Ellis, Mr.

23 Chavez?

24          MR. ELLIS:  Just a moment, your Honor.

25          THE COURT:  Sure.  Go ahead and take your time.

37

1        (Pause.)

2                          CROSS EXAMINATION

3    BY MR. CHAVEZ:

4    Q     Sergeant Gomer, I would like to start with your -- so

5    you were watching multiple screens at one time in this room,

6    is that how that works?

7    A     Yes, sir.

8    Q     And these videos are recorded, right?

9    A     Yes, sir.

10   Q     And did you provide the recordings of the videos to the

11   Government?

12   A     I was unable to do that, sir.  The video machine that

13   normally stores the data from the last 30 days of recordings

14   in the RVSS room was out for repair.

15   Q     Okay.  Did you take any notes while you were watching

16   this video?

17   A     Yes, sir.

18   Q     Did you provide those notes to the Government?

19   A     Yes, sir, I did.

20   Q     And in what form did those notes come?

21   A     The only notes that our camera operators take are

22   entries into a database called the ICAD, Intelligent

23   Computer-Aided Dispatch System, and it's a real brief entry,

24   just the number of people, type of entry.

25              MR. CHAVEZ:  Okay.  Your Honor, I have a piece of

1 discovery provided by the Government that is this printout

2 that --

3          THE COURT:  Okay.

4          MR. CHAVEZ:  -- Sergeant Gomer is talking --

5          THE COURT:  Does it have an exhibit number as yet?

6 We'll make it Exhibit B, if it doesn't, for the defense.

7          MR. CHAVEZ:  Yeah.  It's marked Exhibit B.

8          THE COURT:  Mr. Manahan, do you know what he's

9 talking about?

10          MR. MANAHAN:  I do, and no objection, your Honor.

11          THE COURT:  Okay.  Go ahead, Mr. Chavez, you can

12 approach.

13 BY MR. CHAVEZ:

14 Q    Sergeant Gomer, I'm showing you this printout right

15 now.

16 A    Uh-huh.

17 Q    I'm going to leave it here for you to look at.  I'm

18 hoping you can help explain to me -- help me understand

19 exactly what the information on this printout means.  So

20 could you tell me when this entry was made, looking at this

21 printout?

22 A    Well, there's a few different times that are on this

23 entry.

24 Q    Okay.  Let's start with the time at the very top where

25 it says "San Diego Sector" and then Tuesday, January 3rd,

1  19:47:35.  I assume that's 7:00 o'clock in the evening.

2  Would that have been the last time that this record was

3  altered?

4  A    No, sir.  The record was not altered then.

5  Q    Okay.  Do you know what that time indicates?

6  A    That time indicates the time and date when the database

7  was accessed to print this particular ticket entry.

8  Q    Okay.  And then two lines down there's another entry

9  that says 5/21/08, 17:27:41.  What does that time indicate?

10  A    That indicates the time of entry for this ticket into

11  the database according to the desktop computer that this

12  database is installed on.

13  Q    Okay.  And then on the next line down there's another

14  date and time, and that is 5/21/08, 18:06:49.  I assume

15  that's a half hour later on that same day, and what does

16  that time indicate?

17  A    I don't know, sir.

18  Q    You don't know what that time indicates.  So you would

19  have put this entry in at 17:27:41?

20  A    That's the time that was on that desktop computer.

21  Q    Okay.  Thank you.  And then on the next line there

22  towards the end, it says RSLT, MULTVIOL.  Do you know what

23  that means?

24  A    Yes, sir.

25  Q    What does that mean?

40

1   A      Multi-violation.

2   Q      And could you explain to me what that means?

3   A      That indicates that this particular ticket entry

4   included more than just one type of ticket entry.

5   Q      Okay.  And the next thing says CAM 23?

6   A      Yes, sir.

7   Q      Does that mean that this was the 23rd camera?

8   A      Yes.

9   Q      And so you were monitoring 23 cameras when you were

10  working at this time?

11  A      No, sir.

12  Q      No?

13  A      When these individuals came over the border, that's the

14  only monitor that I was on.

15  Q      Right.

16  A      There are other RVSS camera operators in the room.

17  Q      Okay.  So you were just working the one camera?

18  A      Yes, sir.

19  Q      And are you able to move that camera?

20  A      Yes, sir.

21  Q      And you can zoom in and out?

22  A      Yes, sir.

23  Q      And you can pan left and right?

24  A      Yes, sir.

25  Q      Okay.  And remind me how long have you been doing this

41

1  job for?

2  A    This particular mission started in August of 2006 for

3  me.

4  Q    And do you usually monitor this camera near the Otay

5  Mesa Port of Entry?

6  A    Yes, sir.

7  Q    Okay.  So you've seen lots of individuals come over the

8  fence in your time doing your duties?

9  A    Yes, sir.

10 Q    Okay.  Have you ever met Mr. Garcia?

11 A    No, sir.

12 Q    Have you ever spoken to him?

13 A    No, sir.

14 Q    And you were asked by U.S. Attorney Manahan to testify

15 today?

16 A    Yes, sir.

17 Q    And you were not physically present when he was

18 arrested?

19 A    No, sir.

20 Q    And because you've watched this video, you're pretty

21 familiar with the area that this video is monitoring?

22 A    Yes, sir.

23 Q    Have you been out to that -- physically out to that

24 area?

25 A    Yes, sir.

1 Q    Okay.  And you said that there's a border -- there's a

2 road that runs right along the fence there?

3 A    Yes, sir.

4 Q    Okay.  And you're about a mile, less than a mile from

5 the Otay Mesa Port of Entry there?

6 A    Less than a mile, sir.

7 Q    Less than a mile.  And there's a lot -- at times

8 there's a significant amount of traffic there, is that

9 correct?

10 A    You mean vehicle traffic, sir?

11 Q    I mean trucks enter the Otay Mesa Port of Entry there?

12 A    Yes, sir.

13 Q    And sometimes there's a backup in the trucks crossing

14 the line into Mexico?

15 A    Yes, sir.

16 Q    And these trucks are 18 wheelers?

17 A    Normally, yes, sir.

18 Q    Okay.  And there's also a significant number of

19 businesses in the area as well?

20 A    Yes, sir.

21 Q    They're relatively large buildings?

22 A    Yes, sir.

23 Q    There's -- for instance, there's a Mattel building down

24 there?

25 A    I don't know the names of the businesses, sir.

43

1  Q    Okay.  But there's -- in these large buildings, there's

2  lots of people that work in those buildings I presume?

3  A    I can't assume that, sir.

4  Q    Well, you have been down there, right?

5  A    Yes, sir.

6  Q    And you saw cars parked in the parking lots of these

7  numerous buildings?

8  A    Sure.

9  Q    Okay.  Now, I want to go back to your communications

10 with Agent Kim.  So you communicated to him to -- you

11 communicated to him that you saw people coming down the

12 fence, right, that primary fence?

13 A    Yes, sir.

14 Q    And you communicated to him where they were?

15 A    Yes, sir.

16 Q    And how long did it take him to get to these

17 individuals?

18 A    I'm not sure if you mean the total time from my first

19 transmission?

20 Q    Yeah, from your first transmission to, yeah, to when

21 Sergeant Kim arrived near the area where these men were

22 coming down the fence.

23 A    Approximately one minute.

24 Q    And during this time were you able to monitor these

25 individuals?

44

1  A    Yes, sir.

2  Q    You were able to see what they were doing?

3  A    Yes, sir.

4  Q    And then you said one of the individuals came over the

5  secondary fence, correct?

6  A    Yes.

7  Q    And you said it was about a minute until Agent Kim was

8  able to find that individual in the bush?

9  A    Yes.

10  Q    Okay.  And were you able to see the individual during

11  that time?

12  A    Yes.

13  Q    Can you identify that individual in this courtroom

14  today?

15  A    No.

16          MR. CHAVEZ:  That's all.  Thank you, sir.

17          THE COURT:  Any redirect, Mr. Manahan?

18          MR. MANAHAN:  No, your Honor.

19          THE COURT:  Thank you, Mr. Chavez.

20          All right.  May this witness then be excused?

21          MR. MANAHAN:  Your Honor, this witness needs to

22  go.  Can he be excused that he could leave the Court?

23          THE COURT:  Yes.  That's what I just asked.

24          MR. CHAVEZ:  Yes, your Honor.  No objection

25  whatsoever.

45

1        THE COURT:  So no objection to his being excused.
2 Okay, sir.  You're excused.  Thanks very much.
3        THE WITNESS:  Thank you.
4        THE COURT:  Have a good day.
5        And as far as the Government's next witness, then,
6 Mr. Manahan?
7        MR. MANAHAN:  At this time the Government would
8 call Border Patrol Agent Kim.
9        THE COURT:  All right.  Agent Kim will be called
10 to the stand.
11        ANDREW KIM - PLAINTIFF'S WITNESS - SWORN
12        THE CLERK:  State your full name and spell your
13 last name for the record.
14        THE WITNESS:  Andrew Kim, K-I-M.
15        THE COURT:  All right.  Mr. Manahan, you may
16 inquire of the witness.
17        MR. MANAHAN:  Thank you, your Honor.
18                    DIRECT EXAMINATION
19 BY MR. MANAHAN:
20 Q    Sir, what is your occupation?
21 A    I'm a Border Patrol agent.
22 Q    And, Agent Kim, how long have you been with the United
23 States Border Patrol?
24 A    A little over one year.
25 Q    And what are your duties with the United States Border

46

1  Patrol?

2  A    I protect our nation's borders.  Anyone who crosses our

3  borders I apprehend.

4  Q    Did you receive any specialized training regarding your

5  duties with the United States Border Patrol?

6  A    Yes.  I spent 19 weeks at the U.S. Border Patrol

7  Academy.

8  Q    And what, if any, training did you receive during those

9  19 weeks?

10  A    I learned firearm techniques, arrest techniques,

11  immigration law, naturalization law, U.S. statutory laws,

12  how to arrest, handcuff people.

13  Q    Okay.  Thank you.  Turning your attention to May 21st,

14  2008 at approximately 5:39 p.m., were you on duty at that

15  time?

16  A    Yes, I was.

17  Q    And did anything unusual happen at that approximate

18  time?

19  A    I was notified that there was an individual -- two

20  individuals actually, crossing in the Druckers area, and I

21  was the agent who was assigned to that nearby area.

22  Q    Who made that communication to you?

23  A    The RVSS, which stands for Remote Video Surveillance

24  Systems operator informed me.

25  Q    Do you know the name of the operator who informed you?

47

1  A    That would be Sergeant Gomer.

2  Q    How did you respond to his communication?

3  A    I acknowledged it, and I proceeded to head to the

4  location where the two individuals were spotted.

5  Q    Approximately how long did it take from the time you

6  received that communication to get to the Druckers area?

7  A    Approximately one minute.

8  Q    Sir -- Agent Kim, I have just displayed for the entire

9  court to see a photograph that has been premarked as

10  Government Exhibit Number 1 for identification purposes.  Do

11  you recognize this?

12        MR. ELLIS:  Your Honor, procedurally I object at

13  this point to publishing before it's actually been admitted

14  and foundation.

15        THE COURT:  Overruled without prejudice.  Go

16  ahead.

17        Do you recognize it?

18        THE WITNESS:  Yes, I do.

19  BY MR. MANAHAN:

20  Q    And what is this, sir?

21  A    This is the Druckers area, and from here you can see

22  the primary and secondary fence fitted with concertina wire,

23  and just north of the secondary fence, that's the truck lane

24  off Druckers.

25  Q    Agent Kim, is this picture a fair and accurate

48

1 depiction of the area at or near where you arrested the

2 Defendant?

3 A    Yes, it is.

4 Q    And would this photograph aid and assist you in your

5 testimony today?

6 A    Yes.

7         MR. MANAHAN:  Your Honor, at this time I move that

8 Exhibit 1 be entered into evidence.

9         MR. ELLIS:  No objection.

10        THE COURT:  It will be received.

11 BY MR. MANAHAN:

12 Q    Agent Kim, I have just displayed to the Court what has

13 been premarked for identification purposes as Government's

14 Exhibit Number 2.  Do you recognize this, sir?

15 A    Yes, I do.

16 Q    What is it?

17 A    This is also Druckers, and a closer view of secondary

18 fence with the concertina wire.

19 Q    Is this a fair and accurate description of the fence at

20 or near where you believe Defendant climbed over the

21 secondary fence?

22 A    Yes.

23 Q    Would this photograph aid and assist you in giving your

24 testimony today?

25 A    Yes.

49

 1          MR. MANAHAN:  Your Honor, at this time I ask that

 2  Government's Exhibit Number 2 be entered into evidence.

 3          MR. ELLIS:  No objection.

 4          THE COURT:  That will be received.

 5  BY MR. MANAHAN:

 6  Q     Agent Kim, you're familiar with the Druckers area?

 7  A     Yes, I am.

 8  Q     Is there a port of entry in the Druckers area?

 9  A     There is one right to the east about 75 yards to the

10  east.

11  Q     What port of entry is that?

12  A     That would be the Otay Mesa Port of Entry.

13          THE COURT:  And does the photo look east as we're

14  viewing it?

15          THE WITNESS:  Yes.

16          THE COURT:  Thank you.

17  BY MR. MANAHAN:

18  Q     Okay.  But there's no port of entry right at where --

19  I'm sorry.  Let me start it this way.  What did you see when

20  you arrived in the Druckers area?

21  A     When I approached Druckers area, I looked in between

22  the fences, and I saw one individual who was turning back

23  south, and I was also notified by RVSS -- by Sergeant Gomer,

24  the RVSS operator, that one other individual had made it

25  north of the secondary.  So I used where I saw the

1  individual turn back south as a reference point to look for

2  the second subject.  And as I was searching the area, I

3  noticed just north of the truck lane in a bush kind of a

4  white shirt.  As I went closer to examine it, that's when I

5  first met the Defendant, Mr. Garcia-Villegas.

6  Q    And in that area where you saw the one individual

7  heading back and found the other individual in the bush, is

8  there a port of entry right there?

9  A    No.

10 Q    How did you respond when you noticed an individual in

11 the bush?

12 A    I immediately identified myself as a Border Patrol

13 agent.  I told him to put his hands up and let me see his

14 hands, in the Spanish language.

15 Q    And how did he respond?

16 A    He didn't say anything.  He just came out with his

17 hands up.

18 Q    What did you do next?

19 A    I immediately put him in handcuffs, and once I did

20 that, I walked him to my vehicle which was close by, and I

21 searched him.

22 Q    Can you explain what you mean by searched?

23 A    I did a brief -- I just searched him if he had any

24 weapons on him for my safety.

25 Q    How did you accomplish that?

51

```
 1  A    I patted down his -- the pants area by his pockets and
 2  his waste and the top torso, his shirt.
 3  Q    So when you used the word "search," did you mean what's
 4  commonly known as a frisk or a pat down?
 5  A    Yes.
 6  Q    Did you ask the individual any questions?
 7  A    Yes.  Afterwards I filled out a little kind of form
 8  that we usually have, on that I asked -- I asked him his
 9  name, his first name of his mother, father, his date of
10  birth, and where he was -- which state in Mexico he was born
11  in.
12  Q    How did he respond?
13            MR. ELLIS:  Your Honor, renew my pretrial motion.
14            THE COURT:  Overruled until let's hear the answer.
15            THE WITNESS:  He -- he answered my questions, and
16  then he started talking to me in English.  He stated to me
17  that he just wanted to go back to -- he just went to Mexico
18  to --
19  BY MR. MANAHAN:
20  Q    Before -- how did he respond when you asked him his
21  name?
22  A    He told me his name was Javier Garcia-Villegas.
23  Q    Okay.  I'm sorry.  And what was the next question you
24  asked him?
25  A    Just his mother and father's name.
```

52

1  Q    And did he respond to those questions?

2  A    Yes, he did.

3  Q    Did he offer any other communication other than

4  responding to those direct questions?

5  A    Yes.  He just kind of told me that he went to Mexico to

6  visit his mother, and I asked him -- he -- yeah, he told me

7  that he went to go visit his mother and that he lives in the

8  United States and he's been here since he was a young kid,

9  child.  And so then I asked him, "Well, why didn't you ever

10 file for immigration papers," and to that he said the

11 process took too long.

12 Q    Did you make any observations about Mr. Garcia-Villegas

13 as you were handcuffing him?

14       MR. ELLIS:  Objection, your Honor.  Relevance.

15 Possibly calls for expert testimony.  Wasn't brought up in

16 any en lims from the Government.  At least like a proffer.

17       THE COURT:  Overruled.  I'll hear the testimony.

18 Then you can renew the objection.

19       MR. ELLIS:  Yes, your Honor.

20       THE COURT:  But it sounds like it would go to the

21 nature and extent of the stop/arrest, custody issue that

22 figures into the motion brought by the defense.  So go

23 ahead.

24       THE WITNESS:  I noticed that he had some tears in

25 his shirt by the lower torso, and as I was handcuffing him,

53

1  his hands were bloody.

2  BY MR. MANAHAN:

3  Q    Did you ask any further questions than the ones you've

4  already described?

5  A    No.

6  Q    What did you do next?

7  A    I put him inside my Jeep, and I called for a transport

8  unit so that he would be transported back to the station.

9  Q    And was he eventually transported?

10 A    Yes.

11 Q    Okay.  And, Agent Kim, what is the legal way for an

12 individual to enter the United States from Mexico to walk?

13        MR. ELLIS:  Objection, your Honor.  Foundation.

14 Calls for a legal conclusion, expert testimony.

15        THE COURT:  Sustained.  You want to lay a little

16 foundation as to his training in that area?

17        MR. MANAHAN:  We've already gone over that he has

18 training in immigration law and --

19        THE COURT:  Well, we did in general, but he wasn't

20 asked whether or not he was schooled in the legal way one

21 enters the country.

22        MR. MANAHAN:  I'm sorry, your Honor.

23        THE COURT:  That's okay.  Go ahead.

24 BY MR. MANAHAN:

25 Q    During your 19 weeks of training as a Border Patrol

54

1  agent, were you ever taught the legal way to walk from

2  Mexico into the United States?

3          MR. ELLIS:  Objection.  Compound, vague.

4          THE COURT:  Overruled.  Just takes a yes or no

5  answer.

6          THE WITNESS:  Yes.

7  BY MR. MANAHAN:

8  Q    And what is that legal way?

9  A    It's to cross through the port of entry.

10          MR. MANAHAN:  No further questions, your Honor.

11          THE COURT:  All right.  Cross examination?

12          MR. ELLIS:  Yes, sir.

13          THE COURT:  Mr. Ellis.

14          MR. ELLIS:  I have a number of documents to go

15  over.

16          THE COURT:  Yeah, you're free to go to and from

17  the witness, whatever you need.

18          MR. ELLIS:  Thank you, your Honor.

19                    CROSS EXAMINATION

20  BY MR. ELLIS:

21  Q    Is it going to bother you if I stand close to you for a

22  few minutes?

23  A    No, it doesn't.

24          THE COURT:  If it does, just tell me and we'll

25  shoo him away.

55

1  BY MR. ELLIS:

2  Q    Agent Kim, I'm showing you a three-page document that

3  I've premarked as Defense Exhibit C.  Can you take a look at

4  this document for a moment.  Have you looked at it?

5  A    Yes.

6  Q    For the record, this is a document that says  Record of

7  Deportable Inadmissible Alien?

8  A    Correct.

9  Q    And it has your signature on the first page?

10 A    Yes.

11 Q    And this is one of the reports you wrote in this case?

12 A    Yes.

13 Q    Show you next what I've marked as Defense Exhibit D.

14 Can you take a look at this document also.

15 A    Okay.

16 Q    This is a document.  On the top it says in Spanish

17 notification of rights?

18 A    Yes.

19 Q    Again, this document also has your signature on it?

20 A    Yes.

21 Q    I'm next going to show you what I've marked as Defense

22 Exhibit E.  It says Notice to Appear.  Would you take a look

23 at that.  I take it this is a three-page document, is that

24 correct?

25 A    Yes.

56

1 Q    Again, this is a document with your signature on it?

2 A    Yes.

3 Q    A document you filled out?

4 A    Correct.

5 Q    Next I'll show you what I've marked a Defense Exhibit

6 F.  It says Warrant of Arrest of Alien.  Take a look at

7 that.

8 A    Okay.

9 Q    Again, that has your signature on it?

10 A    Yes.

11 Q    This is a document you filled out?

12 A    Yes.

13 Q    And finally, sir, I want to show you what I've marked

14 as Defense Exhibit G which says U.S. Visit Secondary

15 Processing.  Can you take a look at that.

16 A    Okay.

17 Q    This is a printout from a database that Immigration

18 uses, is that correct?

19 A    It's not from our databases that we use, but it looks

20 like it --

21 Q    That's not information you input?

22 A    No.

23 Q    Agent Kim, I wanted to talk to you a little bit about

24 the training you received when you were at the academy,

25 okay?

57

```
 1  A     Okay.
 2  Q     I also want to talk to you about other training you've
 3  received.  Is it fair to say that in the over a year you've
 4  been a Border Patrol agent, you've received additional
 5  training on the job?
 6  A     Yes, I have.
 7  Q     And that's to supplement the training you got when you
 8  were doing your 19-week training academy?
 9  A     Yes.
10  Q     And you've learned such things as immigration law?
11  A     Yes.
12  Q     When to arrest somebody?
13  A     Yes.
14  Q     How to arrest somebody?
15  A     Yes.
16  Q     For instance, arresting people who jump over a fence
17  near the border?
18  A     That's if it was in my view.
19  Q     So if you saw someone jump over the border fence, you
20  would arrest that person?
21  A     In my presence, if I saw it then, yes.
22  Q     Yeah.  Okay.  Not a fair question.
23  A     Yeah.
24  Q     I mean, you've been trained.  You know what the law is
25  when it comes to what happens at the border?
```

58

1    A     Yes.

2    Q     Well trained?

3    A     Yes.

4    Q     So well trained you know it's illegal to jump over the

5    border fence?

6    A     It's illegal to enter the United States without being

7    inspected.

8    Q     Exactly, and someone who jumps over the border fence

9    hasn't gone to be inspected at the port of entry, correct?

10   A     Correct.

11   Q     Or examined, correct?

12   A     Correct.

13   Q     Two different things some might argue.  And so with

14   your trained experience, you would know to arrest that

15   person?

16   A     Yes.

17   Q     And that's what you did in this case?  You received a

18   radio call that someone had jumped over the fence?

19   A     Yes.

20   Q     Okay.  Now --

21            MR. MANAHAN:  Object.  That question was compound.

22   He first asked if that's what you did and then you received

23   a communication.  It wasn't clear what he was responding to.

24            THE COURT:  Overruled.  I think I understood it.

25   Proceed.

59

BY MR. ELLIS:

Q    Now, you testified on direct examination that you asked the person you arrested some questions.  Do you remember that?

A    I do.

Q    And you said you filled out a form?

A    Yes.

Q    I'm going to approach you again because we have a bunch of things here.  I'm going to show you Exhibit C, D, E and F, and I want you to indicate which one of these forms is the form that you filled out.

A    It would be the Form 826, but it wasn't this one, exactly this one.

Q    Do you happen to have the form you filled out with you?

A    No.  This is pretty much the same information that was the original 826.

Q    My question is, sir, do you have the Form I826 that you filled out in the field on May 21st, 2008 at approximately 5:45?

A    I don't understand your question as to do I have it.

Q    Do you have it with you?

A    On me, no.

Q    Do you have it at your office?

A    It's possible it's there.  I don't know.  It's filed.

Q    Did you provide it to the Government?

60

1   A    It's possible that it's filed.  I really don't know.

2   Q    Did you provide that form to the Government?

3   A    No.

4           THE COURT:  And that's exhibit which?

5           MR. MANAHAN:  That's Exhibit E, your Honor.

6           THE COURT:  Okay.  Thanks.

7   BY MR. ELLIS:

8   Q    When you first encountered the individual you arrested

9   on May 21st, you had received a phone call -- you received a

10  radio report from an RVSS operator, is that correct?

11  A    Yes.

12  Q    And he responded.  Is it a general frequency where he

13  said "I see people entering the United States?"

14  A    Yes.  He spotted two individuals cross over.

15  Q    And you responded to that?

16  A    I did.

17  Q    And that was your area of operation for the day?

18  A    Yes.

19  Q    And when you got the call you responded to that area?

20  A    Correct.

21  Q    From the time you got the call to the time you got to

22  that area was approximately one minute?

23  A    Approximately.

24  Q    And this area is known as Druckers?

25  A    Yes.

61

1  Q    And once you got to the Druckers area, you were in

2  continuous contact with the RVSS operator?

3  A    Yes.  When I got there, he was still relaying

4  information to what was happening.

5  Q    And by relaying information, you mean he saw presumably

6  what happened on a screen, and he was telling you what the

7  screen showed?

8  A    Yes.

9  Q    And by screen, this was a wide video feed?

10 A    Yes.

11 Q    And the information he gave you is that one of the

12 individuals had gone south?

13 A    Yes, but I also saw the individual climbing over back

14 south.

15 Q    I understand, but that was also something the operator

16 told you?

17 A    You know, I don't know if that's what he said, but I

18 just remember seeing one individual go back south.

19 Q    He also told you that the second individual had made it

20 over the concertina wire?

21 A    Correct.  I heard an individual was on the concertina

22 wire and was pretty much clear -- has cleared it.

23 Q    Is it fair for -- that concertina wire is a fancy term

24 for barbed wire?

25 A    It's -- it has spikes.

62

1  Q    Okay.  So you heard that someone had climbed over the
2  spiky wire?
3  A    Yeah.
4  Q    And you received information that that person was
5  hiding?
6  A    No, I didn't.
7  Q    You received continual information from the RVSS
8  operator as to what was occurring?
9  A    The last I remember was that one individual had got to
10 north and then it took about I'd say after maybe a 10-second
11 inspection of the general area I encountered the subject.
12 Q    And you found that person with the assistance of the
13 RVSS operator, correct?
14 A    Well, yes, he told me of the location to go to.
15 Q    The guidance, he guided you to the location, correct?
16 A    Yes.
17 Q    He guided you to the location where the person was
18 hiding?
19 A    No, to the general area of Druckers where he was
20 crossing.  He didn't point out that he was hiding right
21 there.
22          MR. ELLIS:  I'm going to approach again.
23          THE COURT:  Sure.
24 BY MR. ELLIS:
25 Q    I'm going to show you what's been premarked as Exhibit

63

C.

2      I'd move to admit Exhibit C at this time, your Honor.

3         MR. MANAHAN:  I'm sorry.  The Government did not

4 hear --

5         MR. ELLIS:  I'm sorry.  I move to admit Exhibit C.

6         MR. MANAHAN:  Exhibit C is the RLI?

7         MR. ELLIS:  It's the I213.

8         THE COURT:  Any objection?

9         MR. MANAHAN:  Can I just see it.  Yes, no

10 objection.

11         THE COURT:  All right.  That will be received.

12 BY MR. ELLIS:

13 Q    You testified earlier this is a report that you wrote,

14 is that correct?

15 A    Yes.

16 Q    I'm going to direct your attention to the second page.

17 In this report you wrote:

18         "With the RVSS operator giving me

19         guidance, I found an individual later

20         identified a Garcia-Villegas Javier

21         attempting to conceal himself in a

22         nearby bush along side the truck lane."

23 A    Yes.

24 Q    That's what you wrote on May 21st?

25 A    Yes.

64

```
 1  Q    That's what you wrote the day of the arrest?

 2  A    Correct.

 3  Q    Because that's what happened?

 4  A    Well, he gave me guidance, as I say, to the area of

 5  Druckers, and using his information that was passed on to

 6  me, I found him.

 7  Q    And that's information you knew you could rely upon?

 8  A    Yes.

 9  Q    That was information you knew to be true?

10  A    Yes.

11  Q    You knew if the RVSS operator told you someone had

12  jumped the fence, that's what had happened?

13  A    That's what he told me.

14  Q    And that's what you knew to be true?

15  A    Yes.

16  Q    Now, I'm going to show you Government Exhibit 1.  Can

17  you see that from where you're at?

18  A    Uh-huh.

19  Q    Okay.  Now, you said this is the general area of

20  Druckers?

21  A    Correct.

22  Q    And is it -- and so we're all clear, this is heading

23  east at this point, is that correct?

24  A    The truck is going east, yes.

25  Q    And for general purposes, are there factories that
```

65

1  would be just north of this or businesses?

2  A    Yes, there are businesses.  That street right there is

3  actually called Druckers, the one that's going north/south,

4  and I believe just north of where the Defendant was

5  apprehended is a parking lot.

6  Q    Was that for the Mattel Corporation and some other

7  companies?

8  A    Excuse me?

9  Q    Mattel?

10  A    No, no, no.  It's further -- it's further east than

11  that.

12  Q    What company would that have been?

13  A    I'm not familiar with the name of the company.

14  Q    Does this -- from this picture can you tell where you

15  were parked on May 21st when you got there?

16  A    I was -- the Druckers Road goes north/south, and then

17  like I'd say 50 -- 40 yards there's a street that parallels

18  Druckers called Kerns, and I was on Kerns.

19  Q    And is it fair to say that Kerns then is a couple

20  hundred yards away from the border?

21  A    From the border?

22  Q    Yes.

23  A    I don't --

24  Q    I'll make it clear, from the secondary fence?

25  A    From the secondary fence, not even.  Seventy yards, 75

66

1 yards.

2 Q    So you were parked --

3 A    To the best of my knowledge.

4 Q    I understand that.  No one asked you ahead of time to

5 guesstimate.  So you were parked on May 21st about 75 yards

6 away from the secondary fence?

7 A    Yes.

8 Q    Now, on May 21st, after you handcuffed Mr. Garcia, you

9 walked him to your car?

10 A    Yes.

11 Q    And once you got him to your car -- let me ask you

12 this.  Was he walking in front of you or behind you?

13 A    I don't really remember.

14 Q    Presumably you would have been guiding him to your car,

15 correct?

16 A    Might have been walking next to him like this.

17 Q    Next to him, escorting him to your vehicle?

18 A    Yes.

19 Q    You didn't want him to run away or anything?

20 A    No.

21 Q    He couldn't have run away?

22 A    Excuse me?

23 Q    You wouldn't have allowed him to have run away?

24 A    No.

25 Q    And after you walked him approximately 75 yards, you

67

1 got to your vehicle?

2 A    No.  I actually went into the truck lane, and I parked

3 my vehicle really close to where I actually apprehended Mr.

4 Garcia-Villegas.  So it was I would say 10, 15 yards away.

5 Q    I guess I'm confused because a moment ago you testified

6 that when you got there on May 21st, you parked your vehicle

7 near Kerns?

8 A    No, no, no.  I was -- when the call came out, I was

9 parked on Kerns.

10 Q    Okay.  And then you drove closer to --

11 A    And then I drove -- when I responded, I got out of my

12 -- I parked my vehicle off Druckers, and then I got off my

13 vehicle to search the area.

14 Q    Now, once you handcuffed him and escorted him to your

15 vehicle, you began to ask him a series of questions, is that

16 correct?

17 A    Yes, when I was at my vehicle.

18 Q    And you were asking him questions that you've learned

19 to ask people that you've arrested near the border?

20 A    Well, first I searched him first.  Or I did --

21 Q    After searching him, you asked him questions that

22 you --

23            THE COURT:  One at a time.  Go ahead.

24            THE WITNESS:  I just was going to say that I

25 frisked him, and then I began to ask him questions to

1  determine his alienage.

2  BY MR. ELLIS:

3  Q    And these are questions that you learned through your

4  training?

5  A    Yes.

6  Q    You've learned through your training that it's

7  important where a person's family members were born?

8  A    No.

9  Q    You've learned it's important to determine where a

10  person's parents are born?

11  A    I asked him -- I asked him where he was born, in what

12  state.

13  Q    That wasn't my question.  My question is you've learned

14  it's important to determine where someone's parents were

15  born?

16  A    I don't recall.

17  Q    Well, you admit that you do ask people where their

18  parents were born, correct?

19  A    No.  I asked for the first names of his mother and

20  father.

21  Q    You also ask their nationality?

22  A    Not their nationality.  I asked for his nationality.

23  Q    Sir, I'm not asking you -- I'm asking you in general.

24  A    Okay.

25  Q    You have been trained to ask people the nationality of

69

1  their parents, isn't that correct?

2  A    I don't really see how that's --

3        THE COURT:  Just yes or no, have you been trained

4  to do that?

5        THE WITNESS:  Yes, when I'm investigating, asking

6  questions.

7  BY MR. ELLIS:

8  Q    And this is the type of information that you include in

9  reports?

10 A    Yes.

11 Q    And, in fact, that's information you included in the

12 report you wrote in this case?

13 A    I'm -- I'm sorry.  I don't recall.

14 Q    Showing you again what's been admitted as Defense

15 Exhibit C.  This report includes information on the

16 nationality of the parents?

17 A    Yes, that's in there.

18 Q    Now, after you handcuffed Mr. Garcia and escorted him

19 to your vehicle and patted him down, that's when you began

20 to ask the question about alienage?

21 A    Correct.

22 Q    Including where he was a citizen of?

23 A    I -- yes, I asked him what state he was born in.

24 Q    You asked him a question to determine his citizenship?

25 A    Correct.

70

1   Q    You asked him questions regarding his entry?

2   A    I'm just trying to recall if I asked him at that time.

3   I don't -- I don't recall.

4   Q    You asked him what documents he had to be in the United

5   States?

6   A    Correct.

7   Q    Now, Agent Kim, you testified that you originally spoke

8   to Mr. Garcia in Spanish, is that correct?

9   A    Yes.

10  Q    And during the 19 weeks of training, did you receive

11  training on how to speak Spanish?

12  A    Yes, I did.

13  Q    And do you now speak Spanish?

14  A    I speak -- I know Spanish.

15  Q    Law enforcement proficient Spanish?

16  A    I'd say so.

17  Q    And you had further involvement with this case than

18  just the arrest, isn't that correct?

19  A    Yes.  I did the case file.

20  Q    You also are responsible for beginning the deportation

21  paperwork?

22  A    Yes.

23  Q    One of the things -- or one of the jobs you had in this

24  case was notifying Mr. Garcia of certain rights?

25  A    Yes.

71

1  Q    You gave him this notification at what time?  I'll back
2  up.
3  A    Okay.
4  Q    Is it correct that it was on two separate occasions
5  that you reviewed an I826 with him?
6  A    Yes.
7  Q    Is it fair to say that the original I826 was lost?
8  A    Could be stored.  I can't find it.
9  Q    For some reason you decided that you were going to do a
10 second I86 with Mr. Garcia?
11 A    Yes.
12 Q    The original I826 that you reviewed with him, do you
13 recall what time that was?
14 A    I believe the original I826 and the certification done
15 was done by the agents who were working at processing at
16 that time.  I wasn't called into the station until much
17 later.
18 Q    So you don't have any personal knowledge of when he was
19 originally given his rights on the I826?
20 A    I don't know that.
21 Q    Approaching you again with what's been marked Defense
22 Exhibit E, and I'd move that Defense Exhibit E be admitted
23 into evidence.
24        THE COURT:  Any objections?
25        MR. MANAHAN:  No, your Honor.

72

1          THE COURT:  Received.

2   BY MR. ELLIS:

3   Q    These are some of the rights that are given to a person

4   prior to being deported from the United States, is that

5   correct?

6   A    Yes.

7   Q    These aren't all the rights they receive.  These are

8   some of them?

9   A    Correct.

10  Q    In fact, it says "Notification of Rights" at the top?

11  A    Yes.

12  Q    And one of the rights it discusses is about the right

13  to an attorney?

14  A    Yes.

15  Q    Doesn't say they have a right to a free attorney,

16  though, correct?

17  A    To -- to my knowledge, no.

18  Q    In fact, based on your training, you know that people

19  in immigration proceedings do not have the right to a free

20  attorney, correct?

21  A    To the best of my knowledge, no.

22          MR. ELLIS:  One moment, your Honor.

23          THE COURT:  Sure.

24      (Pause.)

25          MR. ELLIS:  Thank you for your time.  That's all.

73

```
 1          THE COURT:  All right.  Any redirect?
 2          MR. MANAHAN:  Just briefly, your Honor.
 3                    REDIRECT EXAMINATION
 4 BY MR. MANAHAN:
 5 Q    Just to be clear, the 826 that you filled out in the
 6 field, what information did you write on that?
 7 A    It had his name, the state he was born in, the date of
 8 birth -- his date of birth, first names of his mother and
 9 father.
10 Q    Did you review any rights with the Defendant regarding
11 what was written on that 826 in the field?
12 A    In the field, no.
13 Q    Okay.  Were you requested to turn over all the
14 documents having to do with Defendant's case by the United
15 States Government?
16 A    Yes.
17 Q    Okay.  Was a search made for that 826?
18 A    Yes, several.
19 Q    Was it found?
20 A    No.
21 Q    Okay.  Turning to the time here you found the Defendant
22 and placed him in handcuffs, why did you place him in
23 handcuffs?
24          MR. ELLIS:  Objection, your Honor.  Relevance.
25          THE COURT:  Overruled.
```

1      THE WITNESS:  Just for officer safety reasons.

2 His shirt was untucked.  I didn't know what he might have

3 had in his possession that could possibly hurt me, so -- and

4 for officer safety reasons.

5 BY MR. MANAHAN:

6 Q    Besides officer safety reasons, was there any other

7 reason?

8 A    He was bleeding, and --

9 Q    In your training and experience, do individuals found

10 near the border sometimes become violent?

11      MR. ELLIS:  Objection, your Honor.  403, relevant,

12 calls for an expert opinion as stated.

13      THE COURT:  Overruled.  It goes to the motion as

14 to custody and the question of the statement.

15      THE WITNESS:  Yes, sometimes people who are

16 apprehended -- or not apprehended but who encounter Border

17 Patrol agents are aggressive and assaultive, especially --

18 particularly actually in the Druckers area.

19 BY MR. MANAHAN:

20 Q    So did you -- during your training with Border Patrol,

21 were you taught that individuals approached near the border

22 are sometimes combative?

23      MR. ELLIS:  Objection, your Honor.  Vague,

24 relevance.  I think he's explored this area enough.

25      THE COURT:  Overruled.

75

1              THE WITNESS:  Yes.

2  BY MR. MANAHAN:

3  Q    And then during your year of working with the Border

4  Patrol, did you become aware of specific instances where

5  individuals encountered near the border became combative?

6  A    Yes.

7  Q    Why did you pat down the Defendant after you approached

8  him?

9  A    Just for safety reasons, in case that he might be

10 hiding a weapon.  My time with the Border Patrol, I've

11 encountered people with pocket knives, metal pipes, screw

12 drivers hidden in their pockets.  So just for my safety I

13 did a quick pat down.

14            MR. MANAHAN:  No further questions, your Honor.

15            THE COURT:  Anything further, Mr. Ellis?

16            MR. ELLIS:  Briefly.

17                    RECROSS EXAMINATION

18 BY MR. ELLIS:

19 Q    You find him, correct?

20 A    Yes.

21 Q    You handcuff him?

22 A    Yes.

23 Q    You brought him to your car?

24 A    Yes.

25 Q    You patted him down?

76

1  A    Yes.

2  Q    Didn't find any weapons?

3  A    No.

4  Q    Didn't take the handcuffs off right at that time?

5  A    I don't recall, but I remember when I did put him in my

6  Jeep, he did not have handcuffs.

7  Q    You didn't immediately remove -- you don't recall

8  immediately removing the handcuffs after the pat down?

9  A    I do not recall to the best of my knowledge.

10 Q    And then after that you put him in your car?

11 A    Yes, in the back in my car.

12 Q    He was being held there?

13 A    This is after I talked to him, right?

14 Q    Yes.

15 A    Yes.

16 Q    And you further detained until the transport got there?

17 A    Yes.

18         MR. ELLIS:  Thank you.

19         THE COURT:  Anything else for this witness?

20         MR. MANAHAN:  No, your Honor.

21         THE COURT:  Okay.  May we excuse Agent Kim now?

22         MR. ELLIS:  Yes, your Honor.

23         THE COURT:  All right.  You are excused, sir.

24 Thank you.

25         Government have another witness?

1                                  (The witness was excused.)

2          MR. MANAHAN:  At this time the Government would

3   call Border Patrol Agent Villarreal.

4          THE COURT:  All right.  Let's have Agent

5   Villarreal come forward then to be sworn.

6       RAMON VILLARREAL - PLAINTIFF'S WITNESS - SWORN

7          THE CLERK:  State your first name and spell your

8   last name for the record.

9          THE WITNESS:  Ramon Villarreal.  Last name is V-I-

10  L-L-A-R-R-E-A-L.

11         THE COURT:  All right.  Mr. Manahan, you may

12  proceed.

13                      DIRECT EXAMINATION

14  BY MR. MANAHAN:

15  Q    Mr. Villarreal, please state your occupation.

16  A    United States Border Patrol Agent.

17  Q    And how long have you been with the United States

18  Border Patrol?

19  A    Approximately five years.

20  Q    And what are your current duties with the United States

21  Border Patrol?

22  A    Line watch duties and patrolling the border of the

23  United States, interdicting and apprehending illegal aliens

24  or narcotics coming into the United States.

25  Q    And have you received any specialized training

78

1  regarding your duties with the Border Patrol?

2  A    Yes, sir.

3  Q    Can you describe those?

4  A    At the United States Border Patrol Academy ranged from

5  handcuffing, different physical defense tactics, immigration

6  law, naturalization law, Spanish -- well, we learned Spanish

7  as well.

8  Q    Was that the first time you learned Spanish?

9  A    No, sir.

10 Q    How long have you known -- how long have you been --

11 are you fluent in the Spanish language?

12 A    Yes, sir.

13 Q    How long have you been fluent in the Spanish language?

14 A    Since I was born, sir.

15 Q    Did you learn it from your parents?

16 A    Yes, sir.

17 Q    Do you speak Spanish on a regular basis?

18 A    Yes, sir.

19 Q    Do you speak Spanish on a regular basis with regards to

20 your duties with the Border Patrol?

21 A    Yes, sir.

22 Q    During your duties with the Border Patrol, with

23 approximately how many people have you conversed with in

24 Spanish?

25 A    It's up in the thousands.

1  Q     During those maybe 1,000 or more conversations, did it
2  appear that the individuals you were speaking to had any
3  difficulty understanding what you were saying?
4  A     No, sir.
5  Q     Is it fair to say then that during those thousands of
6  conversations you were able to easily communicate with the
7  other Spanish speaking individuals?
8  A     Yes, sir.
9  Q     Have you ever met the Defendant, Javier Garcia-Villegas
10 before today?
11 A     The date of his arrest.
12 Q     Okay.  What was the circumstances surrounding the first
13 time you met the Defendant?
14 A     He was brought into the station for transport, and I
15 processed him, took his fingerprints.
16 Q     Okay.  Can you explain what it means to process an
17 individual who's brought in under the circumstances the
18 Defendant was?
19 A     Well, I received the 826 from the agent that filled out
20 the biographical information out in the field.  I take it.
21 I have him sign it, and then I'll take -- input all that
22 information into the database and then roll his fingerprints
23 for immigration and criminal history.
24 Q     Okay.  As part of that processing, did you communicate
25 to the Defendant certain immigration or administrative

80

1  rights that he had?

2  A    Yes, sir.

3  Q    And did those rights include -- what did those rights

4  include with regards to an attorney?

5  A    That if he needed an attorney, he'd have to pay for

6  one.

7  Q    Did you have an opportunity to speak with the Defendant

8  after that initial processing?

9  A    Yes, sir, in the sworn statement.

10 Q    Approximately how long after that initial processing

11 did that communication occur?

12 A    Approximately 40 minutes.

13 Q    When you first met him, did you speak to him in the

14 English or Spanish language?

15 A    I believe it was Spanish.

16 Q    Sir, I've just handed you what has been premarked for

17 identification purposes as Government's Exhibit Number 3.

18 Do you recognize it?

19 A    Yes, sir.

20 Q    Have you had a prior opportunity to review this

21 document?

22 A    Yes, sir.

23 Q    Is this nine-page document a fair and accurate

24 description of the questions that you -- that you posed to

25 the Defendant and the answers given by the Defendant?

81

1  A    Yes, sir.

2  Q    Can you read the statement at the bottom of the first

3  page of that document?

4  A    It says:

5          "I, Andrew J. Johnson Hanson,

6          interpreter certified by the

7          Administrative Office of the United

8          States Courts certificate number 95-036,

9          declare that I'm fluent in the English

10         and Spanish languages and that I

11         transcribe and translated a video

12         recording, the contents of which appear

13         below to the best of my ability on or

14         about June 3rd, 2008 in San Diego,

15         California."

16 Q    And that communication you had with Defendant which is

17 transcribed in this document, was that videotaped?

18 A    Yes, sir.

19         MR. MANAHAN:  Okay.  At this time I'd move that

20 Exhibit Number 3 be entered into evidence, your Honor.

21         THE COURT:  Any objection, Mr. Ellis?

22         MR. ELLIS:  No objection, your Honor.

23         THE COURT:  Okay.  It will be received.

24 BY MR. MANAHAN:

25 Q    When you began speaking to the Defendant approximately

82

1  40 minutes after you informed him of his administrative

2  rights, did you speak to him about those rights again?

3  A    Yes, I did.

4  Q    And what did you tell him at that time?

5  A    That those rights no longer applied and he was being

6  charged criminally.

7  Q    Before speaking further with Defendant, did you advise

8  him of his Miranda rights?

9  A    Correct.

10 Q    Okay.  And what did you advise him about his Miranda

11 rights?

12 A    That he had a right to remain silent, he had a right to

13 have an attorney present with him, and if one was -- he

14 couldn't pay for one, one would be appointed to him.

15 Q    Okay.  And what Spanish word did you use when you told

16 him that if he couldn't afford an attorney, one would be

17 appointed?

18 A    Designara.

19 Q    And, in your opinion, does that word translate into the

20 English language as appointed?

21 A    Yes, sir.

22 Q    Did Mr. Garcia-Villegas ever indicate to you that he

23 was willing to waive his right to remain silent and speak to

24 you?

25 A    Could you repeat the question again?

1  Q     Did the Defendant agree to waive his right to remain

2  silent and agree to speak to you?

3  A     Correct.  He agreed to speak with me.

4  Q     Did he agree to speak with you without a lawyer

5  present?

6  A     Yes, sir.

7  Q     Did Mr. Garcia-Villegas seem confused while you were

8  describing his Miranda rights?

9  A     No, sir.

10 Q     Did you advise him that he could stop at any time, even

11 after he started asking questions, in order to get an

12 attorney?

13 A     Yes, sir.

14        MR. ELLIS:  Your Honor, I would make a continuing

15 best evidence objection at this point.  They've apparently

16 indicated that they have a certified transcript.  I think

17 that's the best evidence of what occurred.

18        THE COURT:  It does say what it says.  To the

19 extent that it helps move things along in the course of the

20 evening that day, I'll overrule it.  But we don't need to

21 restate everything that was in the statement.

22        MR. MANAHAN:  Understood, your Honor.  Thank you.

23 BY MR. MANAHAN:

24 Q     After discussing the Defendant's Miranda rights with

25 him and receiving waivers, did you ask him about his

84

1  citizenship?

2  A    Yes, sir.

3  Q    How did he respond?

4  A    That he was born in Mexico and had no immigration

5  documents to allow him to remain in the United States

6  legally.

7  Q    Did he explain how he entered the United States?

8  A    Yes, by jumping over the fences.

9          MR. ELLIS:  Your Honor, just so the record is

10 clear, we are renewing our pretrial motions.  I know the

11 Court's ruled on those, but just so the record is clear.

12         THE COURT:  Well, I mean, the objection's -- I'll

13 sustain it.  We'll just be going through the statement.  Now

14 that the statement's in evidence, the testimony clearly is

15 cumulative.  But if there's an issue as to confusion or

16 something else at some point in time, that certainly would

17 be appropriate to inquire into.

18 BY MR. MANAHAN:

19 Q    Okay.  Just one last question then, sir.  Do you see

20 the person you interviewed on May 21st in the courtroom

21 today?

22 A    Yes, sir.

23 Q    Can you point him out?

24 A    He's sitting between the two defense lawyers.

25 Q    Can you describe an article of clothing he's wearing?

85

```
 1  A    He's earing a light blue collared shirt.

 2         THE COURT:  Let the record reflect that the

 3  witness has identified the Defendant, Mr. Garcia-Villegas.

 4         MR. MANAHAN:  Okay.  No further questions at this

 5  time, your Honor.

 6         THE COURT:  All right.  Cross examine from the

 7  defense, Mr. Chavez?

 8                     CROSS EXAMINATION

 9  BY MR. CHAVEZ:

10  Q    Good afternoon.

11  A    Good afternoon.

12  Q    Or good morning.

13  A    Good morning.

14  Q    You were the case agent in this case, correct?

15  A    No.  Andrew Kim would be the case agent.  I just did

16  the sworn statement and Miranda.

17  Q    But you are familiar with this case?

18  A    Yes, sir.

19  Q    And you helped with the investigation in this case?

20  A    Yes, sir.

21  Q    Okay.  You said you processed Mr. Garcia?

22  A    Correct.

23  Q    Okay.  And you said you've received training to do your

24  job?

25  A    Yes, sir.
```

1  Q    Okay.  You've been trained what to ask suspects?

2  A    Correct, sir.

3  Q    You've been trained how to ask those questions?

4  A    Yes, sir.

5  Q    And you've been trained to write reports of these

6  investigations?

7  A    Yes, sir.

8  Q    But you didn't write a report in this case, did you?

9  A    No, sir.

10 Q    Okay.  And you've also received training on A files, is

11 that correct?

12 A    Yes, sir.

13 Q    You know how to locate an A file?

14 A    Yes, sir.

15 Q    You know how to interpret the documents that are inside

16 of those A files?

17 A    Yes, sir.

18 Q    You know how to generate documents that will be put

19 into those A files?

20 A    Yes, sir.

21 Q    And you said you had processed thousands of people

22 during your time with the Border Patrol?

23 A    Yes, sir.

24 Q    And so you've seen -- have you seen thousands of A

25 files?

1  A    I'd say about half.

2  Q    Okay.  And in these A files, these A files include

3  biographical information on individuals?

4  A    Yes, sir.

5  Q    Where they're born?

6  A    Yes, sir.

7  Q    Might even include a birth certificate?

8  A    I've never seen a birth certificate, sir.

9  Q    Okay.  But it will have information -- it has

10 information about that individual's birth in there, right?

11 A    Correct.

12 Q    And it will have information about where that person's

13 parents were born?

14 A    Yes, sir.

15 Q    It will have information about whether or not that

16 individual has become a United States citizen?

17 A    Yes, sir.

18 Q    So there are United States citizens that do have alien

19 files, right?

20 A    Only if they became naturalized.

21 Q    Huh?

22 A    Only if they became naturalized, sir.

23 Q    Only if they become naturalized.  And these A files

24 contain information about people coming into the country?

25 A    A file in a sense would be all the paperwork, whether

88

1  it was due to detention or naturalization process.  So what
2  was your -- I'm sorry.  Would you repeat your question.
3  Q    I mean, it would have information about when they had
4  entered the United States?
5  A    No, sir.  That would be more in the actual databases
6  themselves.
7  Q    Okay.  I want to talk a little bit about the
8  information that you had about Mr. Garcia through the sort
9  of processing of him.  You knew his name?
10  A    Correct.
11  Q    You had a date of birth for him?
12  A    Yes, sir.
13  Q    Supposedly he had told you that he was born in Jalisco?
14  A    Yes, sir.
15  Q    In Guadalajara?
16  A    Yes, sir.
17  Q    Okay.  You knew the color of his hair?
18  A    Just by looking at him, yes, sir.
19  Q    His height, his weight.  You knew where his -- where he
20  believed his father lived?
21  A    Correct.
22  Q    You knew where he thought his mother lived?
23  A    Correct.
24  Q    He also suggested that he may have lived -- he
25  allegedly made statements that he had lived in Pomona?

89

1  A     Yes.

2  Q     Okay.  He told you that he was 28 years old?

3  A     By calculating from his date of birth.

4  Q     Okay.  Okay.  You said you had received training on

5  immigration laws of this country, right?

6  A     Yes, sir.

7  Q     And so you know that an individual born in the United

8  States is a United States citizen?

9  A     Correct.

10 Q     But you also know that there are other ways to become a

11 United States citizen?

12 A     Yes, sir.

13 Q     One can become a United States citizen if they were

14 born to a United States citizen?

15 A     Correct.

16 Q     So someone that was born in Mexico could be a United

17 States citizen?

18 A     If certain guidelines are met, yes, sir.

19 Q     Okay.  Did you find out whether Mr. Garcia's father is

20 a United States citizen?

21 A     I believe we did ask.  It wasn't me who asked him that,

22 though.  That was Agent Kim.

23 Q     You didn't find out whether his father --

24 A     No.

25 Q     Okay.  Did you find out whether or not his mother was a

90

1  United States citizen?

2  A    No, sir.

3  Q    Did you find out whether any of his grandparents were

4  United States citizens?

5  A    No, sir.

6  Q    Did you look for the A files for any of the members of

7  his family?

8  A    No, sir.

9  Q    Did you get in touch with his mother or his father?

10  A    No, sir.

11  Q    Okay.  Did you go to Pomona to find out any information

12  about him up there?

13  A    No, sir.

14  Q    Did you get a birth certificate from Mr. Garcia?

15  A    No, sir.

16  Q    Did you ask Mr. Garcia where he had been raised?

17  A    No, sir.

18  Q    Did you ask Mr. Garcia if he had been adopted?

19  A    No, sir.

20  Q    There was some testimony earlier that Mr. Garcia was --

21  had some injuries?

22  A    I believe some cuts on his hands.

23  Q    Did he receive medical treatment for those injuries?

24  A    He did not ask for any medical treatment.

25  Q    Did you offer to provide him medical treatment?

1  A    We cleaned them up.  I mean, they weren't severe.  The

2  were, you know, just nicks.

3  Q    Since Mr. Garcia has been in custody, have other people

4  been brought into custody coming over the border there in

5  Druckers?

6  A    Yes, sir.

7  Q    And have you asked any of those individuals if they

8  have any information about Mr. Garcia?

9  A    The people we arrested, sir?

10 Q    Yeah.

11 A    No, sir.

12 Q    Okay.  And now I want to just hopefully quickly go

13 through a couple of questions about the statements that Mr.

14 Garcia made.  Again, you said you'd been a Border Patrol

15 agent for a number of years, right, five years?

16 A    Yes, sir.

17 Q    Okay.  And so you've seen lots of people sent back to

18 Mexico?

19 A    Yes, sir.

20 Q    Thousands of them?

21 A    Correct.

22 Q    And the vast majority of these people are returned

23 pretty quickly?

24 A    Yes, sir.

25 Q    About how quickly?

92

1  A     Anywhere between six to eight hours.

2  Q     Okay.  So same day?

3  A     Yes.

4  Q     Okay.  So probably -- okay.  Now, at the very end of

5  your -- I want to talk to you about the very end of your

6  interrogation, and I can show you the transcript if you'd

7  like.

8       So basically after you told him or tried to tell him

9  that he was being prosecuted for a -- so it's at the very

10 end, after you tried to tell him he was being prosecuted for

11 a federal crime, you tried to tell him that?

12 A     Yes, sir.

13 Q     Okay.  And you tried to tell him that he was no longer

14 going to be deported, right?

15 A     That he was going to be charged criminally.

16 Q     Okay.  I'm showing you the Government's Exhibit 3,

17 which is the transcript and translation of the -- your

18 interview with Mr. Garcia.  On page three, starting on line

19 eight I guess it is, the translation reads -- and correct me

20 if I'm wrong:

21           "Now you should understand that there

22           has been a change in which you will not

23           be returned to your country at this

24           time."

25 A     Correct.

93

1  Q    Right.  So you told him that he was not going to be

2  sent back to Mexico in the next six to eight hours?

3  A    Correct.

4  Q    Right.  And then you proceeded to try and tell him his

5  rights right after this?

6  A    Yes, sir.

7  Q    And you had just tried to tell him that he was going to

8  be prosecuted for a crime, right?

9  A    Correct.

10  Q    And now I would like to bring your attention to page

11  eight, and this is near the very end of the interview here.

12  It's page eight of nine.  And at the very -- on line 16, you

13  asked him is there anything at this time you would like to

14  add or say --

15  A    Yes, sir.

16  Q    -- is that correct?

17  A    Yes, sir.

18  Q    Okay.  And his response was, "Oh, only to find out how

19  long I'm going to stay?"

20  A    Correct.

21  Q    Right.  And your response was "At this time 24 hours.

22  That's it.  Going to be very little."  That's what the

23  translation says?

24  A    Yes.

25  Q    Okay.  You also said on direct testimony that you asked

94

1  him during this interview whether or not he had any papers

2  to be in the United States.  Could you show me where during

3  this interview you asked him that question?

4  A    Yes, sir.  It should be towards the beginning.

5           THE COURT:  Page six of nine, line nine.

6  BY MR. CHAVEZ:

7  Q    Okay.  But --

8  A    Thank you, sir.

9           MR. MANAHAN:  Objection.  I think the witness can

10  respond to the question.

11           THE COURT:  Yeah, you may respond.

12           THE WITNESS:  Yes, sir, that's on page six of

13  nine.

14  BY MR. CHAVEZ:

15  Q    Okay.  And now can I bring your attention to page

16  three, which is before you ask him that question.  And on

17  line 14 --

18           THE COURT:  I'm sorry.  I missed the page.  I'm

19  sorry to interrupt you.

20           MR. CHAVEZ:  I'm sorry.  On page three of nine.

21           THE COURT:  Okay.  Thank you.

22  BY MR. CHAVEZ:

23  Q    On line 14 right there, this is you speaking or a

24  translation of you speaking.  Correct me if I get it wrong.

25  And you begin the sentence "Sir, since you are not a citizen

95

1  of the United, States," right, that's what you told him?

2  A    Yes, sir.

3  Q    Anywhere before that in this interrogation does he

4  admit to not being a United States citizen?

5  A    Not on this form.

6  Q    Okay.  And the entire interrogation is contained on the

7  video that we saw earlier?

8  A    Yes, sir.

9  Q    Okay.  And also on direct testimony you told -- you

10 said -- and I think I got the language right, that you told

11 him that his rights -- his administrative rights no longer

12 applied?

13 A    Correct.

14 Q    And is there anywhere in this transcription where you

15 use that language?

16 A    Yes, sir.

17 Q    Would you just please tell me the lines and what page

18 and line number?

19 A    It's going to be on page three of nine and starting

20 with line number one.

21 Q    Line number one:

22         "Okay, sir.  You were previously

23         informed of your rights in which you

24         were asked to return to your country as

25         soon as possible.  You should understand

96

```
 1            these rights only apply to immigration

 2            proceedings" --

 3            THE INTERPRETER:  I can't --

 4            MR. CHAVEZ:  Okay.  I'm sorry.  I'm sorry.

 5  BY MR. CHAVEZ:

 6  Q       -- "immigration proceedings for removing

 7            from the United States.  Now you should

 8            understand" --

 9       Does -- anywhere in there does it say your

10  administrative rights no longer apply?

11  A    No, sir.

12  Q    Does anywhere do you say he should disregard those

13  previous rights?

14  A    With the word administrative in it, no.

15  Q    Okay.  Do you use the word "disregard?"

16  A    No, sir.

17            MR. CHAVEZ:  That's all.  Thank you very much.

18            THE COURT:  Mr. Manahan, further questions?

19            MR. MANAHAN:  No further questions, your Honor.

20            THE COURT:  Let me ask a question.  What's the

21  source of this information at page three of nine, line 14

22  that led you to conclude he was not a citizen of the United

23  States at that point in time?

24            THE WITNESS:  The administrative -- this is a

25  right to -- his administrative right to contact the Mexican
```

97

1  Consulate, and since on the field he stated he was not a

2  United States citizen, this applies to him.

3        THE COURT:  Okay.  So you were reading from a form

4  then at that point?

5        THE WITNESS:  Correct.

6        THE COURT:  Okay.

7        MR. MANAHAN:  I just have some questions.

8        THE COURT:  Sure.  Go ahead, Mr. Manahan.

9               REDIRECT EXAMINATION

10  BY MR. MANAHAN:

11  Q    And besides in the field, it's true that you processed

12  the Defendant approximately 40 minutes before this

13  interview, is that correct?

14  A    Correct.

15  Q    And during that time did you gain understanding that he

16  was not a United States citizen?

17  A    That's correct.

18  Q    Okay.  And let me just ask one last question.  When you

19  were reading Defendant his Miranda rights, did you use any

20  aid or device?

21        MR. CHAVEZ:  Objection, your Honor.  Beyond the

22  scope of cross.

23        THE COURT:  It is, but I'll allow it.  He could

24  recall him if he wanted.  Go ahead.

25        THE WITNESS:  Could you repeat the question, sir?

98

BY MR. MANAHAN:

Q    Did you use any aid or device while reading Defendant his Miranda rights?

A    An aid or -- one more time.  I'm sorry.

Q    Did you read it off anything?

A    Oh, yes.

Q    What was that?

A    I carry with me -- it's a -- the Miranda rights in Spanish and English, and I read it off every time.  That way I don't have to memorize it.

MR. MANAHAN:  Okay.  No further questions.

THE COURT:  All right.  Anything else, Mr. Chavez? All right.  You may step down, sir.

THE WITNESS:  Thank you, sir.

(The witness was excused.)

THE COURT:  Government have any further witnesses to call?

MR. MANAHAN:  Yes.  At this time we'll call Border Patrol Agent Hernandez, but given the objections, we'll limit it -- I'll limit his testimony just to whether there was any confusion about --

THE COURT:  Sure.  That's fine.

MR. ELLIS:  I'd just object again, your Honor, as cumulative, 403.

THE COURT:  I'll reserve ruling until we hear what

1 he's asked.

2          MR. ELLIS:  Yes, your Honor.

3      ALFONSO HERNANDEZ - PLAINTIFF'S WITNESS - SWORN

4          THE CLERK:  State your full name and spell your

5 last name for the record.

6          THE COURT:  Okay.  Mr. Manahan, you may proceed as

7 soon as he's done giving us his name.

8          THE WITNESS:  Agent Alfonso Hernandez.

9                    DIRECT EXAMINATION

10 BY MR. MANAHAN:

11 Q    Can you spell your last name?

12 A    H-E-R-N-A-N-D-E-Z.

13 Q    What is your occupation, sir?

14 A    Border Patrol agent.

15 Q    How long have you been a Border Patrol agent?

16 A    Tomorrow will be seven months.

17 Q    Did you receive any specialized training with regard to

18 your duties as a Border Patrol agent?

19 A    Yes.  I was in the academy for three months and still

20 continue with post-academy training.

21 Q    Did you receive any training in the Spanish language at

22 the academy?

23 A    No.  I was able to pass a Spanish test so I didn't have

24 to take any Spanish courses.

25 Q    Are you fluent in the Spanish language?

100

1   A   Yes.

2   Q   How long have you been fluent in the Spanish language?

3   A   My whole life.

4   Q   Directing your attention to May 21st, 2008, were you on

5   duty at approximately 8:00 o'clock?

6   A   Yes.  My shift if from 4:00 p.m. to 2:00 a.m.

7   Q   Did you have an opportunity to meet the Defendant, Mr.

8   Garcia-Villegas, at that time?

9   A   Yes, sir, I did.

10  Q   What were the circumstances regarding when you met him?

11  A   I was a witness in the sworn statement where I met him

12  in the room where we had the interview for him.

13  Q   What language was that interview conducted in?

14  A   In Spanish.

15  Q   Did you have any difficulty understanding that

16  interview?

17  A   None at all.

18          MR. ELLIS:  Objection, your Honor.  Foundation,

19  relevance, expert conclusion.

20          THE COURT:  It's limited as to his ability to

21  understand.  Overruled.  The answer was no problem?

22          THE WITNESS:  None at all.

23          THE COURT:  Go ahead.

24  BY MR. MANAHAN:

25  Q   Did you hear Mr. Garcia-Villegas receive his Miranda

1 rights?

2 A    Yes, I did.

3 Q    Including his right to remain silent?

4 A    Yes.

5 Q    Including his right to an attorney?

6 A    Yes.

7 Q    Including that if he did not have the means to hire an

8 attorney one would be appointed?

9         MR. ELLIS:  Objection, your Honor.  Again, the

10 transcript has been admitted.  It's -- this is cumulative.

11         THE COURT:  Overruled.

12         THE WITNESS:  Yes.

13 BY MR. MANAHAN:

14 Q    Did Mr. Garcia-Villegas seem to have any -- did Mr.

15 Garcia-Villegas respond that he understood those rights?

16 A    Yes, he did.

17 Q    Did he seem to have any difficulty understanding those

18 rights?

19 A    From my perception, none.

20         MR. MANAHAN:  No further questions, your Honor.

21         THE COURT:  Okay.  Cross examine from the defense?

22 No.

23         MR. ELLIS:  No.

24         THE COURT:  All right.  You may step down, sir.

25 May we excuse Agent Hernandez, then?

1            MR. MANAHAN:  The Government rests, your Honor.

2                              (The witness was excused.)

3            THE COURT:  Okay.  And the defense have witnesses

4    to put on at this point or --

5            MR. ELLIS:  We'd move for a Rule 29 motion at this

6    time, your Honor.

7            THE COURT:  All right.  Do you want to articulate

8    the Rule 29?

9            MR. ELLIS:  Yes, your Honor.

10           THE COURT:  Basically the defense is resting.  So

11   aren't we effectively getting into just sort of final

12   argument at this point, not to --

13           MR. ELLIS:  It's up to -- it's up to your Honor

14   how you want to handle this.  I think some of the Rule 29

15   arguments might dovetail with closing arguments anyway.

16           THE COURT:  Yeah.  I'd be comfortable letting you

17   approach the -- I'd probably defer it until your final

18   arguments anyway.  So why not just argue the whole thing in

19   context.  And is there anything further -- and if I overrule

20   the objections on the suppression, particularly the field

21   form without prejudice, you want to renew that at this point

22   and reargue it or --

23           MR. ELLIS:  I would actually, your Honor.  I think

24   that motion specifically, what was clear from Agent Kim's

25   testimony is this.  He arrests people who jump over the

1  border.  That was the question, "What do you do when people

2  jump over the fence?"  "I arrest them."  "That's what you

3  did in this case?"  "Yes."

4       He had training that it's against the law to enter

5  the United States over the fence.  That's what he said.  He

6  had evidence that the person had entered by jumping over the

7  fence.  He saw that person, and he arrested him.  After

8  locating him, he ordered him out of the bush, handcuffed

9  him, walked him a distance to his vehicle, patted him down,

10 and then questioned him.

11      A reasonable person would not have felt free to

12 leave at that time.  That's custody, and the questions he

13 asked were questions that he -- based on training he

14 received at the academy, questions that you use to determine

15 whether or not someone is legally in the United States.

16 When he asked those questions, it was for one reason, to get

17 an incriminating response.

18      When you add the custody together with the

19 incriminating questions, Miranda applies.  He didn't have

20 it.  Those statements should be suppressed.

21      THE COURT:  All right.  And then, Mr. Manahan?

22      MR. MANAHAN:  Just, again, your Honor, the Ninth

23 Circuit expressed in Butler that the Court is to look to the

24 objective circumstances of the interrogation, not to the

25 subjective view harbored either by the suspect or the

1 interrogating officer to determine if the Defendant is in

2 custody.  Furthermore, it doesn't matter if he had probable

3 cause to arrest him, but it's the object of circumstances.

4 I already gave your Honor a list of certain things you can

5 look to.

6          THE COURT:  All right.

7          MR. MANAHAN:  And, again, your Honor, in

8 Cervantes-Flores, the Defendant was handcuffed, and the

9 Ninth Circuit said regardless he was not yet in custody and

10 it was perfectly okay for the officer to ask about his place

11 of birth, his citizenship, whether he had permission to be

12 in the United States, how he had crossed into the United

13 States as part of an investigatory Terry stop.

14          THE COURT:  Right.  Of course, what the record is

15 a little scant on is at what point in time the arrest took

16 place, and here's my view of this.  I think from the agent's

17 own mouth, his job was to arrest people at the border.  It

18 clearly made it clear that he had every intention of holding

19 Mr. Garcia, and he was not going to let him get away, and I

20 think that there -- it becomes very muddled at that point in

21 terms of the Terry stop.  I think that the officer was well

22 within his province to handcuff, to pat down, and to ask the

23 basic questions, but I think that clearly I would find that

24 the gentleman was in a custodial setting at that time.

25          Having said that, the officer said "I asked him

1  his name, the first names of his parents, his date of birth,

2  and which state in Mexico he was from," and the testimony

3  unequivocally and unchallenged was that at that point Mr.

4  Garcia volunteered his state of -- or his lack of

5  immigration documentation.

6          So I think that to the extent that there was a

7  failure to Mirandize which was problematic in this sense,

8  you know, you've got this person volunteering well beyond

9  any questions asked.  So there wasn't any purposeful

10  interrogation into incriminating information.  He was

11  basically getting information he was allowed to get.

12          So I'll deny the motion.  I think that we have --

13  it's clear that it was a custodial type setting, but the

14  officer did not do it for the purpose of gaining

15  incriminating evidence.  He did it for his safety, for his

16  basic investigation duties, and the Defendant volunteered

17  the information.  I think he's held to have waived at that

18  point or that the lack of giving the warnings was harmless

19  at best in this situation.  So the motion is denied.

20          Do you want to argue at this point, Mr. Manahan?

21          MR. MANAHAN:  Closing argument?

22          THE COURT:  Yes.

23      CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

24          MR. MANAHAN:  Thank you, your Honor.

25          Your Honor, as to the Title 8, Section 1325(a)(1)

1  offense of which Defendant is accused --

2         THE COURT:  Oh, was there a point?  Go ahead.

3         MR. ELLIS:  Your Honor, the only thing I think

4  that would be prudent to do ahead of time is we should at

5  least have a conference on the elements of the offense,

6  bench instructions if you will.  I think it might be

7  important to at least have argued those prior to coming to

8  closing arguments.

9         THE COURT:  Okay.  We can do that.  What --

10         MR. MANAHAN:  Your Honor, I submitted a trial

11  memorandum --

12         THE COURT:  You did.

13         MR. MANAHAN:  -- in which section three is

14  applicable law in which the United States gave what it

15  believes to be the elements of the two offenses.

16         THE COURT:  Yeah.  I left that at the break in my

17  office.  Be right back.  Do you have an extra copy?  If not,

18  I'll just grab it real quick.  Here we are.  Okay.  Go

19  ahead.  Section three, so --

20         MR. MANAHAN:  It starts on page -- at the bottom

21  of page three.

22         THE COURT:  Yeah.  All right.  And this is based

23  upon the -- not only the statute but the model current jury

24  instructions Ninth Circuit 5.3.

25         MR. MANAHAN:  That is -- and that's for -- that's

1  a basic attempt instruction.

2        THE COURT:  Right.  And then you've got your

3  1325(a)(2) and instruction 9.5 that follows on page four.

4        MR. MANAHAN:  And that's a 1326 instruction for

5  entering, and basically I just used that to get the mens rea

6  of knowingly and voluntarily.  We had discussed what the

7  mens rea would be.

8        THE COURT:  Right.  Okay.  So, Mr. Ellis, what are

9  your comments about this?

10        MR. ELLIS:  Your Honor, beginning with the Count

11  1, I think that the Government's four puts the cart before

12  the horse, that it is a crime for an alien to attempt to

13  enter the United States at any time or place other than is

14  designated by immigration officers.

15        Well, that's an element.  I think that the fourth

16  element has to be that the entry occurred at a time and

17  place other than designated by immigration officers.  That

18  is an element of the (a)(1) offense.

19        THE COURT:  That we should use an and and not or?

20        MR. ELLIS:  It's not just the introductory

21  language, it's a crime for an alien to attempt to enter.

22  The Government must prove that the Defendant entered the

23  United States at a time and place other than as designated

24  by immigration officers.  Those are elements of the (a)(1)

25  offense.

1          THE COURT:  Okay.

2          MR. MANAHAN:  Your Honor, that's -- it's not

3   really an element.  It's directly from the attempt model

4   jury instruction, and it's instructing a jury that it is a

5   crime.  It's not an extra element, though.  The elements are

6   that he had the conscious desire to enter the United States

7   and that he took a substantial step.  Those are the only

8   elements for an attempt.

9          You could cross out that fourth one since we don't

10  have a jury, but there's no extra element there is my

11  understanding.

12         MR. ELLIS:  1325(a)(1) makes clear it's not just

13  the entry.  It's that the entry occurred at a time and place

14  other than designated as an immigration officer.

15         MR. MANAHAN:  And that's in the third element.

16         MR. ELLIS:  Well, there's a difference between

17  eluding examination, inspection and entering.  I think it's

18  two different things.

19         The third element in this case just that they took

20  a substantial step that is part of the attempt, but the

21  Government also must prove that the entry occurred at a time

22  and place other than designated by immigration officers.

23         THE COURT:  Well, and that's how the offense is

24  charged.  So why wouldn't that be the element?

25         MR. MANAHAN:  All I'm saying it's in the third

109

1  element already.

2          THE COURT:  Yeah.

3          MR. MANAHAN:  It's did something that was a

4  substantial step towards entering the United States at a

5  time or place other than as designated by immigration

6  officers.  There's no fourth element.

7          THE COURT:  Okay.  So what you're saying is that

8  the definition at pages three and four, the fourth element

9  is just somewhat instructive or surplusage?

10         MR. MANAHAN:  That's correct, your Honor.  It's

11 mostly for a jury.

12         THE COURT:  Okay.

13         MR. ELLIS:  I still want to be clear, your Honor,

14 that there are elements the Government must prove that the

15 entry occurred at a time and place other than as designated

16 by immigration officers, and the way the third element is

17 written I think is confusing because it has two -- that is

18 two purposes.  One has to do with the attempt aspect, and

19 the other one has to do with the substantive elements of a

20 1325(a)(1).

21         THE COURT:  But is Mr. Manahan -- or the

22 Government's element two at page three, after we get past

23 the alienage issue, was the Defendant's purpose his

24 conscious desire to enter the United States at a time or

25 place -- you're saying and place -- other than as

1  designated.  And then, number three, did something toward

2  entering the United States at a time or place other than as

3  designated.

4           I'm not sure I understand the distinction you're

5  trying to draw other than replacing and.

6           MR. ELLIS:  Well, I just want to -- I want to make

7  it clear that there's two important parts about this.  I

8  mean, it's just not written very well, and I think in all

9  fairness, it's because there's no model jury instruction,

10 but there's both actis rea and mens rea elements that must

11 be included.  I want to make clear that the actis rea

12 elements in this case are an entry or in this case an

13 attempted entry, and that entry has to be at a time and a

14 place other than as designated by immigration officers and

15 that the mens rea requirement in this case is that the

16 person have the conscious desire to enter the United States

17 and at a time and place other than as designated and that,

18 finally, because it's an attempt, the Government has to

19 prove a substantial step.

20          So I just want to make it clear that I believe

21 that those are all the elements.

22          THE COURT:  Okay.  And does the Government really

23 disagree with that statement?

24          MR. MANAHAN:  The Government believes that the

25 first three elements written here encompass everything

111

1  Defendant just said.

2         THE COURT:  Which has alienage, conscious desire

3  to enter at a time and place other than as designated, and

4  then did something which was a substantial step toward

5  entering the United States at a time or place -- time and

6  place other than as designated.  I think we're

7  communicating, but I'm not sure.

8         MR. ELLIS:  I just want to make sure it's clear,

9  your Honor.  The way it's written it makes it seem as if the

10  mens rea only -- that's what the mens rea is.  I want to

11  make sure it's also clear it's actis rea as well.

12         THE COURT:  Yeah.  I mean, he had to want to do it

13  and tried to do it.  Isn't that what we're saying, and he

14  was an alien?

15         MR. MANAHAN:  Yes, your Honor.

16         THE COURT:  At the time.  I mean, I'm not

17  quarreling.  I just want to make sure I'm not missing the

18  subtle distinction because you also -- one of you says and

19  and one of you says or and --

20         MR. ELLIS:  Well, the Government chose to charge

21  the case the way they did.  So I think based on how they

22  charged the case, they should have to prove it that way as

23  well.

24         THE COURT:  Which was --

25         MR. ELLIS:  And.

1    THE COURT:  -- and.  Okay.  Well, I think I'm

2  clear on that.  Is everybody clear?  Is the record clear

3  that we're talking about for sake of the record, items one,

4  two, and three under section III, starting at page three of

5  the Defendant's trial memoranda which entertain the idea of

6  a conscious desire to enter at a time or place other than as

7  designated by an immigration officer and some we'll call it

8  act, substantial step toward accomplishing that desire to

9  enter at a time and place other than as designated by an

10  immigration officer.  You've got the mental desire and the

11  act -- the desire to act in that regard.  I think that's

12  what you're hoping to have --

13    MR. ELLIS:  Yes, your Honor.

14    THE COURT:  -- and I think that's what the

15  Government's said here.

16    MR. MANAHAN:  Yes, your Honor.

17    THE COURT:  So, having that clear in our minds,

18  how long of an argument do you anticipate, Mr. Manahan?

19    MR. MANAHAN:  Less than five minutes, perhaps

20  significantly less.

21    THE COURT:  Mr. Ellis, what do you think?

22    MR. ELLIS:  Fifteen minutes.

23    THE COURT:  Okay.  Let me do this.  I've got in 12

24  minutes a judge's conference telephonically.  My suggestion

25  would be rather than perhaps break up somebody in the middle

1   of something we just maybe come back at 1:15 and have you

2   argue at that point.  Would that be inconvenient?

3            MR. ELLIS:  I think that would be appropriate,

4   your Honor.

5            MR. MANAHAN:  Not at all, your Honor.

6            THE COURT:  Okay.  I just -- I have this one-hour

7   thing I've got to do.

8            All right.  So we will stand in recess at this

9   time until 1:15, and we'll reconvene at that point to

10  continue with argument.

11           Now, the defense identified a number of exhibits,

12  I'm just reminded in the back of my mind that weren't

13  offered.

14           MR. ELLIS:  Two were offered.

15           THE COURT:  And that was all that was intended?

16           MR. ELLIS:  Yes, your Honor.

17           THE COURT:  Okay.  And we've got all the

18  Government's that were intended to be offered?  I know -- I

19  think we've got them all.  You tell me, Mr. Manahan.  Maybe

20  you tell me at 1:15 if we missed something to complete the

21  record.

22           MR. ELLIS:  And then just the last thing I'll say

23  if we have a minute because I don't think Count 2 is going

24  to be an issue, but for Count 2 there must also be an entry.

25  I think that in all fairness to the Government, I think a

114

1  Rule 29 motion should be granted at this time.  In the light

2  most favorable to the Government, there was not technically

3  an entry in this case because someone was under constant

4  surveillance the entire time.  If you're under constant

5  surveillance, you haven't entered.  And, therefore, he could

6  not have eluded examination or inspection because he never

7  entered.

8          So I think off the bat the Court should grant Rule

9  29 on that count.

10         THE COURT:  Well --

11         MR. MANAHAN:  I think a plain reading of

12  1325(a)(2) does not anywhere encompass an entry.  Entry is

13  squarely in 1325(a)(1).

14         THE COURT:  (a)(1).

15         MR. MANAHAN:  I have done a -- a search -- an all-

16  fetch search on West Law for any cases using official

17  restraint in the same paragraph of eluding examination or

18  1325(a)(2), and there are zero cases out there.  I think

19  that the -- the legal fiction that if you're under official

20  restraint you can't have entered only applies to 1325(a)(1),

21  and so I would respectfully request the Court to deny that

22  motion.

23         MR. ELLIS:  Well, your Honor, the -- reading from

24  -- and I'll provide a copy of the case to the Court --

25  United States v. Rincon-Jimenez, 595 F.2d 1192, Ninth

115

1  Circuit, 1979, regarding Section 1325, the Court said in

2  part:

3              "Eluding examination or inspection has

4              specific reference to immigration

5              procedures conducted at the time of

6              entry."

7              So that's my reading of it.  I'll approach at this

8  time -- I don't have an extra copy, but I think that the

9  Government can probably find that during lunch.  So I'll

10 just approach if I may.

11             THE COURT:  Okay.  Let me read that, and are there

12 any cases you want to offer -- well, you found none that --

13 that support or deal with what the issue is that the defense

14 is raising.  So why don't I read this, and we can take it up

15 first at 1:15 and then move to argument --

16             MR. ELLIS:  Yes, your Honor.

17             THE COURT:  -- next or however sounds best at that

18 time.

19             All right.  So we'll be in recess until 1:15.

20         (Proceedings recessed to reconvene.)

21

22

23

24

25

1           <u>AFTERNOON SESSION</u>

2                  --o0o--

3           THE COURT:  All right.  The Court finds counsel

4   and Mr. Garcia back.  And we left off on the discussion

5   about Count 2 and the defense's motion to acquit under Rule

6   29.

7           Now, I read this <u>Rincon</u> case, and I have to say I

8   don't think it really is on point to what the issue is.  I

9   think more on point is <u>U.S. v. Gonzalez-Torres</u>, which you

10  may have also mentioned, but it is the case that talks about

11  -- and just reading headnote five -- that when under

12  surveillance, an alien has not made an entry, despite having

13  crossed the border, with the intention of evading inspection

14  because he lacks the freedom to go at large and mixed with

15  the population.  It's a case out of this Court, and I didn't

16  see anything that says that's not the law, which would make

17  Count 2 a bit I guess the reason for the motion.

18          Mr. Manahan, any response you have to the

19  viability of Count 2 in light of that authority?

20          MR. MANAHAN:  Yes, your Honor.  I think the proper

21  way to look at what the elements of the offense should be is

22  it could be found in <u>Cervantes-Flores</u>, page 834, where

23  they're talking about the jury instruction for 1326, and it

24  basically said you'll look at the statute, and the statute

25  clearly delineates between 1325(a)(1) which includes entry

1  and 1325(a)(2) which does not include entry.  There's a

2  semicolon between those two I believe.  I mean, they're to

3  be seen as separate offenses.

4        Furthermore, your Honor, I don't know if it's

5  clear that the Defendant was under official restraint the

6  entire time.  I believe the testimony of Sergeant Gomer was

7  that he was first seen on the north side of the primary

8  fence.  It's my understanding -- and I think that the Court

9  can take judicial notice -- that the United States Mexican

10 border is actually to the south of the primary fence, and

11 the case makes clear that in order to be under official

12 restraint when you come in by climbing fences, not at the

13 port of entry, you have to be observed at the moment you

14 cross the border.

15       THE COURT:  So and you're right as far as what Mr.

16 Gomer said.  He saw two people coming down the north side of

17 the primary fence.  But you're saying he's already in the

18 United States?

19       MR. MANAHAN:  That is past the time the moment he

20 crossed the international border.

21       THE COURT:  And that would make the Gonzalez-

22 Torres decision factually distinguishable because that's

23 watching the actual crossing and thereafter.  Okay.  So

24 that's a good distinction.

25       MR. ELLIS:  Well, your Honor --

1        THE COURT:  Or is it?

2        MR. ELLIS:  It's not.  And here's why.  I don't

3   think that you can take judicial notice of where the United

4   States Mexico border is.  That's the Government's burden of

5   proof.  They haven't proven that in this case.  They've

6   offered no evidence as to where the United States Mexico

7   border is at that part of the border.

8        Really what they're trying to do now is to save

9   Count 2 for reasons beyond anyone's imagination, but the --

10  the truth is is that in the light most favorable to the

11  Government they say they saw the person entering the United

12  States.  There wasn't an entry for purposes of eluding

13  examination or inspection.  And Count 2 has to be dismissed

14  on those grounds under Rule 29.

15       And, to further distinguish, your Honor, for

16  official restraint, again, the Government muddies the waters

17  and I'm sure not on purpose, but if you look at the case law

18  when it comes to official restraint, what they say is the

19  first person free to mix in with the community.  It's not

20  necessarily just that they saw them the entire time but that

21  they saw the entry at least by the time the guy was on the

22  primary fence.  There was no opportunity for him to mix in

23  with the community at large and, therefore, no entry

24  occurred for purposes of examination or inspection, and

25  Count 2 must be dismissed.

1          THE COURT:  Yes, sir?

2          MR. MANAHAN:  Just I would refer the Court to

3  United States v. Cruz-Escoto, 476 F.3d 1081, and at page

4  1085 it's -- first it says -- and I'm paraphrasing at this

5  point -- an alien who comes through the port of entry has

6  not yet entered until the point where he reached inspectors.

7  And now I'm going to quote:

8              "Aliens who climb fences, raft canals,

9              or otherwise sneak across the border in

10             some illegitimate manner are under

11             official restraint only if they're under

12             constant government observation from the

13             moment they set foot in the country

14             until the moment of their arrest."

15         The Government would submit.

16         MR. ELLIS:  I stand by the facts of this case,

17 your Honor.  I don't believe that the facts are -- the

18 Government didn't establish facts that he hadn't entered

19 when he was seen.  I mean, I think it's pretty clear what

20 their theory of the case was until the Rule 29 motion was

21 made.  The -- it's really unfortunate as well because had

22 they made that argument ahead of time, it might have changed

23 the questioning from the agents, but it's clear with the

24 facts that were actually presented and the law, Count 3 must

25 be dismissed.

1          THE COURT:  All right.  I mean, we don't have

2     anything in the record that does establish the location of

3     the border to support the distinction that the Government

4     would want to draw in terms of when observation began

5     relative to entry.  And the --

6          MR. MANAHAN:  Your Honor, the only thing, in

7     Gonzalez-Torres, they actually lost sight of the aliens at

8     one point and still found that official restraint had

9     applied.  So --

10          THE COURT:  Right.  That -- I mean, that was what

11     -- the Escoto case?

12          MR. MANAHAN:  Gonzalez-Torres, your Honor.

13          THE COURT:  Was it Gonzalez-Torres too?  I mean, I

14     know I read Escoto, but I didn't --

15          MR. MANAHAN:  Yes, your Honor.

16          THE COURT:  -- I didn't bring it out.  But yeah,

17     that -- the temporary losing of sight.  I mean, I think the

18     defense motion is well taken on Count 2.  Without any

19     evidence in the record, I don't think I can take judicial

20     notice of it.  It's not a readily known fact, and there's no

21     evidence in the record as to where the border is to draw

22     that distinction.  The clear reading of Gonzalez-Torres in

23     39 F.3d 594 is that you can't have the avoiding examination

24     as charged -- eluding examination or inspection as charged

25     where there is this official restraint concept, and the

121

Circuit, overruling Judge Enright, said the constant

supervision or the continuous observation, despite maybe

momentary absence, does the trick.

So I'm going to grant the Government's (sic) Rule

29 motion as to Count 2.  I think we've identified the

elements for purposes of Count 1, and with that done, unless

there's something further, we can have argument.

MR. ELLIS:  Yes, your Honor.

THE COURT:  Okay.  So, Mr. Manahan.

CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

MR. MANAHAN:  Thank you, your Honor.

Your Honor, the first element of 1325(a)(1) is

that the Defendant was an alien, and in this case we have

multiple points in the transcript in evidence that he

admitted to his alienage.  At page five, line 30 he

specifically admits to being a citizen of Mexico.  At page

six, line five, he admits that he has no documents to allow

him to legally be in the United States.  At page six, line

11, he admits to being born in Mexico.  And at page seven,

line 20, he admits to crossing illegally.

Furthermore, your Honor, we have a strong

circumstantial evidence of the -- of how he came into the

country.  He jumped -- he climbed not one but two borders --

I'm sorry -- two fences, the second fence having concertina

wire, sharp, dangerous wire, which we have testimony to

1   prove caused, you know, at least some cuts to his hands.

2          Your Honor, someone who's not an alien does not

3   enter the United States this way.  We have testimony from

4   the Defendant after his Miranda rights were read to him that

5   he knows the legal way to enter the United States if he has

6   the right to do so.  He states that as a child -- on page

7   six, towards the bottom -- that as a child he came through

8   to the United States through a port of entry.  So he was

9   well aware of the legal way to do it.  Yet he consciously

10  chose to climb fences, knowing that he was an alien and,

11  therefore, did not have a legal right to come through the

12  port of entry.

13          Your Honor, as to the conscious desire element to

14  -- the conscious desire element to come at a time or place

15  other than as designated by immigration officials, again,

16  your Honor, he admits that he crossed illegally on page

17  seven, line 20.  Again, your Honor, he admitted that he

18  knows how to get into the United States legally through a

19  port of entry.

20          Furthermore, your Honor, he told us why he was

21  coming in.  He was coming in to go to Pomona, California, a

22  place where he had lived presumably a large part of his

23  life, and that's at page eight, line nine, your Honor.

24          And, again, your Honor, I think the circumstantial

25  evidence of how he came into the United States by climbing

1  two fences, with the aid of a ladder, by hiding in the
2  bushes after getting in, to avoid being caught shows that he
3  had the conscious desire to enter the United States at a
4  time and place other than as designated by immigration
5  officials.
6          And as to a substantial step, your Honor, the
7  substantial step is the climbing of the fences.  That's an
8  action that he knowingly and voluntarily took.  It was
9  witnessed by Sergeant Gomer.  There's no question of mistake
10  of who that person, Sergeant Gomer, was since he kept
11  watching until Agent Kim arrested him.  And Agent Kim
12  arrested him at most a minute or two after he was -- minutes
13  let's say after he was alerted by Sergeant Gomer.
14          Given his admissions, given the strong
15  circumstantial evidence of how he entered the country, I
16  think there's no question that all the elements of
17  1325(a)(1) have been met and that the evidence only allows
18  the Court to reach one conclusion, and that is that
19  Defendant is guilty of the crime charged.
20          Thank you, your Honor.
21          THE COURT:  Okay.  Thank you.
22          And, Mr. Ellis?
23          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT
24          MR. ELLIS:  Thank you, your Honor.
25          Alienage, from the very beginning, this case came

124

down to alienage, and what steps the Government was going to

take to prove alienage beyond a reasonable doubt.  As a

preliminary matter, this Court should also rule on the

Defendant's Rule 29 motion on Count 1.  The Ninth Circuit

has determined that statements alone are insufficient to

prove alienage.

In <u>United States v. Hernandez</u> at 105 F.3d 1330,

the Ninth Circuit found:

"We do not hold that the mode of a

Defendant's entry is sufficient

corroboration of an admission that the

Defendant is an alien."

That's significant because the Government's only

evidence in this case is they say, well, he said he was from

Mexico, and he climbed the fence.

THE COURT:  What was the mode of entry in

<u>Hernandez</u>?

MR. ELLIS:  He -- in that case, Hernandez had told

an officer that he entered the United States by scaling the

border fence with Mexico and that he did not have

documentation permitting his entering or remaining in the

United States.

THE COURT:  Okay.  Thanks.

MR. ELLIS:  I think what's significant, your

Honor, when you look at statements of alienage and what that

 1 means, and really what alienage means in this case would be
 2 foreign birth and no permission to live in the United
 3 States.

 4         You know where you were born.  You're told maybe
 5 when you're younger.  You grow up some place.  No one really
 6 has knowledge of where it is, personal knowledge of where it
 7 is that they were born.  So there are ways that the
 8 Government could have corroborated his statement.  They
 9 could have brought you a foreign birth certificate.  They
10 didn't.  They could have brought you some sort of report
11 from Mexico.  They didn't.  They could have interviewed his
12 family members, and they didn't.  There is no corroboration
13 whatsoever of these statements.

14         And there are good reasons that someone might make
15 those statements even if they weren't true.  During Agent
16 Villarreal's cross examination, one of the things he talked
17 about was voluntary return and how people are returned to
18 Mexico within eight to 10 hours.  People who say that they
19 are Mexican citizens, those without criminal histories, are
20 quickly returned.

21         Those people who claim citizenship in the United
22 States without any documentation are held for much longer,
23 and there is evidence that Mr. Garcia had no documents on
24 him when he was arrested, and so those are -- that is a
25 reason that one might not be truthful when questioned,

126

1  because one wants to leave quicker.

2          But the term alienage is a complicated one because

3  even if it is true that you were born in a foreign country

4  does not mean that you didn't acquire citizenship at that

5  time.  Also, as Agent Villarreal testified, there are ways

6  that you can derive citizenship through your parents,

7  grandparents, and we heard testimony that there was no

8  investigation on that in this case.

9          The Government didn't even make a determination of

10  that.  They didn't make a determination of where Mr.

11  Garcia's parents were born, if they had citizenship, where

12  they lived, and that would have been important.

13          There are also ways that people can naturalize.

14  People born in a foreign country can also become naturalized

15  United States citizen.  The Government offered no evidence

16  in this case that they had checked to determine whether or

17  not Mr. Garcia has naturalized, and that's a burden that

18  they carry.  It's not Mr. Garcia's burden to tell this Court

19  things that he might have done or could have done.  It's for

20  the Government.

21          Certain courts at certain times are in better

22  positions to make such determinations.  Oftentimes the

23  immigration judges who have particularized training in this

24  area, who hear evidence, who hear from government agents and

25  family members, make complicated legal rulings.  That wasn't

1  done prior to this case.

2          In short, your Honor, the Government's evidence of

3  alienage is insufficient.  Based on that the Court should

4  grant the Rule 29.  But, at a minimum, even if the court

5  doesn't go that far, the evidence that the Government

6  presented does not rise to the level of beyond a reasonable

7  doubt.

8          The second point, your Honor, has to do with the

9  time or place other than as designated by immigration

10  officers.  There was one major flaw in the Government's

11  presentation of evidence.  They never had Sergeant Gomer or

12  Mr. Kim identify Mr. Garcia.  In fact, the Court might

13  remember that Mr. Chavez asked Mr. Gomer on the stand, "You

14  can't identify the person you saw, can you," and he said no.

15          The Court might also remember that Agent

16  Villarreal was specifically asked on direct examination "Can

17  you please point to the person that you interviewed on May

18  21st?"  The gentleman in the blue shirt between defense

19  counsel.  Mr. Kim was never asked that.  The Government has

20  not proven that this was the person that was arrested on May

21  21st at the border.

22          Now, the Government also failed in its

23  presentation because they didn't have any testimony that

24  this area is not a time or place designated by immigration

25  officers to cross.  They've produced no evidence that that

1 statement means a port of entry.  Interestingly, the

2 language used in 1325 is much different than the language

3 used in 1326.  It would seem to presuppose that at times

4 immigration officers could designate certain areas for entry

5 at a certain time.

6        But we've heard no evidence that this fence isn't

7 designated.  And obviously the Government can argue

8 inferences from that, well, he used the ladder.  There's no

9 evidence that there aren't other ports of entry that require

10 certain accouterment to get through.  Your Honor, when you

11 look at what the Government presented to the Court at the

12 end of the day, it doesn't rise to the level that is

13 required for the Government to prove a case beyond a

14 reasonable doubt.  To use the parlance my grandfather would

15 use looking at a case like this, he would say that dog don't

16 hunt.

17        He's an alien.  Where is his birth certificate?

18 If you don't have one, that dog won't hunt.  He's the person

19 who jumped the fence.  Who pointed him out having done that?

20 No one?  That dog don't hunt.  That's what we have in this

21 case, your Honor.  We don't have enough evidence.  It's time

22 to send him home.  Thank you.

23        THE COURT:  Okay.  And, Mr. Manahan?

24 //

25 //

1                REBUTTAL ARGUMENT ON BEHALF OF THE PLAINTIFF

2            MR. MANAHAN:  Thank you, your Honor.  First of

3   all, with regards to Hernandez -- can I have a moment to

4   look at the case?

5            THE COURT:  Sure.

6        (Pause.)

7            MR. MANAHAN:  First of all, your Honor, it appears

8   in Hernandez the Defendant was convicted of a 1326 offense,

9   and that verdict was affirmed, and I believe the Court's

10  language that was read is we do not hold that the mode of

11  Defendant's entry is sufficient corroboration of an

12  admission, but it provides some evidence.

13           They don't say -- they're also not holding that

14  it's not sufficient corroboration.  So I think the only way

15  to reasonably interpret that language is it has to be looked

16  at on a case-by-case basis, whether that is sufficient

17  corroboration to prove alienage.

18           In this case, I would say that the mode of entry

19  in the United States is about as strong as circumstantial

20  evidence gets in terms of proving that a person's an alien.

21  Again, first of all, we know that Defendant knows that the

22  legal way to come -- well, that the way to come through is

23  through a port of entry.  He admitted that.  He climbed a

24  fence that was highly dangerous.  No one could look at a

25  fence with razor wire on top of it and say to themselves, oh,

1 this is a legal way to get through, I'm allowed to get

2 through this.  This is a way to legally get from Mexico into

3 the United States.

4          We know that that was his intention.  He admitted

5 that he knew he was in Mexico.  He knew he wanted to get to

6 the United States.

7          In terms of Agent Kim's testimony, I referred to

8 Defendant as the Defendant multiple times.  Agent Kim had no

9 problem identifying the Defendant that was before him as --

10 as the person he arrested.  I may not have specifically

11 asked, as I did with Agent Villarreal, to identify him, but

12 I think it was clear in the context of this case that he was

13 referring to the Defendant sitting before him.

14          With that, your Honor, I'll submit.

15          THE COURT:  Okay.  May I see Hernandez as well,

16 your copy of it?  Let me just read it for myself.

17          And, Mr. Ellis, that's current I take it?  It's

18 not been overruled or --

19          MR. ELLIS:  I believe so, your Honor.  It was

20 handed to me.  It's 1997.

21          THE COURT:  Okay.  Why don't you hand it up.  Let

22 me read it firsthand.

23          All right.  I've read through Hernandez, and I

24 think -- and that's 105 F.3d 1330.  I think the primary

25 point we draw from this is that when the primary evidence of

1 citizenship offered by the Government consists of the

2 Defendant's own admission, those admissions require some

3 independent corroborating evidence in order to serve as a

4 basis for conviction.  They don't rule out mode of entry by

5 many means.  It can be bolstering as can contemporaneous

6 prior admissions as is noted there.  So I think that puts it

7 into context.

8 　　　　　As to the Rule 29 motion, I'm going to deny that.

9 I think the Government has established the elements of the

10 case for purposes of the motion such that the trier of fact

11 could reach the -- reach a verdict on the case.  Reviewing

12 all the evidence, I do find that at the time of the alleged

13 offense Mr. Garcia was an alien, that he had the express

14 purpose, conscious desire to enter the United States at a

15 time or place other than as designated by an immigration

16 officer, and, clearly, Agent Kim testified that the port of

17 entry was some less than 100 yards away I think in the

18 eastbound direction from the photograph we had in evidence,

19 and I think it would defy logic to even infer that the

20 Border Patrol or the Immigration Service would at any time

21 allow entry at a place where someone has to scale two fences

22 and razor wire in the process.

23 　　　　　The -- a substantial step I think is element three

24 in terms of entering the United States at the time or place

25 not designated is corroborated by the contemporaneous

132

observations of Sergeant Gomer who saw the two individuals,
including who turns out to be the Defendant, come down the
north side of the primary fence, traverse the interim space,
one of them grabbing a ladder, and then a person going over
the ladder and crouching in a bush, that Agent Kim was led
to or directed to and found and arrested Mr. Garcia.  Agent
Kim then did the pat down, did the immigration questioning
that we've talked about at great length, took the man in for
deportation related proceedings, and created his first --
his A file, and that led to the processing by Agent
Villarreal who in terms of the continuous sequence of events
creates the nexus between the man going over the fence and
the person ultimately identified by Mr. Villarreal to be Mr.
Garcia, the Defendant here.

          Clearly we have the post-Miranda statement which
the Court declined to suppress despite the confluence of the
administrative advice on the Miranda warning and the
terminology that was not necessarily typical but apparently
was the custom and practice of the Agent Villarreal to use,
and the statement says without equivocation that Mr. Garcia
was born in Mexico, has no legal right to enter, had a
desire to get to Pomona where he has resided for some period
of time, and he came over the fence.

          It's corroborated by the cuts on his hand, the
tears in his shirt, all observed by Agent Kim at the moment

133

of apprehension, and under the face of the totality of this
evidence and even ignoring the pre-Miranda statement at the
site, which I'm -- as I certainly could do is still find
that the Government has established each of these elements
by evidence beyond a reasonable doubt.

The Government doesn't have to prove it beyond all
doubt, and while birth certificates and other things would
certainly be maybe easier to absorb and to put into the
equation of the necessary elements, the Government's met its
burden under the sum total of what I have here to establish
these elements that we've debated and would find to what
appears at page three and the top of page four of the
Government's trial brief.

So I will based upon these findings, Mr. Garcia,
find you guilty of the 1325(a)(1) charge, Count 1 of the
superseding information.

With the finding of guilt are we prepared to go to
sentencing or do we want time to -- for you folks to prepare
on that or --

MR. ELLIS:  The parties have spoken, your Honor.
We're prepared to go forward at this time.

THE COURT:  Okay.  Then what would the Government
suggest the appropriate sentence be for the Defendant on the
violation of conviction?

MR. MANAHAN:  Your Honor, this is a Class B

1    misdemeanor, so the sentencing guidelines specifically state

2    that they do not apply.

3              THE COURT:  Okay.

4              MR. MANAHAN:  So we're left with the statutory

5    maximum of six months and the 3553(a) factors.

6              THE COURT:  Correct.

7              MR. MANAHAN:  I believe defense mentioned to me

8    that it wanted me to look at some letters of support from

9    defense before sentencing, but I have -- I have no doubt

10   that this Defendant probably has evidence of his good

11   character, your Honor.

12             When I look at the 3553(a) factors, the one that

13   stands out the most is the need for deterrence, your Honor.

14   I think your Honor knows this office does not bring many

15   1325 cases, but the reason we brought this one, your Honor,

16   and the reason that I think deterrence is needed and

17   obviously deterrence is difficult in any of these situations

18   given the socioeconomic realities of -- between the two

19   countries involved, but the reason that deterrence is

20   specifically needed can be shown in Government's Exhibit

21   Number 1.

22             I'm not sure, your Honor -- I already gave it in,

23   so I can't put it up on the board.

24             THE COURT:  It's probably here.  I've got it now

25   in front of me.  Go ahead.

1    MR. MANAHAN:  But, your Honor, it shows that the

2 secondary fence has razor wire on top of it and that that

3 fence is immediately adjacent to a road that's traversed by

4 trucks, and sometimes those trucks travel at a high rate of

5 speed, and this situation, your Honor, creates danger for

6 everyone involved when someone decides to traverse that

7 fence.  It creates danger to the individual crossing

8 obviously because he could get seriously injured on that

9 razor wire.  It also potentially causes danger to the Border

10 Patrol agents who if someone was injured on top of that

11 would have to go up there and assist him, but it causes a

12 lot of danger to the alien and to the drivers of those

13 trucks streaming by, because there's a high risk of someone

14 because of that razor wire falling off into the road which

15 would cause the truck going by at a high rate of speed

16 probably to hit him or to swerve out of the way, endangering

17 whoever was in that truck, and I believe that Sergeant Kim

18 addressed that in one of the exhibits of the Defendant in

19 his report of investigation.

20    And so, your Honor, the Government in trying to,

21 you know, give general deterrence and to try to specifically

22 deter this Defendant from crossing in this means again

23 submits that 100 days confinement would be adequate but not

24 more than is necessary, and it would be keeping within the

25 other 3553(a) factors.  And with that I'll submit, your

 1  Honor.

 2          THE COURT:  Okay.  Mr. Ellis?

 3          MR. ELLIS:  Your Honor, I'd like to start by

 4  indicating that Mr. Garcia's family is present in court in

 5  the back.  His aunt and cousins are here to show support for

 6  him.

 7          THE COURT:  Okay.  Thanks for coming.

 8          MR. ELLIS:  Your Honor, this -- this case is

 9  difficult for a number of reasons.  The reasons for coming

10  to the United States, the reasons for leaving are difficult.

11  I have to start by talking about the Government's request

12  for 100 days, though, your Honor.  Only one of the 3553(a)

13  factors deals with general deterrence and specific

14  deterrence.  I think it's clear whatever sentence Mr. Garcia

15  gets, it's going to be good enough for him.  He's not going

16  to come back.  He's not going to have any legal right to

17  return to the United States, and if he did, he'd be looking

18  at a felony and presupposing the Government can prove

19  alienage again in front of the immigration judge.

20          But let's talk about some of the things the

21  Government attorney said.  He said we don't bring these

22  cases very often.  That's not completely true.  They didn't

23  used to bring these cases very often.  In the last three

24  weeks, they've brought at least three of them.  The

25  sentences that those individuals received as far as I know

1  is 27 days and 30 days, the other cases in our office.  And,
2  you know, obviously I don't know if they crossed razor wire
3  or not.  That doesn't make it seem more aggravating to me,
4  but -- it just makes it seem more dangerous for the person
5  crossing.
6          There's programs in Arizona where they're charging
7  100 1325s a day or they're trying to, and my understanding
8  is those people generally get between two days and 10 days
9  in custody, which means at the high end of that range the
10 Government's asking for a sentence 10 times that -- what
11 they get for crossing through the desert in Arizona, which
12 is just as dangerous, if not more so, to the people who go
13 to protect them.
14         But the real reason that I would urge the Court to
15 sentence Mr. Garcia to 21 days in custody is this.  Mr.
16 Garcia went to Mexico to see his sick mother.  He returned
17 to the United States to find work to help pay for her
18 treatments in Mexico.  It's not that uncommon for this
19 situation, and I think in some ways we hear it so often that
20 we become immune to that, and although this case moved
21 rather quickly, I got to spend a lot of time with Mr. Garcia
22 and his family in a short period of time, and for certain
23 people being in custody is more difficult than others.  Some
24 people can do months in custody with no problem, but it's
25 undisputed in this case Mr. Garcia has no criminal history.

 1 For him 21 days has been a lot.

 2          Also in this District, your Honor, we quite often

 3 seen felonies receive 60 days.  People who have been

 4 deported and enter into the United States who have committed

 5 a felony get 60 days.  I brought three plea agreements with

 6 me, but I think the Court understands that that's common in

 7 this District for 60 days for felons.

 8          This is not a felon.  He is simply a son who

 9 wanted to be there for his mother and to work for her.

10 Whatever sentence your Honor gives him is going to be

11 followed by additional time.  He'll be in immigration

12 custody for quite some time fighting for his papers.  It's

13 going to be quite some time before he returns to Mexico.

14 All he wanted in this case was a chance, a chance to prove

15 one day down the line that he should be able to remain in

16 the United States legally, and he's lost that with this

17 conviction.

18          What he is willing to do, your Honor, and we've

19 informed the Government of this, he has no real interest in

20 continuing to fight his case.  What he wants to do is get

21 out of custody.  He would be more than happy to waive all

22 rights to further appeal or collaterally attack this

23 conviction.  He just wants to go home.  Twenty-one days for

24 a man who's worked for years and we've talked -- his family

25 has told us, we've spoken to his employer, he worked for the

139

1  same place for four years.  They brought letters.  They
2  brought the documents from his high school.  They brought a
3  bunch of things that shows how hard he's worked since he's
4  been here.  He doesn't deserve 100 days.  He doesn't deserve
5  another day.  He deserves to get out today.
6          Thank you.
7          THE COURT:  Okay.  Mr. Garcia, is there anything
8  you want to say on your own behalf before sentence is
9  imposed?
10         MR. ELLIS:  Can we have just a moment, your Honor?
11         THE COURT:  Sure.  Take your time.
12      (Pause.)
13         THE DEFENDANT:  I just want to offer an apology.
14  I wish to go back to see my mother who's ill.  I'm very
15  sorry for everything.  Thank you.
16         THE COURT:  Okay.  Thank you, Mr. Garcia.  I
17  appreciate your comments.
18         Mr. Garcia, I appreciate your comments and
19  certainly can understand the motivations that are involved
20  here in what you did and what your intention was, but, you
21  know, good reasons still aren't a defense to the criminal
22  conduct that you've been convicted of, and Mr. Manahan is
23  right in respect to the fact that crossing these fences with
24  this razor wire atop poses a danger to you, to the Border
25  Patrol agents, and the others that, you know, frequent or

1  use these areas as a mode of access.  To come into the

2  United States, you really need to do it legally through the

3  proper authorities and in the proper way.  As you can tell,

4  we don't take these situations lightly, and we've had now a

5  trial and a lot of effort has gone into considering these

6  facts and circumstances and whether or not a crime was

7  committed.  So it is serious not only from that dangerous

8  standpoint but because we're all duty bound to uphold and

9  follow the law.

10         But, clearly, you have no criminal history.

11 You've been otherwise a lawful person in whatever community

12 you've resided in, and you made a mistake here which I sense

13 that you're remorseful about.  With all the ties that are

14 here, I hope that at some point in the future there's not an

15 interest again in coming through this -- coming into this

16 country some way other than in a legal sense.

17         And, I mean, many of the comments that -- well,

18 let me back up.  The deterrence factor, of course, is one

19 thing, and these other factors that your lawyer has pointed

20 out and has been discussed here also play into consideration

21 in what would be deterrence and what would also address the

22 crime involved and deter further criminal conduct, and you

23 have an absence of a criminal history.  Like you said, it's

24 otherwise good.

25         And it's true that people get varying sentences in

these cases or cases related to this of all kinds, for all
kinds of reasons, and I don't have all those reasons here to
tell you why in one case 60 days is better than 100 days or
something else.  And here's what I'm going to do.  Because
you have no criminal history and it's a zero to six-month
charge, it is probation eligible, and I think the best
method to redress this considering you've spent 21 days in
custody is to do this, is to sentence you to one year of
unsupervised probation on conditions that you not violate
any laws, you not enter the United States illegally, you not
carry false documents, and that -- and I will tell you this.
You come back again, I'm going to give you six months.  I'll
give you the whole six months I could have given you here
today.  To me that's a better perhaps deterrent than the 100
days where you could then, you know, wipe your hands and
move forward.  Here at least for the next year you've got to
know I'm back here waiting to see if you follow your -- the
statement from your lawyer that you are going to fight for
lawful immigration and not come back illegally.  And if you
follow these conditions that I've set and not violate the
law and not violate these immigration provisions that are
specifically noted in a year, that hammer will be off your
head, but you will have a conviction on your record, and at
some point in time, if you get into this kind of trouble
again, it's going to be -- it's probably not going to be a

1  misdemeanor charge.  You may be looking at felony charges

2  and a whole lot more exposure.

3          And in my view of things, recognizing the

4  deterrence that's necessary and the other factors that

5  you've pointed out in terms of what motivated you in this

6  circumstance, I think this is the appropriate way to address

7  this.  I would waive the standard condition that you test --

8  drug test within 15 days given the lack of any information.

9  I find given the circumstances I've learned now about you

10 and what you're dealing with that there would be an

11 inability to pay any find.  I will not impose the fine.

12 There is a $10 mandatory special assessment that we'll

13 impose unless the Government's inclined to remit given the

14 information we heard about the family and so forth.

15         MR. MANAHAN:  That will be fine, your Honor.

16         THE COURT:  Okay.  That will be remitted.  And so

17 the sentence is one year unsupervised probation.  That means

18 you're going to be released, returned to immigration

19 custody.  And keep in mind I'm going to be here at least for

20 the next year, and if I see you again, it will be six months

21 in jail because you violated my conditions, plus whatever

22 new offense you've created to get into trouble in the first

23 place.  So you're looking at being in jail a long time if

24 this happens again.  So don't do it.  Okay.

25         All right.  So that will be the judgment of the

143

1  Court.  The Court will enter the judgment.  You do have 10

2  days to appeal, this being a petty offense, sir, from the

3  date of the conviction which will be today's date, so that

4  I've now discharged the obligation of advice required by

5  Rule 58 of the Federal Rules.

6          Anything further, counsel, on this at this point?

7          MR. MANAHAN:  No.  Thank you very much for your

8  time today, your Honor.

9          MR. ELLIS:  No.

10          THE COURT:  All right.  Thank you both for a well

11  presented case.  I appreciate the opportunity to work along

12  with you on this.  So you all take care.  Good luck, Mr.

13  Garcia.

14          Thanks very much.  We'll be in recess.

15      (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25

144

1           I certify that the foregoing is a correct

2      transcript from the electronic sound recording of the

3      proceedings in the above-entitled matter.

4

5      s/Jordan Keilty_____          7/18/08
       Transcriber                            Date
6
       FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
       s/L.L. Francisco_____
9      L.L. Francisco, President
       Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit B



**SOUTHERN DISTRICT OF CALIFORNIA**

**U.S. ATTORNEY'S OFFICE**

**BILINGUAL**
**TRANSCRIPTION AND TRANSLATION**

**Interview on Digital Video File**

# United States vs. Javier Garcia-Villegas
### 08MJ1604

Prepared for Assistant U.S. Attorney George V. Manahan

by Andrew J. Hanson, Language Specialist
U.S. Attorney's Office

149

## SUMMARY

A subject in an Immigration case is interviewed in Spanish on May 21, 2008.  The interview is transcribed and translated.

The interview is reproduced on a DVD in a VOB file labeled: VTS_01_1; size: 695,878 KB.

The times in the middle column refer to the time as played back on Media Player Classic, version 6.4.8.4.

## LEGEND

**RSP**          MALE VOICE – Respondent Javier Garcia-Villegas  (Self-identifies)

**AGT**          MALE VOICE -- Border Patrol Agent Ramon Villareal  (Self-identifies)


[IA]        INAUDIBLE

[OL]:        OVERLAP

[UI]:        UNINTELLIGIBLE

[*ph*]:        PHONETIC

/:        Two or more words separated by a "/" are options, due to lack of clarity or specificity in the original language.

[ ]:        Text within brackets are inserts by the translator to aid in comprehension.  After "you", [*pl*] indicates the plural form used in Spanish.

...:        Pause in utterance.  Unfinished or interrupted.

***Italics:***                    ***Source language is English***

**Normal font:**                    **Source language is Spanish**


I, Andrew J. Hanson, Interpreter Certified by the ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS, Certificate Number 95-036, declare that I am fluent in the English and Spanish languages, and that I transcribed and translated a video recording, the contents of which appear below, to the best of my ability on or about June 3, 2008, in San Diego, CA.

_____

Andrew J. Hanson

<Andrew.Hanson@usdoj.gov>

(619)557-5178

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | *The following is a statement under oath* | 00:12 | *AGT* | *The following is a statement under oath* |
| 2 | *before Border Patrol Agent Ramon* | | | *before Border Patrol Agent Ramon* |
| 3 | *Villareal and witnessed by Border Patrol* | | | *Villareal and witnessed by Border Patrol* |
| 4 | *Agent Alfonso Hernandez, at the Imperial* | | | *Agent Alfonso Hernandez, at the* |
| 5 | *Beach Border Patrol Station in San Diego,* | | | *Imperial Beach Border Patrol Station in* |
| 6 | *California. The statement is.... is being* | | | *San Diego, California. The statement* |
| 7 | *given by Javier Garcia-Villegas.  Today's* | | | *is.... is being given by Javier Garcia-* |
| 8 | *date is May 21, 2008 and the time is 8:09* | | | *Villegas.  Today's date is May 21, 2008* |
| 9 | *pm.  Both agents are in uniform and no* | | | *and the time is 8:09 pm.  Both agents* |
| 10 | *weapons are visible.* | | | *are in uniform and no weapons are* |
| 11 | | | | *visible.* |
| 12 | Señor, ¿quiere hablar conmigo en inglés | | | Sir, do you want to talk to me in English |
| 13 | o en español? | | | or in Spanish? |
| 14 | En español, como... como Ud. guste. | 01:05 | *RSP* | In Spanish, how... however you want. |
| 15 | Señor, los siguientes Avisos de Derechos | | *AGT* | Sir, the following Notifications of Rights |
| 16 | y sus... en sus declaraciones están | | | and your... in your statements are being |
| 17 | siendo grabadas en la audio y video cinta. | | | recorded on the audio and video tape. |
| 18 | ¿Entiende Ud.? | | | Do you understand? |
| 19 | Sí. | | *RSP* | Yes. |
| 20 | ¿Está bajo la influencia de algunas | | *AGT* | Are you under the influence of any |
| 21 | drogas o alcohol en este tiempo, señor? | | | drugs or alcohol at this time, sir? |
| 22 | No. | 01:25 | *RSP* | No. |

| Transcription | Time | | Translation |
|---|---|---|---|
| 1  Okey, señor.  Ahm, anteriormente se le | | **AGT** | Okay, sir.  Uhm, you were previously |
| 2  avisó de sus derechos, en cuales Ud. | | | informed of your rights, in which you |
| 3  pidió a regresar a su país lo más pronto | | | asked to to [sic] return to your country |
| 4  posible.  Debe de entender que esos | | | as soon as possible.  You should |
| 5  derechos solamente aplican en | | | understand that those rights only apply |
| 6  procedimientos de Imigración para | | | in Immigration proceedings for |
| 7  sacarlo de los Estados Unidos.  Ahora | | | removing you from the United States. |
| 8  Ud. debe de entender que ha habido un | | | Now you should understand that there |
| 9  cambio en cual Ud. no lo regresarán a su | | | has been a change in which you will not |
| 10  país en este momento.  Eh, en vez ahora | | | be returned to your country at this time. |
| 11  será procesado para un delito federal. | | | Eh, instead now you will be tried for a |
| 12  ¿Entiende lo que acabo de explicar? | | | federal crime.  Do you understand what |
| | | | I have just explained? |
| | | | |
| 13  Sí. | | **RSP** | Yes. |
| 14  Señor, como no es ciudadano de los | 02:13 | **AGT** | Sir, since you are not a citizen of the |
| 15  Estados Unidos, al ser arrestado o | | | United States, upon being arrested or |
| 16  detenido tiene derecho a pedirnos que | | | detained you have a right to ask us to |
| 17  notifíquemos a los representantes | | | notify the consular representatives of |
| 18  consulares de su país aquí en los | | | your country here in the United States if |
| 19  Estados Unidos si lo desea.  Entre otras | | | you so desire.  Among other things, a |
| 20  cosas, un funcionario consular de su país | | | consular official from your country can |
| 21  puede ayudarle a obtener asesoramiento | | | help you obtain legal counsel, put you in |
| 22  legal, ponerse en contacto con su familia | | | contact with your family and visit you in |
| 23  y visitarle en la cárcel.  Si Ud. desea que | | | jail.  If you want us to notify the consular |
| 24  notifíquemos a los funcionarios | | | officials from your country you can |
| 25  consulares de su país puede solicitarlo | | | request it now or at any opportunity in |
| 26  ahora o en cualquier oportunidad en el | | | the future.  After the consular officials |
| 27  futuro.  Después de que se haya | | | from your country have been notified, |
| 28  notificado a los funcionarios consulares | | | they will be able to call you or visit you. |
| 29  de su país, ellos podrán llamarle o | | | Do you understand? |
| 30  visitarle.  ¿Entiende? | | | |
| 31  Sí. | 02:51 | **RSP** | Yes. |
| 32  ¿ [UI] al Consulado Mexicano este | | **AGT** | [UI] to the Mexican Consulate this |
| 33  tiempo? | | | time? |

152

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | No. | | **RSP** | No. |
| 2 | Okey.  Señor, antes de que le hagamos | 02:58 | **AGT** | Okay.  Sir, before we ask you any |
| 3 | pregunta, Ud. debe de comprender sus | | | question, you should understand your |
| 4 | derechos.  Ud. tiene el derecho de | | | rights.  You have the right to remain |
| 5 | guardar silencio.  Cualquier cosa que Ud. | | | silent.  Anything that you say can be |
| 6 | diga puede ser usada en contra de Ud. en | | | used against you in court or in any |
| 7 | la corte o en cualquier procedimiento de | | | Immigration or administrative |
| 8 | Inmigración o administrativo.  Ud. tiene | | | proceeding.  You have the right to |
| 9 | derecho de hablar con un abogado para | | | speak with an attorney so that he may |
| 10 | que él le aconseje a Ud. antes de que | | | counsel you before we ask you |
| 11 | nosotros le hagamos preguntas, y él | | | questions, and he can be present |
| 12 | puede estar presente durante la | | | during the questioning.  If you do not |
| 13 | interrogación.  Si Ud. no tiene los medios | | | have the means to hire an attorney, one |
| 14 | para emplear a un abogado, uno se | | | will be designated before any |
| 15 | designará antes de cualquier | | | questioning if you so desire.  If you |
| 16 | interrogación si Ud. desea.  Si Ud. se | | | decide to answer questions now, |
| 17 | decide a contestar preguntas ahora, sin la | | | without the presence of an attorney, you |
| 18 | presencia de un abogado, Ud. todavía | | | still will have the right to quit answering |
| 19 | tendrá el derecho de dejar de contestar | | | questions whenever you want.  You |
| 20 | preguntas cuando Ud. quiera.  Ud. | | | also have the right to quit answering |
| 21 | también tiene el derecho de dejar de | | | questions whenever you want until you |
| 22 | contestar preguntas cuando Ud. quiera | | | can speak with an attorney.  Do you |
| 23 | hasta que hable con un abogado. | | | understand your... your rights? |
| 24 | ¿Entiende su... Ud. sus derechos? | | | |
| 25 | Sí. | 03:59 | **RSP** | Yes. |
| 26 | ¿Está Ud. dispuesto a renunciar estos | | **AGT** | Are you willing to waive these rights and |
| 27 | derechos y hablar conmigo? | | | speak with me? |
| 28 | Sí. | | **RSP** | Yes. |

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | Señor, soy oficial del Departamento de | 04:12 | AGT | Sir, I am an officer from the |
| 2 | Aduanas y Protección Fronteriza, | | | Department of Customs and Border |
| 3 | autorizado por la ley para administrar | | | Protection, authorized by law to |
| 4 | juramentos y tomar testimonio con la | | | administer oaths and take testimony in |
| 5 | conexión con la je... ejecución de las | | | connection with the x... execution of the |
| 6 | leyes de Inmigración y Naturalización de | | | Immigration and Naturalization laws of |
| 7 | los Estados Unidos.  Deseo tomar su | | | the United States.  I want to take your |
| 8 | declaración jurada con respecto a su | | | sworn statement with respect to your |
| 9 | ingreso ilegal a los Estados Unidos. | | | illegal entry into the United States. |
| 10 | [PAUSE]  Okey, señor.  Vamos a [UI] | | | [PAUSE]  Okay, sir.  We're going to [UI] |
| 11 | pregunta.  ¿Está Ud. bajo la influencia de | | | question.  Are you under the influence |
| 12 | drogas en este tiemp... en este momento, | | | of drugs at this time... at this moment, |
| 13 | señor? | | | sir? |
| 14 | No. | | RSP | No. |
| 15 | ¿No? [PAUSE]  ¿Está Ud. dispuesto a | | AGT | No? [PAUSE]  Are you willing to |
| 16 | contestar mis preguntas en este... en este | | | answer my questions at this... at this |
| 17 | momento sin la presencia de un | | | time without the presence of an |
| 18 | abogado? | | | attorney? |
| 19 | Sí. | 05:11 | RSP | Yes. |
| 20 | ¿Jura Ud. que todas las declaraciones | | AGT | Do you swear that all of the statements |
| 21 | que va a... va a hacer es la verdad y nada | | | that you're going... going to make is |
| 22 | más que la verdad, que Dios le ayude? | | | [sic] the truth and nothing but the truth, |
| | | | | may God help you? |
| 23 | Sí. | | RSP | Yes. |
| 24 | ¿Cuál es su nombre verdadero y | | AGT | What is your true and correct name? |
| 25 | correcto? | | | |
| 26 | Javier García Villegas. | 05:24 | RSP | Javier Garcia Villegas. |
| 27 | ¿Ha usado Ud. algunos otros nombres? | | AGT | Have you ever used any other names? |
| 28 | Ah, no. | | RSP | Uh, no. |
| 29 | ¿De qué país es Ud. ciudadano? | | AGT | Of what country are you a citizen. |
| 30 | De Guadalajara, Jalisco, México. | | RSP | From Guadalajara, Jalisco, Mexico. |

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | [*PAUSE*] Señor, ¿tiene Ud. papeles de | 05:49 | *AGT* | [*PAUSE*] Sir, do you have papers from |
| 2 | Inmigración, documentos de Inmigración | | | Immigration, documents from |
| 3 | para dejarlo parmenecer en los Estados | | | Immigration to allow you to remain in |
| 4 | Unidos legalmente? | | | the United States legally? |
| 5 | No. | 05:56 | *RSP* | No. |
| 6 | ¿Cuál es su día de nacimiento? | | *AGT* | What is your day of birth? |
| 7 | ¿Mi fecha de nacimiento? | | *RSP* | My date of birth? |
| 8 | Fecha de nacimiento. | | *AGT* | Date of birth. |
| 9 | 3/2 del ´80. | | *RSP* | 3/2 of ´80. |
| 10 | ¿Dónde nació, señor? | 06:06 | *AGT* | Where were you born, sir? |
| 11 | En Guadalajara, Jalisco. | | *RSP* | In Guadalajara, Jalisco. |
| 12 | ¿Ha sido Ud. alguna vez ordenado | | *AGT* | Have you ever been ordered deported? |
| 13 | deportado? | | | |
| 14 | Nunca, no. | 06:13 | *RSP* | Never, no. |
| 15 | [*PAUSE*] ¿Cuándo entró Ud. a los | | *AGT* | [*PAUSE*] When did you enter the |
| 16 | Estados Unidos esta última vez? | | | United States this last time? |
| 17 | ¿Cómo, la "última vez"? | | *RSP* | What do you mean, the "last time"? |
| 18 | [*UI*] ¿Cuántas veces...? | | *AGT* | [*UI*] How many times ...? |
| 19 | ¿La primera vez que yo llegué aquí a | 06:37 | *RSP* | The first time that I arrived here in the |
| 20 | Estados Unidos? | | | United States? |
| 21 | Sí.  ¿Por dónde entró? | | *AGT* | Yes.  Where did you enter through? |
| 22 | Ah, por la línea. | | *RSP* | Uh, through the border. |
| 23 | ¿Por la línea? | | *AGT* | Through the border? |
| 24 | Por aquí, Tijuana. | | *RSP* | Through here, Tijuana. |
| 25 | ¿Por la garita? | | *AGT* | Through the Port of Entry? |
| 26 | Sí. | | *RSP* | Yes. |
| 27 | ¿Nomás cruzó...? | | *AGT* | You just crossed...? |
| 28 | Ah, yo estaba niño.  Tenía... | | *RSP* | Uh, I was a child.  I was... |
| 29 | Oh, estaba niño. | | *AGT* | Oh, you were a child. |
| 30 | Sí. | | *RSP* | Yes. |
| 31 | Okey. | | *AGT* | Okay. |

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | Hace como 20 años. | | **RSP** | About 20 years ago. |
| 2 | Okey.  Y, ¿cuándo entró Ud. a Estados | | **AGT** | Okay.  And when did you enter the |
| 3 | Unidos esta, esta vez? | | | United States this, this time? |
| 4 | ¿Cómo?  Es la primera vez que salgo yo | 07:05 | **RSP** | What do you mean?  It's the first time |
| 5 | para acá. | | | that I'm leaving for here. |
| 6 | Okey.  Y... | | **AGT** | Okay.  And. |
| 7 | Para... para México. | | **RSP** | For... for Mexico. |
| 8 | ¿Y cuando fue Ud. arrestado fue como | | **AGT** | And when you were arrested was about |
| 9 | unas 3 horas? | | | some 3 hours? |
| 10 | Pos, más o menos. | 07:15 | **RSP** | Well, more or less. |
| 11 | Más o menos.  ¿Acababa Ud. de entrar | | **AGT** | More or less.  You had just illegally |
| 12 | ilegalmente a los Estados Unidos esa | | | entered into the United States that |
| 13 | vez? | | | time? |
| 14 | Uhm. | | **RSP** | Uhm. |
| 15 | ¿Hace 3 horas atrás? | 07:22 | **AGT** | Back 3 hours ago? |
| 16 | Es la primera vez que... apenas. | | **RSP** | It's the first time that... barely. |
| 17 | Apenas. | | **AGT** | Barely. |
| 18 | Sí, [*UI*] . | | **RSP** | Yes, [*UI*] . |
| 19 | ¿Y cruzó ilegalmente? | | **AGT** | And you crossed illegally? |
| 20 | Sí. | | **RSP** | Yes. |
| 21 | ¿Cómo cruzó, señor? | | **AGT** | How did you cross, sir? |
| 22 | Ah, brincando las... [*UI*] los *fences*. | | **RSP** | Uh, hopping the... [*UI*] the *fences*. |
| 23 | Okey.  ¿Y había alambrado o algo? | | **AGT** | Okay.  And was there a wire fencing or |
| | | | | something? |
| 24 | Sí. | | **RSP** | Yes. |
| 25 | ¿Cuánto le iban a cobrar? | | **AGT** | And how much were you going to be |
| | | | | charged? |
| 26 | Ah, no.  Me iba a pasar con un amigo | 07:50 | **RSP** | Uh, no.  I was just going to cross with a |
| 27 | nomás. | | | friend. |
| 28 | Okey. | | **AGT** | Okay. |
| 29 | Con un amigo [*IA*] . | | **RSP** | With a friend [*IA*] . |

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | ¿Quién le puso la escalera, señor? | | **AGT** | Who put up the ladder, sir? |
| 2 | Ah, mi amigo.  [*OL*] [*UI*] | | **RSP** | Uh, my friend.  [*OL*] [*UI*] |
| 3 | ¿Y su amigo se regresó a México? | 07:56 | **AGT** | And your friend returned to Mexico? |
| 4 | No sé.  Ya, ya no lo miré yo. | | **RSP** | I don't know.  I... I didn't see him again. |
| 5 | Okey.  ¿Adónde iba Ud. hoy, señor? | | **AGT** | Okay.  Where were you going today, sir? |
| 6 7 | Ah, yo iba a llamar a alguien para que viniera a recogerme mi familia. | | **RSP** | Uh, I was going to call someone for my family to come and pick me up. |
| 8 | Okey.  ¿Y a qué ciudad iba? | | **AGT** | Okay.  And what city were you going to? |
| 9 | A Pomona. | 08:11 | **RSP** | To Pomona. |
| 10 | Pomona ahí está en California, ¿verdad? | | **AGT** | Pomona is here in California, right? |
| 11 | Sí, Pomona, California. | | **RSP** | Yes, Pomona, California. |
| 12 | ¿A qué iba a Pomona? | | **AGT** | Why were you going to Pomona? |
| 13 | Ah, allá vivo. | | **RSP** | Uh, I live there. |
| 14 | ¿Allá vive? | 08:20 | **AGT** | You live there? |
| 15 | Allá vivía, sí. | | **RSP** | I used to live there, yes. |
| 16 17 18 | [*PAUSE*]  ¿Hay algo más en este momento que le gustaría a Ud. agregar o decir? | | **AGT** | [*PAUSE*]  Is there anything else at this time that you would like to add or say? |
| 19 20 | Ah, nada más que saber, este, cuánto tiempo me voy a quedar. | | **RSP** | Uh, only to find out, uh, how long I'm going to stay. |
| 21 22 | En este tiempo, 24 horas.  [*UI*] que va a ser muy poco. | | **AGT** | At this time, 24 hours.  [*UI*] that it's going to be very little. |
| 23 | Sí. | 08:52 | **RSP** | Yes. |
| 24 25 26 | Sí.  Oye, señor, ¿tiene Ud. miedo de regresar a México si es sacado de los Estados Unidos? | | **AGT** | Yes.  Hey, sir, are you afraid of returning to Mexico if you´re removed from the United States? |
| 27 | No. | | **RSP** | No. |
| 28 | ¿Que lo torturen o lo... o lo persigan? | | **AGT** | That you'll be tortured or... or persecuted? |
| 29 | ¿Si tengo miedo? | 09:01 | **RSP** | Am I afraid? |

| | Transcription | Time | | Translation |
|---|---|---|---|---|
| 1 | Sí. | | *AGT* | Yes. |
| 2 | No. | | *RSP* | No. |
| 3 | [*PAUSE*] *Okay,  This concludes the* | 09:19 | *AGT* | [*PAUSE*] *Okay,  This concludes the* |
| 4 | *sworn statement.  The time now is, uh,* | | | *sworn statement.  The time now is, uh,* |
| 5 | *8:19 pm.* | | | *8:19 pm.* |
| 6 | [END OF RECORDED INTERVIEW] | 09:25 | | [END OF RECORDED INTERVIEW] |
| 7 | | | | |

**JAMES M. CHAVEZ**
California State Bar No. PENDING
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone (619) 234-8467
Facsimile (619) 687-2666
james_chavez@fd.org

Attorneys for Mr. Garcia-Villegas

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE JEFFREY T. MILLER)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 08CR1761-JTM |
| Plaintiff, | ) | |
| v. | ) | **PROOF OF SERVICE** |
| **JAVIER GARCIA-VILLEGAS**, | ) | |
| Defendant. | ) | |

     Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of his information and belief, and that a copy of the foregoing document has been served via CM/ECF this day upon:

     GEORGE MANAHAN, ASSISTANT UNITED STATES ATTORNEY
     george.manahan@usdoj.gov,barbara.townsend@usdoj.gov,Efile.dkt.gc1@usdoj.gov

Dated: August 11, 2008                  ___*s/ James M. Chavez*_____
                               JAMES M. CHAVEZ
                               Federal Defenders of San Diego, Inc.,
                               225 Broadway, Suite 900
                               San Diego, CA 92101-5030
                               (619) 234-8467  (tel)
                               (619) 687-2666  (fax)
                               e-mail: james_chavez@fd.org