KAREN P. HEWITT
United States Attorney
GEORGE V. MANAHAN
Assistant U.S. Attorney
California State Bar No. 239130
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: 619 557-7174 (Office); 619 235-4716 (Fax)
Email: george.manahan@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 08-cr-1761-JM (AJB) |
| Plaintiff - Appellee, | ) | |
| | ) | BRIEF FOR APPELLEE UNITED STATES |
| v. | ) | |
| | ) | |
| JAVIER GARCIA-VILLEGAS, | ) | |
| Defendant - Appellant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**I**

**QUESTION PRESENTED**

     1.     Whether the evidence of Appellant's alienage was sufficient?

     2.     Whether Appellant's pre-arrest field admissions were properly admitted?

     3.     Whether Appellant's post-Miranda admissions were properly admitted?

     4.     Whether Appellant's identity was sufficiently proven?

/ / /

/ / /

/ / /

/ / /

/ / /

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................... iii

I     QUESTIONS PRESENTED ....................................................... 1

II    JURISDICTION .................................................................... 2

      A.   BASIS FOR SUBJECT MATTER JURISDICTION IN THE
           MAGISTRATE COURT ..................................................... 2

      B.   BASIS FOR JURISDICTION IN THE DISTRICT COURT .......... 2

      C.   THE NOTICE OF APPEAL WAS TIMELY ............................. 2

      D.   BAIL STATUS ................................................................ 2

III   STATEMENT OF THE CASE ..................................................... 2

IV    ARGUMENT ......................................................................... 6

      A.   The Evidence of Alienage Was Sufficient ............................ 6

      B.   Appellant's Pre-Arrest Field Admissions Were Properly Admitted ... 12

           1.   Appellant Was Not in Custody When He Made His
                Field Admissions ................................................... 12

           2.   Appellant Was Not Interrogated When He Voluntarily
                Made His Field Admissions ...................................... 14

      C.   Appellant's Post-Miranda Admissions Were Properly
           Admitted .................................................................... 16

           1.   Appellant Was Properly Advised of His Miranda Rights ... 16

           2.   Border Patrol Agents Made Clear That Appellant Was
                Entitled to a Free Attorney and Advised Appellant to
                Disregard the Administrative Rights in Favor of Those
                Read to Him Under Miranda ..................................... 18

           3.   Appellant's Post-Miranda Admissions Should Not Be
                Suppressed Under Seibert ........................................ 20

      D.   Appellant's Identity Was Sufficiently Proven ...................... 22

      E.   The United States Agrees That Appellant Did Not Qualify for
           Collection of DNA Pursuant to the DNA Analysis Backlog
           Elimination Act of 2000 ................................................. 24

V     CONCLUSION ...................................................................... 24

CERTIFICATE OF SERVICE ........................................................... 25

i

TABLE OF AUTHORITIES

<u>Cases</u>                                                                                      <u>Page</u>

Berkemer v. McCarty,
    468 U.S. 420 (1984)                                                         13

California v. Prysock,
    453 U.S. 355 (1981)                                                         17

Gallegos v. City of Los Angeles,
    308 F.3d 987 (9th Cir. 2002)                                                13

In re Indian Palms Associates, Ltd.,
    61 F.3d 197 (3d Cir. 1995)                                                  10

International Industrial Park, Inc. v. United States,
    80 Fed. Cl. 522 (2008)                                                      10

Miranda v. Arizona,
    384 U.S. 436 (1966)                                                         16

Missouri v. Seibert,
    542 U.S. 600 (2004)                                                         20

Opper v. United States,
    348 U.S. 84 (1954)                                                           7

Phillips v. Attorney General of State of Cal.,
    594 F.2d 1288 (9th Cir. 1979)                                               16

United States v. Alvarez,
    899 F.2d 833 (9th Cir. 1990)                                                13

United States v. Brignoni-Ponce,
    422 U.S. 873 (9th Cir. 1975)                                                12

United States v. Buffington,
    815 F.2d 1292 (9th Cir. 1987)                                               13

United States v. Butler,
    249 F.3d 1094 (9th Cir. 2001)                                           13, 14

United States v. Cervantes-Flores,
    421 F.3d 825 (9th Cir. 2005)                                     12, 13, 14, 15

United States v. Cherer,
    513 F.3d 1150 (9th Cir. 2008)                                               20

United States v. Corona-Garcia,
    210 F.3d 973 (9th Cir. 2000)                                                 7

United States v. Darrell,
    629 F.2d 1089 (5th Cir. 1980)                                           22, 23

United States v. Davis,
    530 F.3d 1069 (9th Cir. 2008) ............................................................... 12

United States v. Dowd,
    417 F.3d 1080 (9th Cir. 2005) ............................................................... 20

United States v. Garcia-Hernandez,
    550 F. Supp. 2d 1228 (S.D. Cal. 2008) ................................................... 8

United States v. Gomez-Moreno,
    221 Fed. Appx. 524, 526 (9th Cir. 2007) ............................................. 11

United States v. Gonzalez,
    442 F.2d 698 (2d Cir. 1971) ................................................................. 10

United States v. Greene,
    783 F.2d 1364 (9th Cir. 1986) ............................................................. 13

United States v. Gupta,
    183 F.3d 615 (7th Cir. 1999) ............................................................... 15

United States v. Harrell,
    894 F.2d 120 (5th Cir. 1990) ............................................................... 11

United States v. Hernandez,
    105 F.3d 1330 (9th Cir. 1997) ............................................ 6, 7, 8, 9, 10, 11

United States v. Lares-Valdez,
    939 F.2d 688 (9th Cir. 1991) ............................................................... 17

United States v. Long Tong Kiam,
    432 F.3d 524 (3d Cir. 1996) ................................................................. 15

United States v. Lopez-Alvarez,
    970 F.2d 583 (9th Cir. 1992) ................................................................. 7,8

United States v. Mattarolo,
    209 F.3d 1153 (9th Cir. 2000) ............................................................. 12

United States v. Narvaez-Gomez,
    489 F.3d 970 (9th Cir. 2007) ...................................................... 16, 21, 22

United States v. Norris,
    428 F.3d 907 (9th Cir. 2005) ................................................................. 7

United States v. Parr,
    843 F.2d 1228 (9th Cir. 1988) ............................................................. 13

U.S. v. Ramirez,
    ---, F.3d -- 2008 WL 3271093 (9th Cir. 2008) ..................................... 20

United States v. Ramirez-Villalba,
    2007 WL 2044306 (9th Cir. 2007) ..................................................... 15

United States v. San Juan-Cruz,
    314 F.3d 384 (9th Cir. 2002) ........................................ 18, 19

United States v. Sauceda-Avalos,
    225 Fed. Appx. 646,648 (9th Cir. 2007) .................................. 15

United States v. Williams,
    435 F.3d 1148 (9th Cir. 2006) ........................................... 21

United States v. Zenon-Encarnacion,
    387 F.3d 60 (1st Cir. 2004) .............................................. 2

Warszower v. United States,
    312 U.S. 342 (1941) ................................................... 11

    Statutes

8 U.S.C. § 1325 ....................................................... 2, 7

8 U.S.C. § 1326 ....................................................... 7, 9

18 U.S.C. § 3401 ........................................................ 2

18 U.S.C. § 3402 ........................................................ 2

28 U.S.C. § 636(a)(4) ................................................... 2

Illegal Immigration Reform and Immigrant Responsibility Act,
Pub. L. 104-208, Div. C, Title I, § 102(a)-(c), 110 Stat. 3009-554 (Sept. 30, 1996) ..... 9-10

    Rules

Fed. R. Evid. 201(b) ................................................... 10

Fed. R. Evid. 401(d) ................................................... 10

Fed. R. Evid. 804(b)(3) & cmt n. subdiv.(b)(3) ............................. 9

## II

## JURISDICTION

A.    BASIS FOR SUBJECT MATTER JURISDICTION IN THE

      MAGISTRATE COURT

Appellant Javier Garcia-Villegas ("Garcia-Villegas" or "Appellant") appeals the one year of unsupervised probation imposed after he was found guilty of attempted illegal entry in violation of 8 U.S.C. § 1325 (misdemeanor) on June 11, 2008, by the Honorable Anthony J. Battaglia, in the United States Magistrate Court for the Southern District of California. (Am. J. Crim. Case 1-3 (Case Docket # 25).)  The magistrate court had jurisdiction to convict Appellant pursuant to 28 U.S.C. § 636(a)(4) and 18 U.S.C. § 3401.  See United States v. Zenon-Encarnacion, 387 F.3d 60, 64 (1st Cir. 2004) (explaining that Magistrate Judges have authority to try and sentence petty offense defendants without their consent).

B.    BASIS FOR JURISDICTION IN THE DISTRICT COURT

This Court has appellate jurisdiction over judgments of conviction from the magistrate court pursuant to 18 U.S.C. § 3402.

C.    THE NOTICE OF APPEAL WAS TIMELY

Rule 58(g)(2)(B) of the Federal Rules of Criminal Procedure requires that a notice of appeal to the district court be filed within ten days after the entry of the conviction appealed.  Appellant filed his Notice of Appeal on June 17, 2008, six days after his conviction.  Appellant's Notice of Appeal, therefore, was timely filed.

D.    BAIL STATUS

Appellant was released from the Bureau of Prisons on June 12, 2008.

## III

## STATEMENT OF THE CASE

On May 21, 2008, Border Patrol Agent Andrew Kim was performing line watch duties in Imperial Beach, California, in an area know as "Druckers," approximately 5 miles east of the San Ysidro Port of Entry and on the north side of the International Border between the United States and

Mexico. (TBT 46;[1] Def.'s Trial Ex. C, Record of Deportable/Inadmissible Alien, at 1-2 (attached to this brief as Ex. 1).)  There are two fences located near the border between the United States and Mexico at Druckers. (TBT 34-35, 47-49; Govt's Trial Exs. 1, 2 (attached to this brief as Exs. 2 and 3, respectfully).)  The southern fence is call the primary fence and the northern fence is called the secondary fence. (TBT 34-35, 47-49.)  There is concertina wire on top of the secondary fence. (TBT 35, 47-48; Govt's Trial Ex. 2.)  In the Druckers area, there is a truck lane immediately to the north of the secondary fence which is typically traveled on by 18 wheelers, sometimes causing a significant amount of traffic. (TBT 36, 42, 47.)

At approximately 5:39 p.m., Remote Video Surveillance System ("RVSS") Operator Alan Gomer advised Agent Kim of two individuals heading north from the border fence. (TBT 34-35, 46-47; Def.'s Trial Ex. C at 1-2.)  RVSS Operator Gomer observed two individuals scaling down the north side of the primary border fence in the Druckers area. (TBT 34.)  One of the individuals picked up a ladder that was lying north of the primary fence, and then both individuals ran to the secondary fence. (TBT 34-35.)  The individual carrying the ladder hooked it onto the top of the secondary fence. (TBT 35.)  Then the other individual climbed the ladder as the first individual steadied the ladder from the bottom. (TBT 35.)  When he got to the top, the individual climbing the ladder negotiated the concertina wire on the top of the secondary fence and then jumped down to the north side of the secondary fence. (TBT 35.)  He then crossed the road just north of the secondary fence and hid in some brush about 10 yards north of the secondary fence. (TBT 36.)  RVSS Operator Gomer communicated his observations to Agent Kim and continued to observe the individual who climbed the fence until he was found, questioned, and arrested by Agent Kim. (TBT 35-36.)

Following his arrival to the area, approximately one minute after receiving RVSS Operator Gomer's call, Agent Kim observed an individual returning back to Mexico by climbing the primary fence. (TBT 47, 49, 61; Def.'s Trial Ex. C at 2.)  RVSS Operator Gomer advised Agent Kim that the other individual had made it past the secondary fence. (TBT 35-36, 49.)  Using the area where he saw the other individual as a reference point, Agent Kim searched the area to the north of the

---

[1] TBT refers to the transcript of motion hearing/bench trial before the Honorable Anthony J. Battaglia on June 11, 2008, exhibit A to Appellant's Opening Brief.

secondary fence. (TBT 49-50.) Approximately 10 seconds later, agent Kim observed an individual in a white shirt in a bush just north of the truck lane that is adjacent to the secondary fence. (TBT 50, 62.)

Agent Kim immediately identified himself as a Border Patrol agent and told the individual hiding in the bush to put his hands up in the Spanish language. (TBT 50.) The individual complied with Agent Kim's command without saying anything. (TBT 50.) Agent Kim immediately put the individual in handcuffs, and walked the individual to Agent Kim's nearby vehicle (which was parked approximately 10 yards away). (TBT 50, 67.) After reaching the vehicle, Agent Kim patted the individual down. (TBT 50-51.) Agent Kim then asked the individual for his name, his mother's and father's first name, his date of birth and whether he was born in a state in Mexico. (TBT 51, 67-69, 73.) The individual responded in English that his name was Javier Garcia-Villegas and told Agent Kim his mother's and father's name. (TBT 51-52.) Mr. Garcia-Villegas also freely admitted that he was a citizen and national of Mexico illegally present in the United States and that he did not possess any immigration documents permitting him to enter or remain in the United States legally. (TBT 51-52, 70; Def.'s Trial Ex. C at 2.) Mr. Garcia-Villegas also spontaneously explained to Agent Kim that he went to Mexico to visit his mother, and that he had lived in the United States since he was a young child, but that he failed to file for immigration papers because the process took too long. (TBT 51-52.) Agent Kim noted that Mr. Garcia-Villegas had tears at the bottom of his shirt and that his hands were bloody. (TBT 52-53.) Agent Kim then placed Mr. Garcia-Villegas under arrest (at approximately 5:40 p.m.), placed Mr. Garcia-Villegas inside of his vehicle, and called for a transport unit to transport Mr. Garcia-Villegas to the Border Patrol station. (TBT 53; Def.'s Trial Ex. C at 2.)

After Mr. Garcia-Villegas was transported to the Border Patrol station, Border Patrol Agent Ramon Villarreal inputted his biographical information into a database and took his fingerprints. (TBT 79.) At that time, Agent Villarreal informed Mr. Garcia-Villegas of his administrative rights, including his right be represented by an attorney during any immigration hearing that Mr. Garcia-Villegas could request, but that the United States would not pay for that attorney. (TBT 79-80.)

Approximately 40 minutes later, at approximately 8:09 p.m., Agent Villarreal again spoke with Mr. Garcia-Villegas. (TBT 80; Govt's Trial Ex. 3, Bilingual Transcription and Translation,

4

Interview on Digital Video File, prepared by Andrew J. Hanson, Certified Interpreter by the
Administrative Office of the United States Courts (Cert. # 95-036), at 2 (exhibit B to Appellant's
Opening Br.) Agent Villarreal told Mr. Garcia-Villegas that the nature of the proceedings against him
had changed because he was now going to be tried for committing a federal crime, and therefore he
had different rights.  (TBT 82; Govt's Trial Ex. 3 at 3.)  Agent Villarreal then advised Mr. Garcia-
Villegas of his new rights, his Miranda rights, which Mr. Garcia-Villegas agreed to waive and answer
Agent Villarreal's questions without an attorney present.  Specifically, the following conversation
occurred between Agent Villarreal and Mr. Garcia-Villegas:

> Agent Villarreal:    [Y]ou were previously informed of your rights, in which you asked to
> to [sic] return to your country as soon as possible.  You should
> understand that those rights only apply in Immigration proceedings for
> removing you from the United States.  Now you should understand
> that there has been a change in which you will not be returned to your
> country at this time.  Eh, instead now you will be tried for a federal
> crime.  Do you understand what I have just explained?
>
> Defendant:    Yes. . . .
>
> Agent Villarreal:    Sir, before we ask you any question, you should understand your
> rights.  You have the right to remain silent.  Anything that you say can
> be used against you in court or in any Immigration or administrative
> proceeding.  You have the right to speak with an attorney so that he
> may counsel you before we ask you questions, and he can be present
> during the questioning.  If you do not have the means to hire an
> attorney, one will be designated before any questioning if you so
> desire.  If you decide to answer questions now, without the presence
> of an attorney, you still will have the right to quit answering questions
> whenever you want.  You also have the right to quit answering
> questions whenever you want until you can speak with an attorney.
> Do you understand your ... your rights?

5

| | | |
|---|---|---|
| 1 | Defendant: | Yes. |
| 2 | Agent Villarreal: | Are you willing to waive these rights and speak with me? |
| 3 | Defendant: | Yes. . . . |
| 4 | Agent Villarreal: | Are you willing to answer my questions at this ... at this time without |
| 5 | | the presence of an attorney? |
| 6 | Defendant: | Yes. |

(Govt's Trial Ex. 3 at 3-5.)

Next, Agent Villarreal placed Mr. Garcia-Villegas under oath.  (Govt's Trial Ex. 3 at 5.) Mr. Garcia-Villegas stated under oath that his true and correct name was Javier Garcia-Villegas, and that he was a citizen of Mexico without any documents allowing him to remain in the United States legally.  (Govt's Trial Ex. 3 at 5-6.)  Mr. Garcia-Villegas explained that he was born in Mexico but that he had entered the United States as a child approximately 20 years ago.  (Govt's Trial Ex. 3 at 6-7.)  Mr. Garcia-Villegas further explained that he left the United States for the first time recently, so the only time he again entered the United States illegally was in association with his arrest approximately 3 hours before his statement.  (Govt's Trial Ex. 3 at 7.)  Mr. Garcia-Villegas admitted that he illegally entered the United States by scaling the two fences separating the United States and Mexico with the assistance of a fence placed by a "friend," including bypassing the concertina wire atop the secondary fence.  (Govt's Trial Ex. 3 at 7-8.)  Mr. Garcia-Villegas  stated that he entered the United States with the intention of going to Pomona, California.  (Govt's Trial Ex. 3 at 8.)

**IV**

**ARGUMENT**

A.    The Evidence of Alienage Was Sufficient

Appellant contends that the Magistrate Judge erred by not granting his motion for a judgment of acquittal because there was insufficient evidence to corroborate his confession regarding his alienage.  "Because corroboration of a defendant's admission is a mixed question of law and fact that is primarily factual, [appeals are] review[ed] for clear error."  United States v. Hernandez, 105 F.3d 1330, 1332 (9th Cir. 1997).  The Magistrate Judge did not clearly err in finding that sufficient corroboration existed.

1    "When the primary evidence of citizenship offered by the Government consists of the

2    defendant's own admissions, those admissions require 'some independent corroborating evidence in

3    order to serve as the basis for a conviction.'" Id. (citing United States v. Lopez-Alvarez, 970 F.2d 583,

4    589 (9th Cir. 1992)).[2/]  The Ninth Circuit has defined the requirements of independent corroboration:

5        [A]lthough the [United States] need not introduce independent evidence of the corpus

6        delicti in conformance with the traditional test, it must introduce sufficient evidence

7        to establish that the criminal conduct at the core of the offense has occurred.  Second,

8        it must introduce independent evidence tending to establish the trustworthiness of the

9        admissions, unless the confession is, by virtue of special circumstances, inherently

10       reliable.

11   Lopez-Alvarez, 970 F.2d at 592; see also Hernandez, 105 F.3d at 1332.  "It is sufficient if the

12   corroboration supports the essential facts admitted sufficiently to justify [an] inference of their truth."

13   Opper v. United States, 348 U.S. 84, 93 (1954); see also United States v. Corona-Garcia, 210 F.3d

14   973, 978 (9th Cir. 2000).  The Magistrate Court had ample corroboration to justify an inference that

15   criminal conduct had occurred and that Appellant's confession was trustworthy.

16       "The gravamen of the offense in this case--that is to say the conduct at the core of the

17   offense--is entry [into the United States]." Corona-Garcia, 210 F.3d at 978 (discussing illegal reentry

18   in violation of 8 U.S.C. § 1326.  As Appellant concedes, there is no principled reason why the law

19   would differ regarding the instant case which involves an illegal entry into the United States in

20   violation of 8 U.S.C. § 1325.).  The Magistrate Court heard evidence that RVSS Operator Alan

21   Gomer observed two individuals heading north into the United States from the time they were

22   climbing down the primary fence.  RVSS Operator Gomer communicated this information to Agent

23   Kim while keeping constant surveillance on the individual who climbed the secondary fence,

24

25       [2] Although Appellant attempts to separate the independent corroboration rule of Hernandez
         from the *corpus delicti* rule, Hernandez itself is clear that it is simply applying the *corpus delicti*
26       rule to the situation of proving an alien's alienage through his own admission.  See Hernandez,
         105 F.3d at 1332 (citing and relying upon Lopez-Alvarez for its independent corroboration rule.
27       Lopez-Alvarez is the Ninth Circuit's seminal case regarding the *corpus delicti* rule.); see also
         United States v. Norris, 428 F.3d 907, 914-915 (9th Cir. 2005) (citing Hernandez in its
28       discussion of the *corpus delicti* rule).

1  bypassed the concertina wire, and hid in a bush on the north side of the road that is adjacent to the
2  secondary fence.  Agent Kim, who arrived on scene approximately one minute after receiving RVSS
3  Operator Gomer's call, quickly found an individual hiding in a bush across the street from the
4  secondary fence approximately in line with the other individual, who was running back into Mexico.
5  Agent Kim noted cuts on the individuals shirt and that his hands were bloody.  RVSS Operator
6  Gomer continued to observe the area, and confirmed that the individual Agent Kim encountered was
7  the same individual he observed climbing down the primary fence, over the secondary fence, and
8  hiding in a bush.  Accordingly, there is abundant evidence to justify an inference that the criminal
9  conduct at the core of the offense Appellant was convicted of, illegal entry into the United States,
10  actually occurred.

11      Similarly, the Magistrate Court had sufficient evidence tending to establish the trustworthiness
12  of Appellant's confession of his Mexican citizenship to justify an inference that the confession was
13  trustworthy.  In fact, the confession was inherently reliable, and therefore there is no need under the
14  law for independent evidence to establish its trustworthiness.  See Lopez-Alvarez, 970 F.2d at 592;
15  Hernandez, 105 F.3d at1332.  This is true because, unlike in Hernandez, where all the defendant
16  admitted was that he was "born in Mexico," see 105 F.3d at 1331-32, Appellant admitted that he was:
17  1) born in Mexico; 2) was currently a Mexican citizen; and 3) was without any documents from
18  United States immigration authorities permitting him to remain in the United States legally.  (Govt's
19  Trial Ex. 3 at 5-6.)  The internally consistent and detailed nature of Appellant's admissions add to
20  their inherent reliability.

21      Furthermore, it is undisputed that Appellant was told that he would be "tried for a federal
22  crime" and was told he had the right to remain silent as well as his other Miranda rights, prior to his
23  admission of alienage.  While the fact the defendant in Hernandez admitted his alienage after
24  receiving his Miranda warnings didn't, by itself, convince the Ninth Circuit that the confession was
25  inherently reliable, see 105 F.3d at 1331-32, other courts have concluded that an individual's
26  admission of alienage after receiving Miranda warnings is a significant factor in determining the
27  trustworthiness of the admittance.  See United States v. Garcia-Hernandez, 550 F. Supp. 2d 1228,
28  1237 (S.D. Cal. 2008) (holding that defendant's admissions in post-Miranda statement and during

8

plea colloquy that he was citizen of Mexico sufficient to prove alienage for purposes of 8 U.S.C. § 1326). Appellant's detailed admissions regarding his alienage after he was told he would be "tried for a federal crime" for his illegal entry, significantly increasing the trustworthiness of the statement. Cf. Fed. R. Evid. 804(b)(3) & cmt n. subdiv. (b)(3)(hearsay exception for statements against interest because of trustworthiness). Certainly, such a warning would counteract any thought Defendant might have had that a false admission of alienage would foster a "speedy return to Mexico, and out of the hands of United States law enforcement agents." (Appellant's Opening Br. 8.) Accordingly, the Court should conclude that Appellant's admission of alienage was given under circumstances making the admission inherently reliable.

Even if the circumstances surrounding Appellant's admission were, by themselves, insufficient to make it inherently reliable, the Magistrate Court heard other corroborating evidence justifying an inference of the truth of Appellant's admission. First, the Magistrate Court heard evidence regarding the means by which Appellant attempted to enter the United States. No Appellate Court has ever held that the means of entry of an individual into the Untied States can not, by itself, be sufficient corroborating evidence of the trustworthiness of the individual's admission of alienage. Rather, in Hernandez, the Ninth Circuit simply stated "we do not hold that the mode of a defendant's entry is sufficient corroboration of an admission that the defendant is an alien, but it provides some evidence that the post-arrest admission is reliable." 105 F.3d at 1333. Not holding that the mode of entry is sufficient corroboration is different than holding that a mode of entry can never be sufficient corroboration. At most, Hernandez simply held that defendant Hernandez's mode of entry was not sufficient corroboration of the trustworthiness of his admission of alienage, and instructs other courts that whether a mode of entry is sufficient corroboration has to be analyzed on a case-by-case basis.

There are compelling reasons for this Court to view Appellant's mode of entry into the United States very differently than did the Hernandez court. In Hernandez, the defendant simply admitted to a United States Border Patrol Agent that he had entered the United States by scaling the one border fence that in 1994 separated the United States with Mexico. See 105 F.3d at 1331; see also Illegal Immigration Reform and Immigrant Responsibility Act, Pub.L. 104-208, Div. C, Title I, § 102(a)-(c),

9

1   110 Stat. 3009-554 to 3009-555 (Sept. 30, 1996) (authorizing appropriations for the Attorney General

2   to begin construction of a second fence along the 14 miles of the international land border between

3   the United States and Mexico, starting at the Pacific Ocean and extending eastward).[3/] See generally

4   International Indus. Park, Inc. v. United States, 80 Fed. Cl. 522, 524-25 (2008).

5          Appellant, however, scaled not only the original primary fence, but also the larger, secondary

6   fence with its top portion consisting of a greater than vertical slope, or overhang, if one were to

7   attempt to climb it from the Mexican side.  (Gov't Trial Exs. 1, 2.)  Additionally, on top of the

8   secondary fence is dangerous concertina wire.  (TBT 35, 47-48, 61; Gov't Trial Exs. 1, 2.)

9   Moreover, adjacent to the secondary fence (which did not exist at the time of the Hernandez decision),

10  is a truck lane heavily trafficked by 18 wheelers.  (TBT 42, 47, 50, 64; Gov't Trial Exs. 1, 2.)  If

11  scaling one, smaller border fence "provides some evidence that [a] post-arrest admission [of alienage]

12  is reliable," see Hernandez, 105 F.3d at 1333, than scaling two border fences, the second being larger,

13  more difficult to climb because its top half has a greater then vertical slope, is affixed with concertina

14  wire on top, and is adjacent to a dangerous truck lane, must provide significantly greater evidence that

15  Appellant's admission of alienage is reliable.  Accordingly, the Magistrate Judge did not clearly err

16  when he determined there was sufficient corroborative evidence to justify an inference that

17  Appellant's confession was trustworthy.

18         Furthermore, "an earlier admission followed by an identical admission made close in time to

19  the first admission is an indication of the reliability of the later admission."  Id. at 1332-33.  Prior to

20  his post-Miranda admission of alienage, Appellant freely admitted that he was a citizen and national

21  of Mexico with no immigration documentation permitting him to enter or remain in the United States

22  legally.  (TBT 51-52, 70; Def.'s Trial Ex. C at 2.)  Hernandez made no comment regarding whether

23

24         [3] Facts "generally known within the territorial jurisdiction of the trial court" or that are

25  "capable of accurate and ready determination by resort to sources whose accuracy cannot
    reasonably be questioned" are judicially noticeable. Fed. R. Evid. 201(b).  "A court shall take

26  judicial notice if requested by a party and supplied with the necessary information."  Fed. R.
    Evid. 401(d).  Judicial notice may be taken at any stage of proceeding, including appeal.  See In

27  re Indian Palms Associates, Ltd., 61 F.3d 197, 205 (3d Cir. 1995); see also United States v.

28  Gonzalez, 442 F.2d 698, 707 (2d Cir. 1971) ("[W]here adequate information is available for the
    taking of judicial notice, an appellate court should use such information.).

the defendant's earlier admission *combined* with evidence regarding mode of entry would be sufficient to corroborate an admission of alienage.  See 105 F.3d at 1332-33 (discussing prior admission and mode of entry evidence exclusive of any other evidence).  Regardless, it is certainly true that the Magistrate Judge's conclusion that Appellant's admission of alienage was sufficiently corroborated by the evidence, including Appellant's scaling two fences and his multiple consistent statements, so as to not be clearly erroneous.

These are not the only pieces of evidence, however, the Magistrate Judge had to corroborate Appellant's admission of alienage.  There is also the fact that Defendant admitted that his mother and father were both also Mexican. (TBT 69; Def.'s Trial Ex. C at 1.)  Additionally, there was evidence that Appellant lived in the United States for most of his life.  (Govt's Trial Ex. 3 at 6-7; TBT 51-52.)  Therefore, Appellant lived in the United States for most of his life without being able to take advantage of the privileges of a citizen or a legal resident, and lived in fear that, if caught, he could be deported at any time, giving him every reason to determine if he was eligible to legally remain in the United States.  Despite these facts, according to Appellants own admission, he considered, but never actually filed any paperwork to obtain legal status in the United States.   (TBT 52.)  Accordingly, Appellant's argument that perhaps he is, unknown to even himself, actually a United States citizen is unreasonable.[4]  In any case, the evidence regarding Appellant's history of living most of his life in the United States and of his parents' Mexican citizenship provided yet more corroborating evidence permitting the Magistrate Judge to infer that Appellant's admission of

---

[4] Furthermore, the *corpus delicti* rule's requirement of corroboration is only intended to prevent an over reliance on, potentially, untrustworthy confessions that a defendant knowingly makes (perhaps because of pressure supplied by law enforcement officials), not to prevent the reliance on admissions a defendant believes to be correct but that is actually false.  This is apparent from the fact that admissions made prior to a crime being committed do not need to be corroborated.  See Warszower v. United States, 312 U.S. 342, 347 (1941) (cited with approval in United States v. Gomez-Moreno, 221 Fed. Appx. 524, 526 (9th Cir. 2007) (concluding that even if a defendant's admissions were the government's only evidence of his alienage, that is sufficient to prove alienage beyond a reasonable doubt, for purposes of a § 1326 prosecution, if the admissions were made before the crime at issue occurred); cf. United States v. Harrell, 894 F.2d 120, 127 (5th Cir. 1990) ("[T]he government need not discredit every possibility that the [defendants] were naturalized citizens of the United States.  It need only demonstrate, beyond a reasonable doubt, that [defendants] were not United States citizens . . . .  That obligation may be achieved entirely with direct or circumstantial evidence, or a combination of both.").

1    alienage was trustworthy. For all of the reasons discussed, this conclusion was not clearly erroneous.

2    Accordingly, Appellant's appeal based on the sufficiency of the evidence of alienage should be

3    denied.

4         B.    Appellant's Pre-Arrest Field Admissions Were Properly Admitted

5         Appellant contends that the Magistrate Judge erred by denying his motion to suppress his

6    admissions made to Agent Kim in the field because, Appellant argues, the admissions were made

7    during a custodial interrogation. The denial of a motion to suppress, as well as the issue of whether

8    a defendant is in custody for Miranda purposes, is reviewed de novo. See United States v.

9    Cervantes-Flores, 421 F.3d 825, 829 (9th Cir. 2005). However, the underlying factual findings are

10   reviewed for clear error. See United States v. Davis, 530 F.3d 1069, 1077 (9th Cir. 2008).

11        Although the Magistrate Judge erred in concluding that Appellant was in custody at the time

12   he made admissions to Agent Kim, he correctly determined that all of the material admissions made

13   by Appellant were unprovoked by any interrogation, and therefore were not suppressible under

14   Miranda. This Court should affirm the Magistrate Judge's decision not to suppress Appellant's field

15   admissions.

16        1.    Appellant Was Not in Custody When He Made His Field Admissions

17        Defendant argues that admissions made by him in the field to Agent Kim were made while

18   in custody and therefore should be suppressed as Miranda's requirements were not met. A Border

19   Patrol officer, however, may question individuals reasonably detained near the border about their

20   citizenship and immigration status, and he may ask them to explain suspicious circumstances, as part

21   of a Terry stop without requiring Miranda warnings. See Cervantes-Flores, 421 F.3d at 829-30 (9th

22   Cir. 2005); United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (9th Cir. 1975). He may also

23   conduct a limited protective "patdown" search of a suspect for concealed weapons during a Terry stop

24   if there is a reason to believe the suspect may have a weapon. See United States v. Mattarolo, 209

25   F.3d 1153, 1158 (9th Cir. 2000). This Court should conclude that Defendant's admissions to Agent

26   Kim were obtained as part of a Terry stop and affirm the Magistrate Judge's denial of Defendant's

27   motion to suppress.

28

1   "[N]ot all questioning by law enforcement officers triggers the [Miranda] warning

2   requirement." United States v. Butler, 249 F.3d 1094, 1098 (9th Cir. 2001). "The sine qua non of

3   Miranda is custody." Id. The safeguards prescribed by Miranda become applicable when a suspect's

4   freedom of action is curtailed to a degree associated with formal arrest. See Berkemer v. McCarty,

5   468 U.S. 420, 440 (1984). "There is 'no bright-line for determining when an investigatory stop

6   crosses the line and becomes an arrest,'" although "a distinction . . . may be drawn at the point of

7   transporting the defendant to the police station." United States v. Parr, 843 F.2d 1228, 1231 (9th Cir.

8   1988); see also Gallegos v. City of Los Angeles, 308 F.3d 987, 992 (9th Cir. 2002) (no rigid time

9   limitation on Terry stops, critical inquiry is whether officers diligently pursued a means of

10  investigation that was likely to confirm or dispel their suspicions). Courts are instructed to considered

11  the totality of the circumstances in determining whether a Terry stop has escalated to the point of the

12  defendant being under arrest. See United States v. Alvarez, 899 F.2d 833, 838 (9th Cir. 1990).

13      As the Ninth Circuit advised in Butler, the case books are full of scenarios in which a person

14  is detained by law enforcement officers, is not free to go, but is not "in custody" for Miranda

15  purposes. See 249 F.3d at 1098. For instance, detention of persons presenting themselves for

16  admission to the United States at the border by immigration officials is not custody, even though such

17  persons are not free to leave or to refuse to be searched. Id. Similarly, "[a] Terry stop-and-frisk is

18  not custody." Id. Furthermore, the use of force by an officer does not necessarily convert a Terry stop

19  into the defendant being taken into custody, and thus does not necessarily require that Miranda

20  warnings be given, if it is reasonable under the circumstances because of the risk of a physical

21  confrontation or the suspect fleeing. See Cervantes-Flores, 421 F.3d at 830 (handcuffing suspect did

22  not convert Terry stop questioning into a custodial interrogation); see also; Parr, 843 F.2d at 1231

23  (placing suspect in police car did not convert a Terry stop into defendant being in custody); United

24  States v. Buffington, 815 F.2d 1292, 1300 (9th Cir. 1987) (forcing suspects to exit car and lie down

25  on wet pavement at gunpoint did not convert Terry stop into arrest); United States v. Greene, 783 F.2d

26  1364, 1367-68 (9th Cir. 1986) (officers instructing suspects to put their hands on a car and drawing

27  their weapons did not convert Terry stop into arrest).

28

13

1   Here, the facts are nearly identical to those in <u>Cervantes-Flores</u>, where the Ninth Circuit held

2   that the questioning of the suspect occurred during a <u>Terry</u> stop, and therefore he was not in custody

3   and did not require <u>Miranda</u> warnings.   Like in <u>Cervantes-Flores</u>, Agent Kim had reasonable

4   suspicion to question Appellant regarding whether he had illegally crossed the border, he limited the

5   scope of his questions to investigating that suspicion alone, and his use of handcuffs was justified by

6   Appellant's flight risk and Agent Kim's safety concern.   <u>See</u> <u>Cervantes-Flores</u>, 421 F.3d at 830.

7   <u>Contra</u> <u>Butler</u>, 249 F.3d at 1101 (finding an alien in custody when he was locked in a holding cell and

8   had his shoes and belt confiscated).

9   Although Defendant argues that the Court should find Appellant was in custody because

10   "Agent Kim admitted that he would arrest anyone who had jumped over the border fence"

11   (Appellant's Opening Br. 11), what Agent Kim actually stated was that he would only immediately

12   arrest someone for climbing the border fence if he actually saw the individual climbing the fence.

13   (TBT 57.)  In the instant case, however, although Agent Kim did not actually witness Appellant climb

14   over the border fence, he did have articulable suspicion that Appellant did so because he was told by

15   RVSS Operator Gomer that someone had recently climbed the fences and Agent Kim found Appellant

16   in the proximity of the area where the crime occurred.  (TBT 47-50, 62.)   Agent Kim then asked

17   Appellant questions to determine if he had entered the United States illegally in order to ensure he

18   was arresting the right person.  (TBT 67-68.)  This is almost the exact situation the Ninth Circuit

19   concluded was a <u>Terry</u> stop in <u>Cervantes-Flores</u>.  <u>See</u> 421 F.3d at 829-30.  Therefore, this Court

20   should similarly conclude that Agent Kim's initial encounter with Appellant was during a <u>Terry</u> stop

21   that did not require an admonition of Appellant's <u>Miranda</u> rights.

22       2.   <u>Appellant Was Not Interrogated When He Voluntarily Made His Field</u>

23       <u>Admissions</u>

24   Appellant was not legally entitled to be told of his <u>Miranda</u> rights because Agent Kim did not

25   interrogate Appellant for purposes of <u>Miranda</u>.  Additionally, Appellant made all of his material

26   admissions without being prompted by any questioning by Agent Kim, and therefore those admissions

27   were not the result of a custodial interrogation.  For either of these reasons, this Court should

28   conclude that the Magistrate Judge did not err in refusing to suppress Appellant's field admissions.

14

When Border Patrol agents encounter suspected illegal aliens in the open prior to arrest, and shortly thereafter question the suspects as to their citizenship, such encounters are ordinarily considered <u>Terry</u> stops, not custodial questioning, and therefore do not require prior <u>Miranda</u> warnings.  See, e.g., Cervantes-Flores, 421 F.3d at 829-30; <u>United States v. Ramirez-Villalba</u>, 2007 WL 2044306, at *1 (9th Cir. 2007) (concluding that asking individuals found in the brush approximately a mile and a half north of the Mexican border and four to five miles west of the port of entry questions related to whether they were legally in the United States was not an in-custody interrogation, and therefore no Miranda warnings were necessary); <u>United States v. Sauceda-Avalos</u>, 225 Fed. Appx. 646, 648 (9th Cir. 2007) (concluding that questioning suspects as to their citizenship and immigration status constituted a lawful <u>Terry</u> stop rather than a custodial interrogation, rendering Miranda warnings unnecessary); <u>see also</u> <u>United States v. Long Tong Kiam</u>, 432 F.3d 524, 531 (3d Cir. 1996) (concluding that suspicion of criminal conduct does not overrule the simultaneous responsibility of immigration officials to ascertain an individual's legal right to enter the United States); <u>United States v. Gupta</u>, 183 F.3d 615, 617 (7th Cir. 1999) (no requirement of <u>Miranda</u> rights before immigrant is asked about his identity, nationality, business, and claim of entitlement to enter the United States).  An immigration officer "may question [individuals reasonably detained near the border] about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." <u>Cervantes-Flores</u>, 421 F.3d at 830 (upholding District Court's refusal to suppress a field admission of alienage in a § 1326 trial because questioning an individual detained near the border regarding his place of birth, his citizenship, whether he had permission to be in the United States, and how he had crossed into the United States, was reasonably limited in scope to determining whether the individual had crossed the border illegally, and therefore was permissible during a <u>Terry</u> stop without any requirement to inform the individual of his <u>Miranda</u> rights).  Here, after identifying himself as a United States Border Patrol Agent, Agent Kim asked Appellant for his name, his mother's and father's first name, his date of birth and whether he was born in a state in Mexico in order to determine whether he has entered the United States illegally.  (TBT 51, 67-69, 73.)  These questions were limited in scope to determining whether Appellant had a legal right to be found in the United

1    States, and therefore did not constitute interrogation for purposes of <u>Miranda</u>. Therefore, any of

2    Appellant's responses to these questions should not be suppressed for failure to give <u>Miranda</u>

3    warnings.

4    Furthermore, as the Magistrate Judge concluded, the material admissions made by Appellant

5    in the field were not in response to any questioning by Agent Kim. Rather, without prompting by

6    Agent Kim, Appellant explained that he lived in the United States most of his life, although he lacked

7    the legal right to do so, and he was returning from Mexico after visiting his mother. (TBT 51-52, 70,

8    105; Def.'s Trial Ex. C at 2.) A statement made by a defendant, even if he is in custody, is admissible

9    if it was volunteered upon the defendant's own initiative and was not made in response to

10   interrogation by the police. <u>See</u> <u>Phillips v. Attorney General of State of Cal.</u>, 594 F.2d 1288, (9th Cir.

11   1979). Therefore, the Magistrate Judge did not err in denying Appellant's motion to suppress his field

12   admissions which were made under Appellant's own initiative, not in response to Agent Kim's

13   questioning.

14   For all the reasons discussed, the Court should affirm the Magistrate Judge's denial of

15   Appellant's motion to suppress his field admissions.

16   C.    <u>Appellant's Post-Miranda Admissions Were Properly Admitted</u>

17   Appellant also contends that the Magistrate Judge erred by denying his motion to suppress his

18   admissions made to Agents Villarreal and Hernandez at the Border Patrol station after he was advised

19   of his <u>Miranda</u> rights. A lower court's decision to admit statements that are challenged for having

20   been obtained in violation of Miranda is reviewed de novo while the underlying factual findings are

21   reviewed for clear error. <u>See</u> <u>United States v. Narvaez-Gomez</u>, 489 F.3d 970, 973 (9th Cir. 2007).

22   1.    <u>Appellant Was Properly Advised of His Miranda Rights</u>

23   Under <u>Miranda</u>, before interrogating a suspect in custody, law enforcement officials must

24   inform them "that he has the right to remain silent, that anything he says can be used against him in

25   a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an

26   attorney one will be appointed for him prior to any questioning if he so desires." <u>Miranda v. Arizona</u>,

27

28

16

384 U.S. 436, 479 (1966).  These are the only warnings that are required to be given.[5]  See

United States v. Lares-Valdez, 939 F.2d 688, 690 (9th Cir. 1991).  Although the Supreme Court has

stressed that one virtue of Miranda is the fact that the giving of the warnings precludes the need for

a case-by-case inquiry into the actual voluntariness of the accused's admissions, this does not suggests

any desirable rigidity in the form of the required warnings.  See California v. Prysock, 453 U.S. 355,

359 (1981).  "Quite the contrary, Miranda itself indicated that no talismanic incantation [is] required

to satisfy its strictures."  Id.

Prior to being interviewed at the Border Patrol Station, Appellant was informed in Spanish,

"Si Ud. no tiene los medios para emplear a un abogado, uno se designará antes de cualquier

interrogación si Ud. desea." (Govt's Trial Ex. 3 at 4.)  The certified interpreter of the Administrative

Office of the United States Courts interpreted this statement to mean, "If you do not have the means

to hire an attorney, one will be designated before any questioning if you so desire."  Appellant argues

that the Miranda rights he was read were deficient because they did not state that if he could not

afford an attorney, one would be *appointed* to him.

The Magistrate Judge rejected this argument because he found that:

[W]hat the agent is saying is if you can't afford to hire a lawyer, you will have one

designated.  That seems to be the alternative that where you are impecunious, you're

going to get a lawyer.  That would be the plain reading of the words . . . .  I think

taking it in the context of the language of Mr. Garcia's country of origin on its face,

it would not appear that there was confusion or anything but a voluntary waiver. . . .

[Magistrate Judge watches video of Appellant being read his Miranda rights.]  Based

on what I've seen, I think it's clear he understood and knowingly and voluntarily

waived his Miranda rights.  I've already indicated my feeling and ruling as to the

designar being used.  Although I wouldn't say that's the best term, it's certainly not

---

[5] Here, Defendant was not only specifically informed of all four of the required Miranda
warnings, but the agents went above and beyond Miranda's requirements and informed
Defendant of his right to quit answering questions after he started answering and to be able to
stop answering questions at any time until he could speak with an attorney.  Cf. Lares-Valdez,
939 F.2d at 959-960 (concluding that Miranda did not require that defendant be informed of right
to stop questioning after it had begun).

17

1    a confusing term inconsistent with the Spanish language and the context of a

2    statement.

3    (TBT 24-28.)  In making this determination, the Magistrate Judge considered the definition of the

4    English word "designate" from page 612 of <u>Webster's Third New International Dictionary</u>

5    (unabridged ed. 1981), which defined the word, *inter alia*, as "appoint; esp: to assign officially by

6    executive or military authority," and also stated designate is a synonym for "appoint."  The Magistrate

7    Judge also considered the translation of the Spanish verb "designar" from page 336 of <u>Harper Collins</u>

8    <u>Spanish Unabridged Dictionary, Sixth Edition</u> (2000), which primarily uses the English word

9    "appoint" as the proper translation, and only secondarily translated the verb as "designate."  The

10   Magistrate Judge also considered the context of the sentence in which the word was used and the

11   demeanor of Appellant as he was provided with his <u>Miranda</u> rights, as viewed from the video

12   recording of that interview.[6]  Given the overwhelming evidence the Magistrate Judge considered, his

13   finding that it was communicated to Appellant, and that Appellant understood, that if he could not

14   afford an attorney one would be appointed to him was not clearly erroneous.

15            2.    <u>Border Patrol Agents Made Clear That Appellant Was Entitled to a Free</u>

16                  <u>Attorney and Advised Appellant to Disregard the Administrative Rights in</u>

17                  <u>Favor of Those Read to Him under Miranda</u>

18        Defendant argues, relying on <u>United States v. San Juan-Cruz</u>, 314 F.3d 384 (9th Cir. 2002),

19   that his admissions should be suppressed because his <u>Miranda</u> warnings, coming after he was

20   previously provided administrative warnings, did not adequately convey that he had the right to an

21   attorney at no expense.  In <u>San Juan-Cruz</u>, the Ninth Circuit determined that <u>Miranda</u> warnings read

22   to a defendant handcuffed to a chair were invalid where they were read to him soon after he was

23   advised of his administrative rights to have counsel present during questioning at his own expense,

24   because the two sets of conflicting instructions, read one after the other, were confusing, and did not

25   clearly convey to the defendant that he possessed the right to have an attorney present for free.  <u>See</u>

26   _____

27            [6] Although the Magistrate Judge did not mention its use, he also has a declaration from the
     certified Court interpreter stating: "[I]n the context of the sentence, another possible translation

28   would be, "If you do not have the means to hire an attorney, one will be appointed before any
     questioning if you so desire."  (Docket No. 12, Ex. 3.)

1 | *id.* at 387-88. The San Juan-Cruz court explained, however, that agents can easily rectify this

2 | confusion either by making clear during the Miranda admonition that the defendant is entitled to a

3 | free attorney or by advising the defendant to disregard the administrative rights in favor of those read

4 | to him under Miranda. See *id.* at 389.

5 | While the agents in San Juan-Cruz did neither of those things, see *id.*, the Border Patrol agent

6 | in this case did both of them. First, approximately forty minutes after Appellant was advised of his

7 | administrative rights, he was told by Border Patrol Agent Villarreal:

8 | > You were previously informed of your rights, in which you asked to to [sic] return to

9 | > your country as soon as possible. You should understand that those rights only apply

10 | > in Immigration proceedings for removing you from the United States. Now you

11 | > should understand that there has been a change in which you will not be returned to

12 | > your country at this time. Eh, instead now you will be tried for a federal crime.

13 | (Govt's Trial Ex. 3 at 3.) Appellant indicated that he understood that there had been a change due

14 | to the fact that he was now being charged with a federal crime. (Govt's Trial Ex. 3 at 3.)

15 | Second, the Border Patrol agent explained to Appellant that before he asked Appellant any

16 | further questions, Appellant should understand his rights as they at that point existed. Specifically,

17 | Defendant was informed of his right to "speak with an attorney so that he may counsel [Appellant]

18 | before [the Border Patrol agents] ask [Appellant] questions, and [the attorney] can be present during

19 | the questioning." (Govt's Trial Ex. 3 at 4.) The Border Patrol Agent then specifically advised

20 | Defendant that "if you do not have the means to hire an attorney, one will be designated before any

21 | questioning if you so desire."[7] (Govt's Trial Ex. 3 at 4.)

22 | Therefore, Defendant was adequately informed of his right to an appointed attorney without

23 | any confusion based on his previously being told of his administrative rights. The San Juan-Cruz

24 | court explained that an agent could easily rectify any potential confusion in either of two ways, and

25 | Agent Villarreal did both: he made it clear that Defendant was entitled to a free attorney, and he

26 | advised Defendant that the previously discussed administrative rights no longer applied because he

27 |

28 | [7] The previous section explains that what Appellant was actually told in Spanish is more appropriately translated to "one will be appointed before any questioning if you so desire."

1   was now charged with a federal crime.  Accordingly, the Court should affirm the Magistrate Judge's

2   decision not to suppress Appellant's post-<u>Miranda</u> admissions.

3        3.    <u>Appellant's Post-Miranda Admissions Should Not Be Suppressed under</u>

4              <u>Seibert</u>

5        Appellant asks this Court, for the first time, to suppress his post-Miranda admissions pursuant

6   to <u>Missouri v. Seibert</u>, 542 U.S. 600, 617 (2004), despite the fact that he never raised such an

7   objection before the Magistrate Judge.<u>8/</u>  Courts hearing appeals do not normally entertain arguments

8   raised for the first time on appeal.  <u>See</u> <u>United States v. Cherer</u>, 513 F.3d 1150, 1156 (9th Cir. 2008).

9   Where a criminal defendant does not raise a claim before the trial court, an appellate court reviews

10  the claim for plain error.  <u>United States v. Dowd</u>, 417 F.3d 1080, 1085 (9th Cir. 2005).  The Ninth

11  Circuit has recently explained review for clear error:

12        Under the plain error standard, relief is not warranted unless there has been: (1) error,

13        (2) that was plain, and (3) that affected substantial rights.  Under the third limitation

14        of the plain error standard, "the error must have been prejudicial: It must have affected

15        the outcome of the district court proceedings." . . .  If those conditions are met, [an

16        appellate court] may exercise [its] discretion to notice the error only if the prosecutor's

17        actions, "viewed in the context of the entire trial . . . seriously affected the fairness,

18        integrity, or public reputation of judicial proceedings, or where failing to reverse a

19        conviction would result in a miscarriage of justice."

20  U.S. v. Ramirez, --- F.3d ----, 2008 WL 3271093 (9th Cir. 2008) (internal citations omitted).  The

21  Magistrate Judge did not commit plain error by failing to suppress Appellant's post-<u>Miranda</u>

22  statements pursuant to <u>Seibert</u>.

23        The Ninth Circuit has also recently stated the law regarding when admissions are suppressible

24  because they were obtained through a deliberate two-step process under <u>Seibert</u>:

25

26  _____

27        <u>8</u> Counsel for the United States made a good faith effort to verify that Appellant is raising his
    <u>Seibert</u> argument for the first time at this appeal.  If this argument was made and somehow
28  escaped notice, the United States' counsel apologizes to the Court and to Appellant and his
    counsel.  Nevertheless, even if it was raised, this Court should deny Appellant's appeal.

1    A defendant's post-Miranda statements may be inadmissible if law enforcement

2    officers use a two-step interrogation process.  A two-step interrogation involves

3    eliciting an unwarned confession, administering the Miranda warnings and obtaining

4    a waiver of Miranda rights, and then eliciting a repeated confession.  If the

5    interrogators deliberately employ the two-step strategy, the district court must

6    suppress post-warning statements unless the interrogators take curative measures to

7    apprise the defendant of his rights; if the two-step method is not deliberate, the

8    post-warning statements are admissible if voluntarily made.

9    United States v. Narvaez-Gomez, 489 F.3d 970, 973-74 (9th Cir. 2007).  In determining whether an

10   interrogator deliberately withheld a Miranda warning until after a suspect confessed, a court should

11   consider whether the objective evidence and any available subjective evidence, such as the officer's

12   testimony, support an inference that the two-step interrogation procedure was used to undermine the

13   Miranda warning.  See United States v. Williams, 435 F.3d 1148, 1158 (9th Cir. 2006).  Objective

14   evidence a court should consider includes the timing, setting, and completeness of the prewarning

15   interrogation, the continuity of police personnel, and the overlapping content of the pre- and

16   post-warning statements.  See Narvaez-Gomez, 489 F.3d at 974.

17   The facts in this case are similar, although more helpful to the United States, to those in

18   Narvaez-Gomez.  Therefore, this Court should similarly conclude that  the Border Patrol agents did

19   not deliberately employ a two-step method when interrogating defendant.  In Narvaez-Gomez, a

20   Border patrol agent called by local law enforcement officers asked the defendant his name, place of

21   birth and whether he had any documents to show his legal presence in the United States.  489 F.3d

22   at 972.  The defendant stated his name and indicated that he was born in Mexico, but that he had a

23   legal permanent resident card at his house.  See id.  After a records check came back negative, the

24   Border Patrol Agent asked if the defendant wanted to be taken to his house to retrieve his immigration

25   documents.  See id.  The Defendant then admitted that he did not have any such documents.  See id.

26   The Border Patrol Agent arrested the defendant, handcuffed him and put him in the back seat

27   of her vehicle.  See id.  Then, without giving the defendant a Miranda warning, the Border Patrol

28   Agent asked whether the defendant had ever been arrested by Border Patrol and whether he had ever

21

1  been deported.  See id. at 972-73.  The defendant answered both questions in the affirmative.  See id.

2  at 973.

3          Later, another Border Patrol Agent interviewed the defendant with the first Border Patrol

4  Agent present.  The second Border Patrol Agent informed the defendant that he would be processed

5  criminally rather than administratively and that he faced potential criminal charges.  See id.  He then

6  administered a Miranda warning.  The defendant waived his rights and admitted under questioning

7  that he was a citizen of Mexico, he had been previously deported, and he had no permission to enter

8  the United States and no documentation allowing him to be in the United States.  See id.

9          The Ninth Circuit concluded that this two-step interrogation was not deliberately employed

10  to obtain a confession by circumventing Miranda's requirements.  In reaching that conclusion, the

11  court considered the informal setting and brief nature of the first Border Patrol Agent's prewarning

12  interrogation, the fact that the second Border Patrol Agent was only involved during the post-warning

13  interrogation, the lack of reference to the prewarning statements during the more comprehensive

14  post-warning interrogation, the change in setting, and the passage of time between the two

15  interrogations.  See id. at 974-75.

16          In the instant case, although there was a brief reference to Appellant's prior admissions and

17  a slightly less period of time between the field interview and the post-Miranda interview

18  (approximately two and one-half hours versus four hours), all of the other factors the Ninth Circuit

19  considered in Narvaez-Gomez are present in the instant case to a degree equal to, or more favorable

20  to, the United States.  The setting of Agent Kim's interview in an open, outdoor area near the border

21  was more informal than the back of the first Border Patrol Agent's vehicle and the interview was as

22  brief, if not shorter.  As opposed to Narvaez-Gomez, where the first Border Patrol Agent was present

23  for both interrogations, the interrogations in this case were performed by completely different agents.

24  Like in Narvaez-Gomez, the setting for the post-Miranda interview was changed to a Border Patrol

25  station.  Also, in this case there is no subjective evidence indicating that the agents deliberately

26  performed a two-step interview in order to circumvent Miranda, and no evidence that Appellant's

27  admissions were not voluntary.  Therefore, the Court should conclude that Appellant's post-Miranda

28

1  admissions were not obtained in violation of <u>Seibert</u>. Certainly, there was no clear error in not

2  suppressing Appellant's post-Miranda admissions under <u>Seibert</u>.

3        D.    <u>Appellant's Identity Was Sufficiently Proven</u>

4        Appellant argues, relying mainly on <u>United States v. Darrell</u>, 629 F.2d 1089 (5th Cir. 1980),

5  that there was insufficient evidence that Appellant was the person who committed the crime of

6  illegally entering the United States on May 21, 2008. Appellant argues that since Agent Villarreal

7  was the only witness who was asked to point out Appellant in the courtroom, there was no evidence

8  identifying Appellant as the person who scaled the fence. (Appellant's Opening Br. 19.) Yet, as the

9  <u>Darrell</u> court pointed out, "It is true, of course, that a witness need not physically point out a

10 defendant so long as the evidence is sufficient to permit the inference that the person on trial was the

11 person who committed the crime." 629 F.2d at 1091. In this case, the evidence clearly permitted that

12 inference. RVSS operator Gomer witnessed an individual scale the two border fences. Agent Kim

13 soon thereafter responded to the area. Agent Kim provided the following testimony regarding what

14 occurred shortly after his arrival:

15       When I approached Druckers area, I looked in between the fences, and I saw one

16       individual who was turning back south, and I was also notified by RVSS -- by

17       Sergeant Gomer, the RVSS operator, that one other individual had made it north of

18       the secondary. So I used where I saw the individual turn back south as a reference

19       point to look for the second subject. And as I was searching the area, I noticed just

20       north of the truck lane in a bush kind of a white shirt. As I went closer to examine it,

21       **that's when I first met the Defendant, Mr. Garcia-Villegas**.

22 (TBT 49-50 (emphasis added).)

23       Agent Kim then described his field interview of Appellant, including that the individual Agent

24 Kim arrested "told [him] his name was Javier Garcia-Villegas." (TBT 51.) Agent Kim then put

25 Appellant inside his Jeep and called for a transport unit to transport Appellant back to the station.

26 (TBT 53.) After Appellant was transported to the Border Patrol Station, Agent Villarreal performed

27 the initial processing of Appellant. (TBT 79.) Therefore, it is obvious that there was more than

28 sufficient evidence to permit the inference that the person on trial was the person who committed the

1    crime.  Accordingly, the Court should affirm the Magistrate Court's verdict since there was ample

2    evidence of Appellant's identity.

3        E.    The United States Agrees That Appellant Did Not Qualify for Collection of DNA

4              Pursuant to the DNA Analysis Backlog Elimination Act of 2000

5        Appellant's argument regarding any collection of his DNA being outside the parameters of

6    the DNA Analysis Backlog Elimination Act of 2000 appears to be correct.  The Untied States

7    Attorney's Office does not have any information regarding whether any DNA samples were taken

8    from Appellant.  It does not object, however, to the Court making any appropriate orders to the

9    probation office regarding any such samples which may have been taken.

10                                    **V**

11                              **CONCLUSION**

12       For the foregoing reasons, this Court should affirm Appellant's conviction.

13       DATED: September 2, 2008                    Respectfully submitted,

14

15                                                   Karen P. Hewitt
                                                     United States Attorney

16                                                   s/*George V. Manahan*
                                                     GEORGE V. MANAHAN
17                                                   Assistant U.S. Attorney

18

19

20

21

22

23

24

25

26

27

28

                                         24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 08-cr-1761-JM |
| Plaintiff, | ) ) | |
| v. | ) ) | **CERTIFICATE OF SERVICE** |
| | ) ) | |
| JAVIER GARCIA-VILLEGAS, | ) ) | |
| Defendant. | ) ) | |
| | ) ) | |

IT IS HEREBY CERTIFIED THAT:

I, George Manahan, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of BRIEF FOR APPELLEE UNITED STATES on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

   1.    James Michael Chavez, and
         John C Ellis, Jr
         Federal Defenders of San Diego, Inc.
         225 Broadway
         Suite 900
         San Diego, CA 92101
         Attorneys for Defendant

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 2, 2008.

s/ *George V. Manahan*
GEORGE V. MANAHAN

# Exhibit A

U.S. Department of Justice

Immigration and Naturalization Service

# Record of Deportable/Inadmissible Alien

| Family Name (CAPS) | First | Middle | | Sex M | Hair BLK | Eyes BRO | Cmplxn MED |
|---|---|---|---|---|---|---|---|
| GARCIA-Villegas, Javier | | | | | | | |

| Country of Citizenship MEXICO | Passport Number and Country of Issue | Case No: File Number A094 947 222 | Height 61 | Weight 165 | Occupation LABORER |
|---|---|---|---|---|---|

| U.S. Address IN DHS CUSTODY | | Scars and Marks See Narrative |
|---|---|---|

| Date, Place, Time, and Manner of Last Entry 05/21/2008, 1738, 5 mile(s) E of SYS, (PWA) AFOOT | Passenger Boarded at | F.B.I. Number | ☒ Single  ☐ Married ☐ Divorced ☐ Widower ☐ Separated |
|---|---|---|---|

| Number, Street, City, Province (State) and Country of Permanent Residence DOMICILIO CONOCIDO GUADALAJARA, JALISCO MEXICO | Method of Location/Apprehension PB 518.3 |
|---|---|

| Date of Birth 03/02/1980   Age: 28 | Date of Action 05/21/2008 | Location Code SDC/IMB | At/Near San Ysidro, CA | Date/Hour 05/21/2008 1740 |
|---|---|---|---|---|

| City, Province (State) and Country of Birth GUADALAJARA, JALISCO, MEXICO | AR ☒ | Form: (Type and No.) | Lifted ☐ | Not Lifted ☐ | By ANDREW KIM |
|---|---|---|---|---|---|

| NIV Issuing Post and NIV Number | Social Security Account Name | Status at Entry PWA Mexico | Status When Found TRAVEL/SEEKING |
|---|---|---|---|

| Date Visa Issued | Social Security Number | Length of Time Illegally in U.S. AT ENTRY |
|---|---|---|

| Immigration Record NEGATIVE - See Narrative | Criminal Record None known | |
|---|---|---|

| Name, Address, and Nationality of Spouse (Maiden Name, if Appropriate) | Number and Nationality of Minor Children CLAIMS NONE |
|---|---|

| Father's Name, Nationality, and Address, if Known  Nationality:  MEXICO GARCIA, Javier UNKNOWN GUADALAJARA, JALISCO  MEXICO | Mother's Present and Maiden Names, Nationality, and Address, if Known VILLEGAS, Maria SEE GUADALAJARA, JALISCO  MEXICO |
|---|---|

| Monies Due/Property in U.S. Not in Immediate Possession | Fingerprinted?  Yes ☒  No ☐ | INS Systems Checks See Narrative | Charge Code Word(s) 16A |
|---|---|---|---|

| Name and Address of (Last)(Current) U.S. Employer | Type of Employment | Salary Hr. | Employed from/to |
|---|---|---|---|

Narrative (Outline particulars under which alien was located/apprehended. Include details not shown above regarding time, place and manner of last entry, attempted entry, or any other entry, and elements which establish administrative and/or criminal violation. Indicate means and route of travel to interior.)

FIN #: ~~████████~~

SCARS, MARKS AND TATTOOS
SCAR HAND, LEFT

MOTHER'S NATIONALITY
MEXICO

FUNDS IN POSSESSION
300.00      Mexican Peso X ↓ G

INS SYSTEMS CHECKS
Central Index System Negative
Deportable Alien Control System Negative
Integrated Automated Fingerprint Identification System Negative
National Crime Information Center Negative
Treasury Enforcement Communications System Negative

Narrative Title: Record of Deportable/Excludable Alien
Narrative Created by KIM

On May 21, 2008, at approximately 5:39 P.M., I, Border Patrol Agent Andrew Kim was
performing line watch duties in the Imperial Beach, California area of operations, near



*AK*

ANDREW KIM
BORDER PATROL AGENT

| Alien has been advised of communication privileges (AK) 5/21/08 (Date/Initials) | (Signature and Title of INS Official) |
|---|---|

| Distribution: TO FILE TO SECTOR TO STATION | Received: (Subject and Documents) (Report of Interview) |
|---|---|
| | Officer: ANDREW KIM |
| | on: May 21,   2008   at   1843   (time) |
| | Disposition:  Warrant of Arrest/Notice to Appear |
| P1 #0805-0855 | Examining Officer:  STEVEN B. HOUSTON |

Form I-213(Rev.4/1/97)Y

U.S. Department of Justice
Immigration and Naturalization Service

Continuation ... e for Form **I-213**

| Alien's Name | File Number Case No: ▓▓▓▓▓▓ | Date |
|---|---|---|
| GARCIA-Villegas, Javier | A094 947 222 | 05/21/2008 |

an area known as "Druckers." This area is approximately five miles east of the San Ysidro, California Port of Entry and approximately 30 yards north of the United States/Mexico International Boundary Fence. "Druckers" is an area notoriously used for smuggling of illegal aliens into the United States and is considered a particularly volatile area because of numerous recent assaults on Border Patrol Agents that have occurred in this location. "Druckers" is also an area of concern because of the truck lanes just north of the secondary fence. Individuals who cross into the truck lanes not only put themselves in danger by traversing fast moving traffic, but also the safety of unsuspecting truck drivers who have to avoid pedestrian traffic.

Operators of the Remote Video Surveillance System (RVSS) advised me via Agency radio of two individuals heading north from the International Boundary Fence with Mexico towards the "Druckers" area. As I approached the area, I witnessed one of the two individuals return back to Mexico. Thereafter, RVSS notified me that the other individual had crossed the concertina wire and into the truck lanes just north of the secondary fence. I responded to the reported location and searched the area. With the RVSS operator giving me guidance, I found an individual later identified as GARCIA-Villegas, Javier, attempting to conceal himself in a nearby bush alongside the truck lane. I identified myself as a United States Border Patrol Agent and questioned GARCIA as to his country of citizenship and nationality. GARCIA freely admitted that he is a citizen and national of Mexico illegally present in the United States and possessed no immigration documentation permitting him to enter or remain in the United States legally. At approximately 5:40 P.M., I arrested GARCIA and subsequently had him transported to the Imperial Beach Border Patrol Station for processing.

At the station, GARCIA's photo and fingerprints were submitted into the Department of Homeland Security Immigration and Criminal databases. Records checks revealed that GARCIA has an immigration history and a criminal history under these following numbers:

A# 094 947 222 (New Issue)
FBI# ▓▓▓▓▓▓▓▓▓▓▓▓▓
FINS# ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

On May 21, 2008, at approximately 8:09 P.M., GARCIA was told that his administrative rights no longer applied, and that he was being charged with 8 USC 1325 Entry without Inspection.

On May 21, 2008, at approximately 8:11 P.M., Border Patrol Agent Ramon Villarreal advised GARCIA of his Consular Communication Rights in the Spanish language as witnessed by Border Patrol Agent Alfonso Hernandez. GARCIA stated that he understood his rights and did not want to speak with the Mexican Consulate at this time.

At approximately 8:12 P.M., Border Patrol Agent Ramon Villarreal advised GARCIA of his Miranda Rights in the Spanish language, as witnessed by Border Patrol Agent Alfonso Hernandez. GARCIA said that he understood these rights and was willing to answer questions without the presence of an attorney.

| Signature | Title |
|---|---|
| ANDREW KIM | BORDER PATROL AGENT |

Form I-831 Continuation Page (Rev. 6/12/92)

7

| Alien's Name | File Number | | Date |
|---|---|---|---|
| GARCIA-Villegas, Javier | Case No: ▓▓▓▓▓▓▓<br>A094 947 222 | | 05/21/2008 |

GARCIA stated under oath that he illegally jumped the United States / Mexico
International Boundary fence today by crossing through the concertina wire. When again
asked if he had any immigration documents in his possession that would allow him to
legally enter into or be in the United States, he said, "No." GARCIA was born in
Guadalajara, Jalisco, Mexico on March 2, 1980. He planned to go Pomona, California where
he currently resides. Furthermore, GARCIA stated that he had no fear of torture or
persecution if he were to return to Mexico.

The advisal of the subject's Miranda Rights, his Consular Communication Rights, and the
answers to his sworn statement were digitally recorded.

GARCIA was issued DHS forms I-826, I-862, I-200, I-286, and a list of free legal
services.

GARCIA is in DHS custody pending criminal prosecution under 8 USC 1325.

I, Andrew Kim, have placed my initials next to the picture on the Department of Homeland
Security (DHS) Form I-213. I have read the above narrative and find it to be a true and
accurate account of the events leading to the arrest of GARCIA-Villegas, Javier. My
initials indicate that this photograph depicts the individual that I encountered and
apprehended on May 21, 2008.

| Signature | Title |
|---|---|
| ANDREW KIM | BORDER PATROL AGENT |

Form I-831 Continuation Page (Rev. 6/12/92)

8

# Exhibit B



# Exhibit C



GOVERNMENT
EXHIBIT
#2
80/11/90